LUCY E. MORRIS, WA Bar # 16510
Deputy Enforcement Director For Litigation
R. GABRIEL D. O'MALLEY, MA Bar # 651432
(E-mail: gabriel.o'malley@cfpb.gov)
(Phone: 202-435-9747)
SHIRLEY CHIU, IL Bar # 6296079
(E-mail: shirley.chiu@cfpb.gov)
(Phone: 202-435-7592)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

KENT KAWAKAMI, CA Bar # 149803 – Local Counsel
(Phone: 213-894-4858)
(E-mail: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Consumer Financial Protection Bureau,

Plaintiff,

v.

Morgan Drexen, Inc.,
and
Walter Ledda, individually, and as owner, officer, or manager of Morgan Drexen, Inc.,

Defendants.

Case No. SACV13-01267 JLS (JEMx)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES**

**DECEMBER 20, 2013**
**2:30 P.M.**
**COURTROOM 10A (SANTA ANA)**
**HON. JOSEPHINE L. STATON**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………..…………………….....1

ARGUMENT……………………………………………………………………...2

I. THE CFPB'S STRUCTURE IS CONSTITUTIONAL…………………………..2

A. Overview of the Bureau's Structure and Powers……………………………3

B. The Dodd-Frank Act Preserves Each Branch Of Government's Ability To Perform Its Constitutional Functions, Consistent With Well-Established Separation-Of-Powers Requirements……………………………………..4

1. The Bureau's combination of features does not impede the President's ability to perform his constitutional functions………………………..4

2. The Bureau's combination of features does not impair Congress's powers…………………………………………………………......7

3. The Dodd-Frank Act does not intrude on the power of the courts…...9

C. Defendants' Request For New Constitutional Restrictions For The Bureau Has No Basis In Separation-Of-Powers Principles………………………...10

1. Defendants' demand for additional "political accountability" has no constitutional basis…………………………………………………..10

2. The Bureau's power to regulate "abusive" acts and practices does not give rise to new constitutional requirements for "additional" structural protections……………………………………………………………...11

3. The Constitution does not impose a multimember commission requirement…………………………………………………………12

a. "Tradition" does not support creating a new constitutional requirement for a multimember commission…………………12

b. Defendants' arguments about the benefits of multimember commissions have no basis in constitutional principles……...14

II. THE BUREAU HAS SUFFICIENTLY STATED ITS CLAIMS FOR RELIEF...16

A. The Bureau Has Sufficiently Stated Its Claims That Defendants Made Misrepresentations About Up-Front Fees While Soliciting And Accepting Them……………………………………………………………………..16

B. Defendants Are Not Exempt From The Bureau's UDAAP AND TSR Authority…...20

CONCLUSION…..24

# TABLE OF AUTHORITIES

**Cases**

*ABA v. FTC*, 636 F.3d 641 (D.C. Cir. 2011) .......... 23

*ABA v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009) .......... 23

*Aguayo v. U.S. Bank*, 653 F.3d 912 (9th Cir. 2011) .......... 17

*AINS, Inc. v. United States*, 56 Fed. Cl. 522 (Fed. Cl. 2003) .......... 7, 8

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d 405 (3d Cir. 2004) .......... 7

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) .......... 13

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) .......... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 17

*Ass'n of Am. R.R. v. U.S. Dept. of Transp.*, 721 F.3d 666 (D.C. Cir. 2013) .......... 14

*Bauer v. Marmara*, -- F. Supp. 2d --, 2013 WL 1684051 (D.D.C. 2013) .......... 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 17, 19

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) .......... 16

*California Pharmacy Management, LLC v. Zenith Ins. Co.*, 669 F.Supp.2d 1152 (C.D. Cal 2009) .......... 16, 17, 19, 20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .......... 9

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) .......... 7

*Cox v. Aurora Electronics, Inc.*, 1993 WL 652792 (C.D. Cal. 1993) .......... 21

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .......... 13

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .......... 13

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) .......... 4, 12

*FTC v. Cyberspace.com*, No. C00-1806L, 2002 WL 32060289 (W.D. Wash. Jul. 10 2002) .......... 19

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) .......... 19

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998) .......... 19

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) .......... 17
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .......... 23
*Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986) .......... 16
*Heintz v. Jenkins*, 514 U.S. 291 (1995) .......... 23
*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .......... 4, 5, 6, 7
*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009) .......... 10
*Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d Cir. 1999) .......... 10
*Loving v. United States*, 517 U.S. 748 (1996) .......... 4
*Mistretta v. United States*, 488 U.S. 361 (1989) .......... 14
*Morrison v. Olson*, 487 U.S. 654 (1988) .......... 5
*Myers v. United States*, 272 U.S. 52 (1926) .......... 5
*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) .......... 12
*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) .......... 10
*Salleh v. Christopher*, 85 F.3d 689 (D.C. Cir. 1996) .......... 9
*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) .......... 9
*Solid Host, NL v. Namecheap, Inc.*, 652 F.Supp.2d 1092 (C.D. Cal. 2009) .......... 21
*State of Tennessee v. Lexington Law Firms*, 1997 WL 367409 (M.D.Tenn. 1997) .......... 23
*The Pocket Veto Case*, 279 U.S. 655 (1929) .......... 13
*Touby v. United States*, 500 U.S. 160 (1991) .......... 12
*U.S. v. Flynn*, 2010 WL 1459476 (D.S.D. 2010) .......... 23
*Yakus v. United States*, 321 U.S. 414 (1944) .......... 12
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .......... 13
*Yumul v. Smart Balance, Inc.*, 733 F. Supp.2d 1117 (C.D. Cal. 2010) .......... 21

**Statutes**

12 U.S.C. § 1462a(i) .......... 8
12 U.S.C. § 16 .......... 8
12 U.S.C. § 1755 .......... 8
12 U.S.C. § 1817(b) .......... 8

12 U.S.C. § 243 ........ 8
12 U.S.C. § 4512(b)(2) ........ 13
12 U.S.C. § 4516 ........ 8
12 U.S.C. § 5481(6) ........ 3
12 U.S.C. § 5491(a) ........ 3
12 U.S.C. § 5491(b), (c) ........ 3
12 U.S.C. § 5491(c)(3) ........ 4
12 U.S.C. § 5497(a) ........ 7
12 U.S.C. § 5497(a)(1) ........ 4
12 U.S.C. § 5497(a)(2) ........ 4
12 U.S.C. § 5497(a)(2)(C) ........ 8
12 U.S.C. § 5512(b)(1) ........ 3
12 U.S.C. § 5512(b)(4)(B) ........ 9
12 U.S.C. § 5517(e)(1) ........ 21
12 U.S.C. § 5531(a) ........ 3
12 U.S.C. § 5531(d) ........ 11
12 U.S.C. § 5536(a)(1) ........ 3
12 U.S.C. §§ 5514, 5515 ........ 3
12 U.S.C. §§ 5517(e)(2)(A)-(B) ........ 21
12 U.S.C. §§ 5517(e)(3) ........ 22
12 U.S.C. §§ 5561-5565 ........ 3
15 U.S.C. § 41 ........ 5
15 U.S.C. § 7219 ........ 8
42 U.S.C. § 902(a)(1), (3) ........ 13
5 U.S.C. § 1211 ........ 13
Dodd-Frank Act 12 § 1100C ........ 23
Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (2010) ........ 1

**Regulations**

16 C.F.R. part 310 .......... 1

75 Fed. Reg. 48, 458, 467-68 (Aug. 10, 2010) .......... 23

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* Sec. 1357, at 598 (1969) .......... 16

S. Rep. No. 111-176, at 2 (2010) .......... 3

Semi-Annual Report of the Consumer Financial Protection Bureau, April 1, 2013–September 30, 2013 96 (Nov. 2013), available at http://files.consumerfinance.gov/f/201311_cfpb_semi-annual-report.pdf. .......... 4

U.S. Const. art. I, § 9, cl. 7 .......... 8

U.S. Senate Comm. on Appropriations, *Committee History*, http://www.appropriations.senate.gov/about-history.cfm; U.S. House of Representatives Comm. on Appropriations, *About the Committee*, http://appropriations.house.gov/about/ .......... 8

## PRELIMINARY STATEMENT

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), respectfully submits this Opposition to Defendants' Motion to Dismiss and their supporting Memorandum of Points and Authorities ("Mem.").

This case arises out of the Bureau's investigation of Morgan Drexen, Inc. ("Morgan Drexen"), and its President and CEO, Walter Ledda, for violations of the Telemarketing Sales Rule, 16 C.F.R. part 310 ("TSR"), and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). Through its investigation, the Bureau has found that Defendants have violated – and continue to violate – the TSR and the Dodd-Frank Act by (1) requesting and receiving fees from consumers before settling the terms of at least one of the consumers' debts; (2) representing that consumers will not be charged up-front fees for Morgan Drexen's debt settlement services, when, in fact, they are; and (3) representing that consumers who enroll in Morgan Drexen's program will be debt free in months, when, in fact, in numerous instances, consumers do not become debt free in months.

Defendants argue for dismissal on two grounds, neither of which is supportable. First, they claim that the Bureau's structure violates the United States Constitution because the Bureau's "combination" of features violates the separation of powers. Defendants fail to show, however, that any of the Bureau's features – alone or in combination – violates the basic separation-of-powers principle that one branch of government may not intrude on the prerogatives of another. Absent such a basic showing, Defendants rely on vague notions of tradition, "political accountability," "broad power," historical practice, and their own policy preference for a multimember commission to ask the Court to create new constitutional requirements here. But Defendants' arguments find no support in separation-of-powers principles, and their personal views on how the Bureau should be constructed do not provide a basis for this Court to declare the Bureau's structure unconstitutional.

In the alternative, Defendants argue that the Bureau has failed to state claims for which it is entitled to relief. Defendants present two arguments to support this challenge. First, Defendants claim that Counts I and III of the Bureau's Complaint should be dismissed because the Complaint does not "plausibly show a violation of the TSR." Mem. at 22. As set forth in detail below, this position ignores (1) case law concerning F.R.C.P. 12(b)(6), which makes clear that the Court must accept as true all allegations in the complaint and that motions to dismiss are disfavored in the Ninth Circuit; and (2) numerous allegations in the Bureau's Complaint that support its contention that Defendants charge illegal up-front fees for a service that rarely provides the promised benefits.

Defendants also argue that certain of the Bureau's claims should be dismissed on the ground that Morgan Drexen is engaged in the practice of law, and thus exempt from coverage under the Dodd-Frank Act. This argument calls for the Court to disregard the Bureau's allegations that little to no legal work is performed for consumers, even though the Court is required to accept the allegations as true at this stage of the litigation, and instead make factual determinations about the character and scope of Morgan Drexen's work. Such a request is completely inappropriate at the 12(b)(6) stage and should be rejected. For all of these reasons, the Bureau requests that the Court deny Defendants' Motion to Dismiss.

## ARGUMENT

### I. The CFPB's Structure Is Constitutional

This Court should reject Defendants' effort to evade responsibility for its actions through a meritless attack on the Bureau's constitutionality. Defendants' constitutional claim rests on a hodgepodge of various Bureau "features" – for-cause removal protection for the Bureau Director, funding outside of the annual appropriations process, single-Director leadership, a "broad" delegation of power, and a statutory provision relating to deference on judicial review (Mem. at 6, 18-19) – that well-established precedent confirms pose no constitutional problem.

Defendants' appear to concede that none of these features "in isolation" violates the Constitution, but rather contend that the "accumulated impact" of these features offends the separation of powers. Mem. at 6. But Defendants' never connect the dots. They assert that "[j]ust because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute." Mem. at 6-7. Defendants fail to show, however, that the combination of structural features at issue here does, in fact, violate the Constitution. Nor could they, for nothing about the Bureau's features – singly or in combination – impairs any branch of government in performing its constitutional responsibilities. And although Defendants urge the Court to find new constitutional requirements that the Bureau's structure violates, those arguments have no basis in separation-of-powers principles.

**A. Overview of the Bureau's Structure and Powers**

In 2010, Congress created the Bureau as part of a "direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176, at 2 (2010). The Dodd-Frank Act created the Bureau as the principal federal agency charged with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). That body of law includes 18 pre-existing consumer-protection statutes, as well as Title X of the Dodd-Frank Act, which among other things bars providers of consumer financial products and services from engaging in any "unfair, deceptive, or abusive act or practice" in violation of the Act. *Id*. §§ 5531(a), 5536(a)(1); see also *id*. § 5481(6) (defining "covered person"). To carry out its responsibilities under these laws, the Bureau may promulgate rules, bring enforcement actions, and supervise certain types of financial institutions. 12 U.S.C. § 5512(b)(1) (rulewriting authority); *id*. §§ 5561-5565 (enforcement authority); *id*. §§ 5514, 5515 (supervision authority).

Congress provided that the Bureau would be led by a Director, who is appointed for a five-year term by the President with the advice and consent of the Senate. 12 U.S.C. § 5491(b), (c). The President may remove the Director for "inefficiency, neglect

of duty, or malfeasance in office." *Id*. § 5491(c)(3). Congress funded the Bureau's operations by authorizing it to receive an allocation from the Federal Reserve System's earnings. *Id*. § 5497(a)(1). By statute, that allocation is limited to 12 percent of the total 2009 operating expenses of the Federal Reserve System – or $597.6 million in the current fiscal year – subject to an annual adjustment for inflation. *Id*. § 5497(a)(2); Semi-Annual Report of the Consumer Financial Protection Bureau, April 1, 2013–September 30, 2013 96 (Nov. 2013), available at http://files.consumerfinance.gov/f/201311_cfpb_semi-annual-report.pdf.

### B. The Dodd-Frank Act Preserves Each Branch Of Government's Ability To Perform Its Constitutional Functions, Consistent With Well-Established Separation-Of-Powers Requirements

As the Supreme Court has explained, separation of powers' "basic principle" is that "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). A branch may not "arrogate power to itself" or "impair another in the performance of its constitutional duties." *Id.* The Bureau's structure complies with these basic principles: The President, Congress, and the courts all remain able to perform their constitutional duties vis-à-vis the Bureau.

#### 1. *The Bureau's combination of features does not impede the President's ability to perform his constitutional functions*

Defendants contend that, by authorizing the President to remove the Bureau Director only for cause, the Dodd-Frank Act impermissibly impedes "the President's ability to ensure that the laws are faithfully executed." Mem. at 8. Well-established precedent forecloses this contention.

The Supreme Court has long recognized, and recently reaffirmed, that Congress may create independent agencies run by officers "whom the President may not remove at will but only for good cause." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3143 (2010) (citing *Humphrey's Executor v. United States*, 295 U.S. 602

(1935)). In *Humphrey's Executor*, the Supreme Court upheld a provision preventing the President from removing Federal Trade Commission commissioners except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 620 (quoting 15 U.S.C. § 41). Later, in *Morrison v. Olson*, the Court explained that such for-cause removal protection was permissible because it is "not essential to the President's proper execution of his Article II powers that [independent] agencies be headed up by individuals who were removable at will." *Morrison v. Olson*, 487 U.S. 654, 691 (1988). So long as the official "may be terminated for 'good cause,'" the President "retains ample authority to assure that the [official] is competently performing his or her statutory responsibilities in a manner that comports" with the statute, *id.* at 692, and "to ensure that the laws are 'faithfully executed,'" *id.* at 696.

Defendants ignore these precedents and instead contend that *Myers v. United States*, 272 U.S. 52 (1926), establishes that removal restrictions are invalid "[i]n the absence of a multimember commission or some other justifying feature." Mem. at 8. But *Myers* establishes no such general rule. On the contrary, the Supreme Court has emphasized that "the only issue actually decided in *Myers*" was that the particular removal restriction for a postmaster was unconstitutional – and has "expressly disapproved" that case to the extent that it is "'out of harmony'" with *Humphrey's Executor*. *Morrison*, 487 U.S. at 687 n.24 (quoting *Humphrey's Executor*, 295 U.S. at 626). And *Humphrey's Executor* demonstrates that the Bureau Director's for-cause removal protection is constitutional. In *Humphrey's Executor*, the Court concluded that for-cause removal protections for FTC commissioners were permissible given the functions that the commissioners performed. *Humphrey's Executor*, 295 U.S. at 628; *see also Morrison*, 487 U.S. at 691. The Bureau Director exercises the same kinds of functions as the FTC commissioners: He "carr[ies] into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed," including by "making investigations and reports" and adjudicating enforcement actions.

*See Humphrey's Executor*, 295 U.S. at 628. The Court's approval of for-cause removal restrictions in *Humphrey's Executor* therefore applies with full force here.

Defendants offer no basis to conclude otherwise. Although Defendants object to the "combination" of the for-cause removal restriction with other Bureau features, they never explain how that combination impedes the President's powers. For example, Defendants do not explain how the Bureau's funding mechanism or the deference it receives on judicial review could impede the President's ability to faithfully execute the laws or any other power.[1] Nor do they explain how the Bureau's supposedly "broad" power to regulate "abusive" acts and practices (*see* Mem. at 19-20) could infringe on presidential powers. Indeed, *Humphrey's Executor* forecloses such an argument, for the commissioners protected by for-cause removal there exercised at-least-as-broad authority to regulate "unfair methods of competition." *Humphrey's Executor*, 295 U.S. at 627.

Defendants likewise cannot contend that for-cause removal becomes unconstitutional when combined with single-Director leadership. Defendants fail to articulate how the Bureau's single-Director leadership has any effect on the President's ability to perform his constitutional duties. Nor could they. Given that the President can just as easily remove a single agency head for "inefficiency, neglect of duty, or malfeasance" as he could members of a commission, there is no reason a commission structure would better protect the President's ability to perform his constitutional functions. Moreover, Defendants' suggestion that *Humphrey's Executor*'s approved for-cause removal only for multimember commissions (*see* Mem. at 8, 16) finds no support in that case's reasoning. That case does not even mention the FTC's multimember

---

[1] Defendants suggest in passing that the Bureau's funding "implicates the President's authority" because if the Bureau were funded by annual appropriations bills, the President would have the opportunity to veto those bills. Mem. at 9. But Defendants do not explain how missing the opportunity to veto new laws impedes the President's ability to faithfully execute existing laws.

leadership structure in analyzing the constitutionality of the removal restriction, and instead focuses on the nature of the commissioners' responsibilities. *See Humphrey's Executor*, 295 U.S. at 626-32.

Defendants simply cannot show that any Bureau feature or combination of features impedes the President's powers.

**2. *The Bureau's combination of features does not impair Congress's powers***

Defendants also err in contending (Mem. at 9-10) that Congress impermissibly relinquished its "power of the purse" by funding the Bureau outside of the annual appropriations process. In establishing the Bureau's funding mechanism, Congress did not relinquish its appropriations power; it exercised it. It was Congress that authorized the Bureau to obtain from the Federal Reserve Board the funds "reasonably necessary to carry out" its mission, up to annual limits. 12 U.S.C. § 5497(a). When the Bureau requests those funds, it acts in accordance with the process, and subject to the limits, set by Congress. To the extent that Congress wishes to change the Bureau's funding, it retains full power to do so pursuant to the ordinary legislative process.

Defendants' argument that this funding mechanism impermissibly "exempts CFPB from the congressional appropriations power" thus fundamentally misapprehends that power. It is well established that Congress may exercise its appropriations power as it sees fit—and need not limit itself to providing funding through annual appropriations bills. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress may . . . decide not to finance a federal entity with appropriations," but rather through some other funding mechanism); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003) ("It has long been held that the Appropriations Clause is not a restriction on Congress."); *cf. Cincinnati Soap Co. v. United States*, 301 U.S. 308, 313 (1937) (approving a statute directing particular revenues to be used for a particular purpose, without annual appropriations). In particular, Congress may create "self-financing programs" by authorizing an agency to

obtain and use funds from a specified source "without first appropriating the funds as it does in typical appropriation and supplemental appropriation acts." *AINS, Inc.*, 56 Fed. Cl. at 539.[2]

By the same token, Congress did not abdicate its power of the purse by providing that the funds that the Bureau obtains from the Federal Reserve "shall not be subject to review by" the House and Senate Appropriations Committees, 12 U.S.C. § 5497(a)(2)(C). The Constitution does not assign the power of the purse to congressional appropriations committees (which in any event are creatures of Congress, not the Constitution[3]), but to Congress as a whole. U.S. Const. art. I, § 9, cl. 7. Congress retains that power, as it may alter the Bureau's funding at any time.

Defendants apparently concede that the Bureau's funding, standing alone, poses no constitutional problem and instead contends that its funding mechanism cannot be combined with the Bureau's other features. *See* Mem. at 10. But that contention cannot withstand scrutiny, for the other features about which Defendants complain – single-Director leadership, for-cause removal protection, scope of authority, and deference on judicial review – have no impact on Congress's ability to exercise its power of the purse or any other power.

---

[2] Indeed, Congress has chosen to fund most financial regulators in this way. *See* 12 U.S.C. § 16 (Office of the Comptroller of the Currency); *id.* § 243 (Federal Reserve Board); *id.* § 1755 (National Credit Union Administration); *id.* § 1817(b) (Federal Deposit Insurance Corporation); *id.* § 4516 (Federal Housing Finance Agency); 12 U.S.C. § 1462a(i) (2010) (Office of Thrift Supervision); 15 U.S.C. § 7219 (Public Company Accounting Oversight Board). Thus, Defendants' contention that "no other agency head" can determine how to spend funds "outside of the appropriations process" (Mem. at 10) is incorrect.

[3] U.S. Senate Comm. on Appropriations, *Committee History*, http://www.appropriations.senate.gov/about-history.cfm; U.S. House of Representatives Comm. on Appropriations, *About the Committee*, http://appropriations.house.gov/about/.

**3. *The Dodd-Frank Act does not intrude on the power of the courts***

Finally, contrary to Defendants' contention (Mem. at 18-19), the Dodd-Frank Act does not intrude on the power of the courts. Defendants object to a Dodd-Frank Act provision directing courts to apply deference to Bureau interpretations of federal consumer financial law "as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer" that law, 12 U.S.C. § 5512(b)(4)(B). According to Defendants, this impermissibly overrides courts' ordinary practice of declining to apply *Chevron* deference to a single agency's interpretation of a statute that multiple agencies share responsibility for administering. Mem. at 19.

This objection turns *Chevron* on its head. *Chevron*'s premise is that Congress – not the courts – controls who has authority to interpret ambiguities in a statute. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). Courts thus apply *Chevron* deference to an agency's interpretations when it appears that Congress intended to delegate interpretative authority to that agency. *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996) (explaining that courts apply *Chevron* "because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." (citing *Chevron,* , 467 U.S. at 843-44). When courts decline to apply *Chevron* with respect to statutes that multiple agencies administer, they do not do so because deference is somehow constitutionally inappropriate, but because they have presumed that Congress did not intend to grant interpretive authority to any one agency. *See Salleh v. Christopher*, 85 F.3d 689, 692 (D.C. Cir. 1996) ("In such cases, it cannot be said that Congress implicitly delegated to one agency authority to reconcile ambiguities or to fill gaps, because more than one agency will independently interpret the statute."). Here, Congress simply replaced that

general presumption with an express statement that it intended to vest interpretive authority over federal consumer financial law in the Bureau.

Defendants' contention that, in so doing, Congress impermissibly prescribed a "rule of decision" to the courts is baseless. The prohibition on prescribing "rules of decision" does not bar Congress from "amend[ing] applicable law" as it did here, but merely bars Congress from compelling particular "findings or results under old law." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139 (9th Cir. 2009) (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) and *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178, 187 (3d Cir. 1999)). The Dodd-Frank Act does not violate this prohibition or otherwise impede the judiciary's powers.

**C. Defendants' Request For New Constitutional Restrictions For The Bureau Has No Basis In Separation-Of-Powers Principles**

In objecting to the combination of features that Congress gave the Bureau, Defendants never confront the basic fact that the Bureau's features do not impede the President, Congress, or the courts in the exercise of their respective functions. Instead, Defendants urge this Court to impose new constitutional restrictions here. In particular, Defendants ask this Court to find that the Constitution demands additional "political accountability" for the Bureau; that the Bureau's power to regulate "abusive" acts and practices gives rise to new constitutional requirements for "additional" structural protections; and that the Constitution mandates that the Bureau be run by a multimember commission. Mem. at 7-18, 19-20. But Defendants never explain what constitutional provision or principle gives rise to these new constitutional requirements. Nor could they, for Defendants arguments find no support in separation-of-powers principles.

***1. Defendants' demand for additional "political accountability" has no constitutional basis***

Defendants complain that the Bureau has "insufficient political accountability." Mem. at 7. But, as explained above, the Bureau remains fully accountable to the President and Congress, who retain their constitutional powers to oversee the Bureau.

Defendants contend that the Constitution requires something more to ensure "responsiveness to the electorate" (Mem. at 7), but they cite no constitutional provision, principle, or precedent to support that contention.

Indeed, Defendants' own arguments belie their claim that the Constitution requires additional political accountability. In particular, Defendants concede that the supposed limits on the President's and Congress's powers "might be constitutionally permissible if CFPB was headed by a multimember commission." Mem. at 10. But Defendants do not, and could not, explain how a commission structure would promote political accountability. In fact, they contend the opposite: They tout multimember commissions for "dilute[ing] the effect of transitory political events on agency policy." Mem. at 15. In short, Defendants fail to refute the basic fact that the Bureau is accountable to the President and Congress; nor does it justify its request for additional "political accountability" requirements.

***2. The Bureau's power to regulate "abusive" acts and practices does not give rise to new constitutional requirements for "additional" structural protections***

Defendants make the novel argument that the Bureau's authority to regulate "abusive" acts and practices in the consumer financial marketplace – *an authority not even implicated in this case* – somehow triggers a constitutional requirement for "additional [structural] protections." Mem. at 19-20. In particular, Defendants contend that there are "questions regarding whether Congress established an 'intelligible principle' to guide agency decisions" in this area, and that these "questions" give rise to new structural constitutional requirements. *Id.* This contention fails on two fronts.

First, there is no "question" that the Dodd-Frank Act establishes an intelligible principle to guide the Bureau's power over "abusive" acts and practices. The Act contains a multi-pronged provision setting forth what that term means: An act or practice cannot be considered "abusive" unless it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or it "takes unreasonable advantage of" one of three statutorily enumerated

circumstances. 12 U.S.C. § 5531(d). The Supreme Court has found adequate "intelligible principles" in far-less-detailed provisions in the past, including instructions for agencies to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 426–27 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943); to take action to "avoid an imminent hazard to the public safety," *Touby v. United States*, 500 U.S. 160, 165-66 (1991); and to modify corporate structures so that they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or inequitably distribute voting power among security holders," *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946).

Second, even if the "abusive" provision did lack an intelligible principle, only that provision – not the entire agency – would be unconstitutional. *See Free Enter. Fund*, 130 S. Ct. at 3161 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder in tact." (internal quotations omitted)). There is simply no support for the proposition that having a "question[able]" intelligible principle can give rise to new structural constitutional requirements.

***3. The Constitution does not impose a multimember commission requirement.***

Finally, Defendants contend that "the Constitution mandates a multimember commission" for the Bureau. Mem. at 15. In advocating for this new constitutional requirement, Defendants invoke the supposed "tradition" of structuring independent agencies as multimember bodies and makes various claims about the policy benefits of multimember commissions. Mem. at 7, 10-18. None of these arguments has any basis in constitutional principles.

a. *"Tradition" does not support creating a new constitutional requirement for a multimember commission*

Defendants maintain that the "tradition" of structuring independent agencies to be led by multimember commissions demonstrates that such a structure is constitutionally

required. Mem. at 12. But, as an initial matter, there is no such unbroken tradition. The Federal Housing Finance Agency, Social Security Administration, and Office of Special Counsel are all headed by single leaders with for-cause removal protections similar to the Bureau's. *See* 12 U.S.C. 4512(b)(2) (Federal Housing Finance Agency); 42 U.S.C. § 902(a)(1), (3) (Social Security Administration); 5 U.S.C. § 1211 (Office of Special Counsel).

In any event, Defendants are wrong to contend that any tradition of multimember structures must be given "great weight" in assessing the constitutionality of the Bureau's structure. Mem. at 11. The cases that Defendants cite in support of that contention (Mem. at 11) offer them no help. Rather, those cases give "great weight" to the existence of a longstanding practice – particularly one in which the branches of government have acquiesced – in upholding the practice as constitutional. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (upholding practice "[g]iven the fact that [it] goes back over 200 years and has received congressional acquiescence throughout its history"); *Eldred v. Ashcroft*, 537 U.S. 186, 200 (2003) (upholding statute that followed history of an "unbroken congressional practice" of enacting similar statutes); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (approving President's actions in part because "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952))); *The Pocket Veto Case*, 279 U.S. 655, 688-89 (1929) (giving "great weight" to "the practical construction that has been given to [a constitutional provision] by the Presidents through a long course of years, in which Congress has acquiesced"); *Bauer v. Marmara*, -- F. Supp. 2d --, 2013 WL 1684051, at *3 (D.D.C. 2013) ("[T]he rich history of informer statutes is well nigh conclusive as to their constitutionality." (quotations omitted)). These cases do not hold that Congress's practice of doing something one way

deserves "great weight" whenever a party raises a constitutional challenge to Congress's decision to *depart* from that practice.[4] Thus, Congress's past decisions to structure many (though not all) independent agencies as multimember commissions say nothing about the constitutionality of independent agencies headed by a single leader.

*b. Defendants' arguments about the benefits of multimember commissions have no basis in constitutional principles*

Finally, Defendants throw out various arguments about the benefits of a commission structure to see what sticks. Nothing does. None of Defendants' arguments finds any support in separation-of-powers principles.

Defendants first complain that the Bureau's leadership structure concentrates "too much unchecked power . . . in the hands of a single person." Mem. at 14. According to Defendants, Congress has unconstitutionally accumulated "all powers legislative, executive and judicia[l] in the same hands," which is "the very definition of tyranny." *Id.* But the legislative, executive, and judicial powers are dispersed among the three branches, not concentrated in the hands of the Bureau Director. The President, Congress, and the courts all exercise checks on the Bureau – and the Bureau Director – through the constitutional powers that remain at their disposal.

In a related vein, Defendants contend that the Constitution requires a multimember structure to supply "internal checks and balances" as a substitute for other checks –

---

[4] Defendants are likewise wrong to suggest that the supposed lack of "historical precedent" for the Bureau's structure carries weight in the constitutional analysis because "novelty . . . signal[s] unconstitutionality." Mem. at 6 (quoting *Ass'n of Am. R.R.*, 721 F.3d at 673 (alterations in Mem.)). For starters, Defendants misquote the cited case, which states only that "novelty, in certain circumstances, may signal unconstitutionality." *Ass'n of Am. R.R.*, 721 F.3d at 673. Moreover, the Supreme Court has made clear that "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation." *Mistretta v. United States*, 488 U.S. 361 (1989). To prevail, Defendants must show that the Bureau's structure – whether novel or not – actually violates separation-of-powers principles. They utterly fail to make that showing.

"presidential removal and congressional appropriations" – that the Bureau supposedly lacks. Mem. at 15. As explained above, however, the checks that the President and Congress exercise over the Bureau are constitutionally adequate, so no internal check would be necessary even under Defendants' theory. More fundamentally, Defendants' argument flies in the face of separation-of-powers principles. If missing presidential or congressional checks on an agency left a branch of government unable to perform its constitutional duties—for example, if the President altogether lacked authority to remove the agency head—that would violate the Constitution. The "internal check" of a commission structure could not restore that branch's impaired authority, and thus could not cure the violation. In short, no separation-of-powers principle demands the "internal checks" of a multimember commission.

Defendants next contend that the absence of a commission structure "undermin[es] judicial review" because "there will be insufficient recordation of competing considerations" offered by commissioners with "minority viewpoints." Mem. at 15. That argument is baseless. Federal courts are fully capable of reviewing—and routinely do review—actions by agencies with single heads just as they review the actions of multimember commissions.

Defendants also contend that commissions are more democratically accountable because, by statute, commission meetings are open to the public. Mem. at 16. But this supposed benefit stems from the statutory open-meetings requirement, not from the commission structure itself.

Finally, Defendants laud multimember commissions for "enabling "'expert decisions as distinguished from raw political . . . decisions." Mem. at 16. But even if Defendants' views on the best structure for arriving at optimal agency decisions were correct, they would be beside the point. Defendants do not even attempt to tie these views to any constitutional principle.

In short, all of Defendants' arguments are untethered from separation-of-powers principles and simply tout the perceived policy benefits of multimember commissions.

But the policy benefits (and drawbacks) of a commission structure are quintessentially questions for Congress to consider. Here, Congress decided that the Bureau should be headed by a single Director. Nothing in the Constitution compelled Congress to make a different choice.

## II. The Bureau Has Sufficiently Stated Its Claims For Relief

### A. The Bureau Has Sufficiently Stated Its Claims That Defendants Made Misrepresentations About Up-Front Fees While Soliciting And Accepting Them

The Bureau has alleged, among other things, that Defendants violate the TSR by (1) requesting or receiving fees from consumers for debt relief services before renegotiating, settling, reducing, or otherwise altering the terms of at least one of their debts (Compl. ¶ 75; Count I); and (2) representing that consumers will not be charged an advance fee for Defendants' debt relief services, when, in fact, they are (Compl. ¶¶ 81-82; Count III). Defendants seek the dismissal of Counts I and III on the ground that the Debt Relief Contract consumers sign does not, on its face, require the payment of up-front fees. Mem. at 22. This argument ignores the 12(b)(6) standard and fundamentally misrepresents the claims at issue. The Bureau is not a private litigant seeking to enforce a contract. Rather, it is a federal enforcement agency that has brought suit against Defendants because, among other actions, Morgan Drexen deceives consumers about up-front fees it charges when they sign up for debt relief services. The contractual language to which Defendants cite does not cure Morgan Drexen's deceptive representations or alter the fact that consumers do, in fact, pay up-front fees when they sign up for debt relief services. As such, the Court should reject Defendants' argument.

In the Ninth Circuit, "Rule 12(b)(6) motions are viewed with disfavor." *California Pharmacy Management, LLC v. Zenith Ins. Co.*, 669 F.Supp.2d 1152, 1158 (C.D. Cal 2009) (citing *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003)); *see also Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted")

(quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* Sec. 1357, at 598 (1969))). When ruling on a 12(b)(6) motion, a Court must "accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff." *California Pharmacy Management, LLC*, 669 F.Supp.2d, at 1158 (citing *Broam*, 320 F.3d. at 1028). To survive a 12(b)(6) challenge, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). The issue on a motion to dismiss "is not whether the [claimant] will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims" asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quotation omitted).

Here, the Bureau has alleged more than "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In its Complaint, the Bureau alleges that, after the Federal Trade Commission ("FTC") amended the TSR to prohibit debt relief companies engaged in telemarketing from requesting or receiving advance fees before renegotiating, settling, reducing, or otherwise altering the terms of at least one of a consumer's debts, Morgan Drexen changed its business model to disguise the fact that it was charging, and would continue to charge, such prohibited up-front fees to consumers. In particular, the Bureau alleges that Morgan Drexen began presenting consumers with two contracts to sign when they responded to Morgan Drexen's advertisements for debt relief services – one concerning debt relief and the other concerning purported bankruptcy services to be provided by an attorney, with Morgan Drexen's support. Compl. ¶¶ 12-13. As Defendants acknowledge in their memorandum, the Bureau alleges

that this "Dual Contract Model is designed to disguise consumers' up-front payments for debt relief services provided by Morgan Drexen as payments for bankruptcy-related work purportedly performed by Network Attorneys." Compl. ¶ 14.Over the course of twenty pages, the Complaint provides further detail about Morgan Drexen's alleged deceptive representations and use of a sham bankruptcy contract to hide the fact that it charges consumers up-front fees for debt settlement services. For example, the Complaint includes allegations that:

- Morgan Drexen advertises that consumers will not pay up-front fees for debt settlement services (e.g. "$0 up-front fees"; "Best part – no up-front fees"). Compl. ¶ 19.

- When consumers respond to this advertising and call to inquire about the advertised debt settlement services, Morgan Drexen makes a series of contradictory statements about the fees consumers must pay under the advertised debt relief program. Compl. ¶ 31.

- As the final step in the intake call, Morgan Drexen asks consumers to sign two contracts, each of which is at least four pages long, single-spaced, contains many legal terms, and is written in small font. Compl. ¶¶ 34, 35.

- Consumers do not have any contact with an attorney prior to signing these contracts. Compl. ¶ 36.

- When consumers sign the contracts, Morgan Drexen obtains their bank information and immediately deducts $100 from their bank account. Compl. ¶ 40.

- Before any debt relief work is performed by Morgan Drexen, consumers are charged an engagement fee of between $1,000 and $1,500. They are also charged a $450 fee that purportedly covers the cost of filing a bankruptcy petition, even though little to no bankruptcy work is performed for consumers. Compl. ¶¶ 48, 60.

- Morgan Drexen – not attorneys who purportedly perform bankruptcy work – receives the vast majority of all of the fees described above. Compl. ¶ 53.

- If consumers seek to terminate their relationship with Morgan Drexen, and obtain a refund of the money they have paid, they are typically unable to do so, or they obtain only a partial refund. Compl. ¶ 54.

Defendants may dispute these allegations, and will have an opportunity to do so through the course of litigation. At the 12(b)(6) stage, however, when the Bureau's Complaint must be construed "in the light most favorable" to the Bureau, and the Bureau's allegations must be accepted as true, *California Pharmacy Management, LLC*, 669 F.Supp.2d at 1158, it is beyond reasonable argument that that the Bureau has alleged facts sufficient to make Counts I and III "plausible on [their] face." *Twombly*, 550 U.S. at 570.

Further, Defendants' suggestion that the Bureau's TSR claims must be dismissed "because the Debt Relief Contract does not require the payment of up-front fees," Mem. at 22, has no basis in law. Courts have consistently refused to allow the terms of contracts between private parties to limit or interfere with public enforcement actions. For example, in *FTC v. Minuteman Press*, the court noted that although written disclaimers would have barred evidence of inconsistent oral representations in a private lawsuit, the FTC could use that evidence in an enforcement action. 53 F. Supp. 2d 248, 262-263 (E.D.N.Y. 1998); *see also, e.g., FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D.Cal. 1999) (court rejected claim that disclaimer cured misleading statements because (i) "the disclaimer is not included in the representations" but rather "found on the contract that consumers eventually sign with the defendant," and (ii) "a disclaimer does not automatically exonerate deceptive activities."); *FTC v. Cyberspace.com*, No. C00-1806L, 2002 WL 32060289, at *2-4 (W.D. Wash. Jul. 10 2002) (cannot escape liability through "fine print disclosures" after creating a false impression), *aff'd* 453 F.3d 1196 (9th Cir. 2006). Here, the Bureau has alleged that Morgan Drexen falsely represents to consumers that they will not be charged an up-front fee for Morgan Drexen's debt relief services. The Debt Relief Contract to which Defendants cite does not cure the deceptive nature of these representations. *FTC v. Gill*, 71 F. Supp. 2d at 1044. Accordingly, the

Bureau requests that the Court deny Defendants' Motion to Dismiss Counts I and III of the Complaint.

### B. Defendants Are Not Exempt From The Bureau's UDAAP And TSR Authority

Defendants contend that Counts I and III-VI of the Bureau's Complaint should be dismissed because the Bureau "does not have the ability to regulate Morgan Drexen – anattorney supported professional – under the CFPA."[5] Mem. at 23. The Court should reject this argument.

As noted above in Section II.A., at the 12(b)(6) stage, a Court must accept as true all factual allegations in the complaint. *California Pharmacy Management, LLC,* 669 F.Supp.2d at 1158. Here, the Bureau has alleged that little, if any, legal work is performed by attorneys on behalf of consumers and that Defendants' Dual Contract Model is a ruse "designed to disguise consumers' up-front payments for debt relief services provided by Morgan Drexen as payments for bankruptcy-related work purportedly performed by Network Attorneys."[6] Compl. ¶¶ 14, 43, 49, and 60. If taken as true and construed in the light most favorable to the Bureau, as they must be at this stage, the Bureau's allegations foreclose Defendants' argument that they are exempt from suit because they are aiding attorneys in the practice of law.

Defendants ask the Court to ignore these allegations and instead find that Section 1027(e)(1) of the Dodd-Frank Act precludes suit against them. Subject to certain limitations discussed below, Section 1027(e)(1) provides: "the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is

---

[5] Defendants also claim that these counts "must be dismissed for the same reasons that the up-front fee claims must be dismissed. . ." but do not elaborate on this position or provide any basis for the Court to dismiss the counts. Mem. at 23.

[6] The Complaint also sets forth in great detail how Morgan Drexen, not attorneys, performs debt settlement work. Compl. ¶ 42.

licensed to practice law." 12 U.S.C. § 5517(e)(1). The Court should not even consider Defendants' argument that this provision prevents the Bureau from pursuing claims against them as it is predicated on a request that the Court make a factual determination – without any record before it – that Morgan Drexen acts as a paralegal for attorneys who provide and charge for legitimate legal services. Mem. at 24. Such a question of fact is not appropriate for decision on a motion to dismiss. *Yumul v. Smart Balance, Inc.*, 733 F. Supp.2d 1117, 1125 (C.D. Cal. 2010) (quotation omitted); *Solid Host, NL v. Namecheap, Inc.*, 652 F.Supp.2d 1092, 1117 (C.D. Cal.2009); *Cox v. Aurora Electronics, Inc.*, 1993 WL 652792 at *5 (C.D. Cal. 1993).

Moreover, Defendants' argument ignores Section 1027(e)(2) of the Dodd-Frank Act, which specifically provides that the Bureau *may* exercise authority with respect to activities of attorneys if (1) the consumer financial product or service is "not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship;" or (2) the consumer financial product or service is "otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service." 12 U.S.C. §§ 5517(e)(2)(A)-(B). As noted above, the Bureau has alleged that little to no legal work is performed for consumers – i.e. the services provided by Defendants are not part of, or incidental to, the practice of law occurring exclusively within the scope of the attorney-client relationship. Thus, when read in its entirety, the limited exemption for attorneys in Section 1027(e) does not preclude the Bureau from enforcing the TSR and the Dodd-Frank Act against Defendants.

To support their request for a factual determination by the Court and their argument that they are exempt under Section 1027(e)(1), Defendants cite to *Moore v. Struthers*, Case No. 11CV7027(2012), a Colorado case in which a state court determined that Morgan Drexen's activities were exempt from the state's Debt-Management Services Act pursuant to a statutory exemption for the practice of law. The case highlights the

extreme nature of Defendants' request that the Court ignore the Bureau's allegations and instead make a factual ruling at this stage of litigation. The Colorado court rendered its decision at the summary judgment stage, based on affidavits submitted by Morgan Drexen, including one from an attorney who claimed that Morgan Drexen provided paralegal services. The court noted that the state "presented no evidence refuting or contradicting" the attorney's affidavit. Mem. at Ex. 4, page 18. A recent Wisconsin court decision makes clear that the record upon which the Colorado court based its decision was inadequate and that Morgan Drexen rarely, if ever, acts as support for attorneys as they provide legal counsel to consumers. In *In re Morgan Drexen, Inc.*, No. 10-S-127 (Wis. Dep't of Fin. Inst. Div. of Banking filed Apr. 25, 2013), an administrative law judge reviewed an "extensive record" of evidence that included "a litany of documentary evidence and twelve deposition transcripts," and rejected Morgan Drexen's contention that it merely acts as an agent of attorneys and thus is excluded from enforcement oversight.[7]

To the extent Defendants argue that Bureau's TSR claims, set forth in Counts I-IV, should be dismissed, the Court should reject this argument, too. As Defendants briefly acknowledge, Mem. at 23, attorney conduct is not exempted from the TSR. Section 1027(e)(3) of the Dodd-Frank Act specifically states that Section 1027(e)(1), upon which Defendants base their dismissal argument, "shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated laws or the authorities transferred under subtitle F or H." 12 U.S.C. §§ 5517(e)(3). Subtitle H of the Dodd-Frank Act transferred

---

[7] *See In re Morgan Drexen, Inc.*, No. 10-S-127, at 3, attached hereto as Exhibit 1. In ruling, the judge found that "[d]ebtors enrolled in the Morgan Drexen debt settlement program typically do not speak with the attorney that is purportedly representing them, do not know how to contact the attorney, receive no legal counsel of any kind, and often do not understand that they are supposed to be represented by an attorney." Ex. 1, at 12.

authority to the Bureau to enforce the TSR with respect to conduct like that alleged here. Dodd-Frank Act 12 § 1100C (amending Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6100 *et seq.*). The TSR does not contain an exemption for attorneys who act as "sellers" or "telemarketers" under the TSR, or for the conduct of any party or entity assisting any such attorney. *See* 75 Fed. Reg. 48, 458, 467-68 (Aug. 10, 2010).

Near the end of their Memorandum, Defendants invoke the Tenth Amendment to challenge the applicability of the Dodd-Frank Act to their conduct. They cite to *ABA v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009), a decision that has since been vacated, *ABA v. FTC*, 636 F.3d 641 (D.C. Cir. 2011), and imply that any regulation of attorney activities under the Dodd-Frank Act violates the Constitution. Mem. at 25. This argument, too, is without merit. The Supreme Court has recognized that a law does not offend the Tenth Amendment where Congress passed it pursuant to one of its enumerated powers. See *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the states. Congress may legislate in areas traditionally regulated by the States."). Courts have also held that, where the language of a statute enacted pursuant to the Commerce Clause demonstrates Congress' intent to regulate attorney activity, the statute does not violate the Tenth Amendment. *U.S. v. Flynn*, 2010 WL 1459476 at *4 (D.S.D. 2010) (court acknowledged that the relevant statute was passed pursuant to Congress' Commerce Clause authority and concluded that the statute's incidental regulation of attorney conduct was permissible); *State of Tennessee v. Lexington Law Firms*, 1997 WL 367409 at *7 (M.D.Tenn.1997) ("Congress may constitutionally regulate attorney conduct, provided that such regulation falls within its enumerated authority under the Commerce Clause"); *see also Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) (holding that Fair Debt Collection Practices Act "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation").

Congress enacted the Dodd-Frank Act pursuant to its authority under the Commerce Clause, and, unlike the statutory provision at issue in *ABA v. FTC*, the language of Section 1027(e) of the Act makes clear that Congress intended to regulate activities of attorneys under the circumstances described in Sections 1027(e)(2)(A)-(B) and 1027(e)(3). Accordingly, the Bureau requests that the Court deny Defendants' Motion to Dismiss Counts I and III-VI of the Complaint.

## **CONCLUSION**

For all the foregoing reasons, the Bureau respectfully requests that the Court deny Defendants' Motion to Dismiss.

Respectfully submitted,

LUCY E. MORRIS
Deputy Enforcement Director For Litigation

/s/ R. Gabriel D. O'Malley
R. Gabriel D. O'Malley
(E-mail: gabriel.o'malley@cfpb.gov)
(Phone: 202-435-9747)
Shirley Chiu
(E-mail: Shirley.chiu@cfpb.gov)
(Phone: 202-435-7592)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Dated: November 27, 2013