UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

vs.

MORGAN DREXEN, INC., ET AL.,

Defendants.

CASE NO. SACV 13-1267-JLS (JEMx)

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

Before the Court is a Motion to Dismiss ("Motion") filed by Defendants Morgan Drexen, Inc. ("Morgan Drexen") and Walter Ledda. (Doc. 22.) Plaintiff Consumer Financial Protection Bureau ("CFPB") filed an Opposition, and Defendants replied. (Opp'n, Doc. 25; Reply, Doc. 27.) Having considered the papers and supporting documentation submitted by the parties, heard oral argument, and taken the matter under submission, the Court DENIES Defendants' Motion.

## I.  BACKGROUND

### A.  The CFPB

In 2010, Congress passed and the President signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). Pub. L. No. 111-203, July 21, 2010. The Dodd-Frank Act created the CFPB as an independent agency in the Federal Reserve System, and tasked the agency with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). Those laws include 18 pre-existing consumer-protection statutes and Title X of the Dodd-Frank Act. *Id.* § 5481(14), (12). Title X prohibits a "covered person" or "service provider" from engaging in any "unfair, deceptive, or abusive act or practice." *Id.* §§ 5531(a), 5536(a)(1).

The CFPB is led by a Director, who is appointed to a five-year term by the President with the advice and consent of the Senate. *Id.* § 5491(a)-(b). The President may remove the Director only "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(3). The CFPB receives its funding from the earnings of the Federal Reserve System. *Id.* § 5497(a)(1). Each year, the CFPB receives the amount the Director determines to be reasonably necessary to carry out the responsibilities of the CFPB. *Id.* § 5497(a)(1). The allocation is capped at a percentage of the total operating expenses of the Federal Reserve in 2009—12% for 2013 and thereafter, adjusted for inflation. *Id.* § 5497(a)(2).

The CFPB is empowered to promulgate rules to implement the federal consumer financial laws, and to enforce those laws through investigation, adjudication, and the commencement of civil litigation. *Id.* §§ 5512, 5531(b), 5561-5565. Pursuant to its enforcement powers, the CFPB commenced the present action against Defendants on August 20, 2013. (Compl., Doc. 1.)

**B. The Complaint**

Defendant Morgan Drexen is a Nevada corporation offering debt relief services. (*Id.* ¶ 5.)[1] Defendant Walter Ledda is the President and CEO of Morgan Drexen. (Compl. ¶ 6.) Morgan Drexen employs the "Attorney Model" of debt relief services. (*Id.* ¶ 8.) Under this model, a consumer contracts with an attorney affiliated with Morgan Drexen for debt relief services, but Morgan Drexen, not the attorney, actually performs the debt relief work and receives the majority of the fees. (*Id.*)

Morgan Drexen advertises debt relief services through television commercials, radio advertisements, and the internet. (*Id.* ¶ 15.) In its commercials, Morgan Drexen claims it can help consumers eliminate their debt through debt relief programs supported by attorneys. (*Id.* ¶ 17.) Morgan Drexen's commercials also claim that the advertised services require no up-front fees, and are a way for consumers to avoid bankruptcy. (*Id.* ¶¶ 19-20.)

When a consumer calls Morgan Drexen, the consumer often hears a recorded testimonial that emphasizes the benefits of avoiding bankruptcy. (*Id.* ¶ 27.) One testimonial recites, "I thought I was going to have to claim bankruptcy, but I really didn't want to do that, so I decided to take a chance on the program I saw advertised. . . . I'm debt free now." (*Id.* ¶ 27.) After Morgan Drexen obtains information about a consumer's income and debt, the consumer is transferred to a "Legal Intake Specialist." (*Id.* ¶ 29.)

---

[1] When ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5 (2010).

The Legal Intake Specialist follows a script when speaking with the consumer. (*Id.* ¶ 29.) The script states that Morgan Drexen will work with an attorney to allow the consumer "to pay back the debt at a reduced amount, without the scar of filing for bankruptcy." (*Id.*)

As the final step of an intake call, a Morgan Drexen employee asks the consumer to access a web portal and electronically sign two contracts, an Attorney/Client Agreement – Debt Resolution Representation ("Debt Relief Contract") and an Attorney/Client Bankruptcy Fee Agreement ("Bankruptcy Contract"). (*Id.* ¶ 34.) Most consumers contact Morgan Drexen to inquire about debt relief services, not bankruptcy related services. (*Id.* ¶ 55.) Nevertheless, the vast majority of customers seeking debt relief services sign both the Debt Relief Contract and the Bankruptcy Contract. (*Id.* ¶ 37.)

These contracts are four or five pages long, contain many legal terms, and are written in small, single spaced font. (*Id.* ¶ 35.) The Debt Relief Contract does not require the payment of up-front fees, but the Bankruptcy Contract requires an engagement fee of between $1,000 and $1,500, a $450 bankruptcy filing fee, and a flat monthly servicing fee of $50. (*Id.* ¶¶ 41, 48.) The Debt Relief Contract commits an attorney affiliated with Morgan Drexen to represent the consumer in attempting to settle the consumer's debt. However, Morgan Drexen, not an attorney, "performs virtually all of the debt resolution work." (*Id.* ¶ 42.) When Morgan Drexen reaches a settlement with a creditor, it emails an attorney, who must choose one of four options, "cancel," "accept," "accept without comments," or "deny." (*Id.* ¶ 45.) If the attorney does not respond within 24 hours, the proposal is automatically deemed approved. (*Id.* ¶ 45.)

The Bankruptcy Contract limits an attorney affiliated with Morgan Drexen to counseling the consumer with respect to preparation for possibly filing a bankruptcy petition, and with respect to pre- and post-filing claims by creditors. (*Id.* ¶ 50.) Morgan Drexen and affiliated attorneys rarely perform any bankruptcy-related work for consumers. (*Id.* ¶ 60.)

Based on these and other allegations, the Complaint asserts six counts, four for violations of both the Telemarketing Sales Rule ("TSR"), 16. C.F.R. § 310, and the

Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a)(1) (counts 1-4), and two solely for violations of the CFPA (counts 5-6). (Compl. at 15-19.)

## II. DISCUSSION

### A. Whether the CFPB is Constitutional

Defendants argue that the Complaint must be dismissed because the CFPB is unconstitutional. (Defs' Mem. at 3-4, Doc. 22-1.) Specifically, Defendants argue that five structural features of the CFPB, in combination, render the agency unconstitutional under the separation of powers principles of Articles I, II, and III:

(1) The President may remove the Director of the CFPB only for cause (12 U.S.C. § 5491(c)(3));

(2) The CFPB is led by a Director, not a multi-member commission (*id.* § 5491(b)(1));

(3) The CFPB is funded from the earnings of the Federal Reserve System, and not by regular congressional appropriations (*id.* § 5497(a)(1));

(4) The CFPB may take action to prevent "unfair, deceptive, or abusive act[s] or practice[s] under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service" (*id.* § 5531(a)); and

(5) The CFPB's interpretations of federal consumer financial laws are afforded deference as if the CFPB were the only agency authorized to interpret those laws (*id.* § 5512(b)(4)(B)). (*See* Defs' Mem. at 6-21.)

"Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3146 (2010) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983)). The Court addresses the structure of the CFPB in relation to each of these categories of constitutionally defined powers.

**1. Executive Power**

Article II provides that "executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, § 3. "[T]he Constitution provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust,'" and also "empower[s] the President to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 130 S. Ct. at 3146 (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)). This authority is not unlimited, however, and "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." *Free Enter. Fund*, 130 S. Ct. at 3146-47.

Defendants assert that the Dodd-Frank Act impermissibly restricts the President's executive power by providing for removal of the Director of the CFPB only for cause. (Defs' Mem. at 8.) Defendants rely principally on *Myers v. United States*, 272 U.S. 52 (1926). (Defs' Mem. at 8.) In *Myers*, the Supreme Court invalidated a statutory provision that provided for removal of a postmaster only with the advice and consent of the Senate. 272 U.S. at 107, 176.

Not long after *Myers*, however, the Court revisited congressional restrictions on the President's removal power in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). There, the Court held that a provision allowing for removal of a commissioner of the Federal Trade Commission ("FTC") only for "inefficiency, neglect of duty, or malfeasance" did not unconstitutionally interfere with the executive power of the President. *Id.* at 619, 632. *Humphrey's Executor* is controlling in this case. Then as now, the FTC was empowered to prevent "unfair methods of competition in commerce." *Id.* at 620. In order to carry out this responsibility, the FTC had the power to investigate, adjudicate, and enforce the prohibition on unfair competition. *Id.* at 620-21. Despite these powers over commercial activity, the Court upheld a provision allowing for removal of commissioners only for "inefficiency, neglect of duty, or malfeasance." *Id.* at 619, 632.

Similarly, here, the Director of the CFPB may be removed by the President "for inefficiency, neglect of duty, or malfeasance," 12 U.S.C. § 5491(c)(3), and the President therefore retains ample authority to assure the Director is competently leading the CFPB in its mission to enforce federal consumer financial laws.

Defendants argue that *Humphrey's Executor* is distinguishable because the case concerned removal of FTC commissioners. (Reply at 13.) Courts, Defendants contend, "only tolerate[] the incursion on the President's removal power . . . where there is a multimember commission." (Defs' Mem. at 17.)[2] Defendants' contention, however, finds no support in *Humphrey's Executor*. Significantly, *Humphrey's Executor* did not distinguish *Myers* on the basis that *Myers* involved an officer, not a commission. *See Humphrey's Executor*, 295 U.S. at 627-28. Instead, the Court distinguished *Myers* on the basis that the postmaster there was performing "executive functions," while the FTC "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628. The CFPB Director's responsibilities and powers are far more similar to an FTC commissioner's than to a postmaster's. Moreover, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison v. Olson*, 487 U.S. 654, 691 (1988). It is no more difficult for the President to assure that the Director of the CFPB is "competently performing his or her statutory responsibilities," *id.* at 692, than it was for the President to oversee the leadership of the

---

[2] Defendants also argue that it is historically unprecedented for an agency with as much responsibility as the CFPB to be led by a director removable only for cause. (Defs' Mem. at 11.) The CFPB, however, is not the first instance in which Congress has placed an agency with substantial responsibilities under the leadership of a single individual removable only for cause. *See* 42 U.S.C. § 902(a) (Commissioner of Social Security Administration removable only for cause); 12 U.S.C. § 4512(a)-(b) (Director of Federal Housing Finance Agency removable only for cause). Moreover, even if no direct analogue of the CFPB has existed before, "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation." *Mistretta v. United States*, 488 U.S. 361, 385 (1989).

FTC at the time of *Humphrey's Executor*. In fact, if the President had needed to fully revamp the leadership of the FTC at that time, he would have been required to affect five separate for cause removals, while only one is required in order to change the leadership of the CFPB.[3] Accordingly, the for cause removal provision of the CFPB, when considered as a part of the CFPB's overall structure and mission, does not impermissibly interfere with the President's power to assure that the laws be faithfully executed.

In a footnote, Defendants argue that two other other provisions of the Dodd-Frank Act interfere with the President's executive power. (Defs' Mem. at 8-9.) First, Defendants argue that Section 1012(b) allows the Director to "simply delegate all of his massive powers to any one he chooses," and thereby "undermines the President's power to appoint and remove executive officials." (*Id.*) Defendants, however, fail to identify any actual delegation by the Director that purportedly interferes with the President's executive power. Section 1012(b), moreover, does not allow the Director to delegate his leadership role, but only allows the Director to "delegate . . . any power vested *in the Bureau* by law." 12 U.S.C. § 5492(b) (emphasis added). This section neither alters the Director's role as head the CFPB, nor lessens the President's authority to assure, by removing the Director for cause if necessary, that the CFPB is competently accomplishing its statutory mission.

Second, Defendants argue that Congress has improperly appointed officers to the Financial Stability Oversight Council ("FSOC") by providing that certain existing executive branch officers are members of the FSOC. (Defs' Mem. at 9 (citing 12 U.S.C. § 5321).) The FSOC and the CFPB are separate entities with distinct missions. *Compare* 12 U.S.C. §§ 5321-22 (FSOC tasked with, among other things, "identifying risks to the financial stability of the United States."), *with* 12 U.S.C. § 5491. Even if this Court were to find that the FSOC is unconstitutional, it would not prevent the CFPB from bringing the

---

[3] Then as now, the FTC was led by five members, each of which could be removed only for good cause. *Humphrey's Executor*, 295 U.S. at 619-620. The FTC commissioners, moreover, served staggered, seven year terms, while the Director of the CFPB serves only a five year term. *Compare id.*, *with* 12 U.S.C. § 5491(c).

present action against Defendants. *See Free Enterprise Fund*, 130 S. Ct. at 3161 ("Because [t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial, invalidation is the required course." (internal citations and quotation marks omitted)). The Court therefore need not, and does not, consider the constitutionality of the FSOC.

In sum, the Court concludes that the structure of the CFPB, considered as a whole, does not impermissibly interfere with the President's executive power.

**2. Congressional Power**

**i. Appropriations Power**

The Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. According to Defendants, the Dodd-Frank Act impermissibly "exempts CFPB from the congressional appropriations power." (Defs' Mem. at 9.) Defendants are mistaken. The Supreme Court has "underscore[d] the straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

Here, no funds have been appropriated from the Treasury, as the CFPB is funded from the earnings of the Federal Reserve System. *See* 12 U.S.C. § 5497. The Appropriations Clause "does not in any way circumscribe Congress from creating self-financing programs . . . without first appropriating the funds as it does in typical appropriation and supplement appropriation acts." *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003), *aff'd*, 365 F.3d 1333 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011). *See also Am. Fed'n of Gov't Employees, AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (Congress itself may choose . . . to loosen its own reins on public expenditure. . . . Congress may also decide not to finance a federal entity with

appropriations.”). The Court therefore concludes that the structure of the CFPB does not violate the Appropriations Clause.

**ii. Legislative Power**

“Article I, § 1, of the Constitution vests ‘[a]ll legislative Powers herein granted . . . in a Congress of the United States.’ This text permits no delegation of those powers.” *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) (quoting U.S. Const. art. I, § 9, cl. 7). As a result, “when Congress confers decisionmaking authority upon agencies *Congress* must ‘lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.’” *Id.* at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Defendants raise concerns with the CFPB’s authority to enforce the prohibition on “abusive” practices. (Defs’ Mem. at 19.) The Dodd-Frank Act, however, contains an intelligible principle to guide the CFPB’s power to prevent “abusive” practices. The Dodd-Frank Act defines “abusive” as either “materially interfer[ing] with the ability of a consumer to understand a term or condition of a consumer financial product or service” or “tak[ing] unreasonable advantage of -- (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.” 12 U.S.C. § 5531(d). This standard is at least as specific as other provisions held to constitute “intelligible principles.” *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 420, 426-27 (1944) (approving agency’s power to fix maximum commodity prices that “will be generally fair and equitable and will effectuate the purposes of th[e] Act” (quotation marks omitted)); *Am. Power & Light Co. v. S.E.C.*, 329 U.S. 90, 104-06 (1946) (approving the Securities and Exchange Commission’s power to “ensure that the corporate structure or continued existence of any company in a particular holding company system does not ‘unduly or

unnecessarily complicate the structure' or 'unfairly or inequitably distribute voting power among security holders.'").

Defendants contend that the "CFPB's lack of structural protection cannot be reconciled with its broad delegation of power." (Defs' Mem. at 20.) It is true that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 474. In *Whitman*, the Supreme Court noted that Congress was required to "provide [the Environmental Protection Agency] substantial guidance on setting air standards that affect the entire national economy." *Id.* at 475. "*But even in sweeping regulatory schemes* [the Supreme Court] ha[s] never demanded . . . that statutes provide a 'determinate criterion' for saying 'how much [of the regulated harm] is too much.'" *Id.* at 475 (emphasis added) (final alteration in original) (quoting Court of Appeals decision in *American Trucking Associations, Inc. v. E.P.A.*, 175 F.3d 1027, 1034 (D.C. Cir. 1999), which the Supreme Court reversed in *Whitman*). Here, the Dodd-Frank Act provides an intelligible principle suitable to the CFPB's power to enforce the prohibition on "abusive" practices. As described above, an "abusive" practice is specifically limited to four circumstances, each of which specifies the type of harm to be prevented. *See* 12 U.S.C. § 5531(d). No more "determinate criterion" is required. Consequently, the CFPB's power to regulate "abusive" practices does not violate the Constitution's prohibition on the delegation of legislative power.[4]

**3. Judicial Power**

"The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Defendants contend that the Dodd-Frank Act intrudes on the power of the courts by improperly limiting judicial review of CFPB actions. (Defs' Mem. at 18-19.)

---

[4] In their Reply, Defendants contend that the "novel structure" of the CFPB requires a "renewed analysis" of the principle of non-delegation. (Reply at 19.) To the extent Defendants are arguing that more than an "intelligible principle" is required with respect to the CFPB, the Court simply notes that it is bound to apply the standard articulated by the Supreme Court in *Whitman*.

The Dodd-Frank Act provides that where the authority of the CFPB and another agency to prescribe rules under the federal consumer financial laws overlap, the CFPB "shall have the exclusive authority to prescribe rules." 12 U.S.C. § 5512(b)(4)(A). The Dodd-Frank Act further provides that "the deference that a court affords to the [CFPB] with respect to a determination by the [CFPB] regarding the meaning or interpretation of any provision of a Federal consumer financial law shall be applied as if the [CFPB] were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law." *Id.* § 5512(b)(4)(B). Defendants argue that the latter provision impermissibly provides a rule of decision to the federal courts by requiring *Chevron* deference to CFPB rulemaking even where the CFPB is not entitled to such deference. (Defs' Mem. at 19.)

Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. 837, 843-44 (1984). However, an agency's interpretation of a statute may not be entitled to deference where multiple agencies "share[] responsibility for the administration of the statute." *Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 216 (D.C. Cir. 1995). According to Defendants, the Dodd-Frank Act treads on judicial power by overriding this rule with respect to the CFPB's interpretations.

Defendants are mistaken. There is no contradiction between *Rapaport* and the Dodd-Frank Act's requirement that CFPB interpretations of federal consumer financial laws be granted deference as if the CFPB was the only agency authorized to interpret those laws. As noted above, the CFPB's rulemaking authority under the federal consumer financial laws is exclusive, and therefore there is no interagency responsibility. Moreover, *Chevron* deference is inappropriate in cases of interagency responsibility only because there is no "reason to believe that the congressional delegation of administrative authority

contemplates" the sort of contradictory results that could arise if *Chevron* deference were accorded in such cases. *Id.* at 217. In other words, deference is not owed in such cases only because Congress did not "explicitly le[ave] a gap for the agency to fill." *Chevron*, 467 U.S. at 843. Where Congress has explicitly granted an agency rulemaking authority, that agency's rules are entitled to deference. *Id*. Here, Congress' intent to grant the CFPB exclusive authority to interpret the federal consumer financial laws is clear, and it is entirely consistent with Article III for courts to defer to CFPB interpretations in the manner contemplated by *Chevron*.[5]

**4. Other Considerations**

Defendants raise other concerns with the structure of the CFPB, but their concerns are not tied to any particular constitutional provision. Defendants, for example, contend that Congress' decision to put one person rather than a multi-member commission at the head of the CFPB places too much power in the hands of single individual. (Defs' Mem. at 14.) In support, Defendants cite to *Hamdan v. Rumsfeld* for the proposition that "'[t]he accumulation of all powers legislative, executive and judiciary in the same hands . . . may justly be pronounced the very definition of tyranny.'" 548 U.S. 557, 602 (2006) (quoting The Federalist No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison)). The quotation appears in a section of Justice Stevens' decision that was not joined by a majority of the Court and that concerned whether a military commission could charge "conspiracy" under the common law of war even though Congress had not positively identified "conspiracy" as a war crime. *Id.* at 600-02. Justice Stevens determined that "[w]hen . . . neither the

---

[5] Defendants also contend that Congress' decision to place a director, rather than a multi-member commission, at the head of the CFPB impedes judicial review. (Defs' Mem. at 15.) Commissions, Defendants contend, allow for minority viewpoints, which aid in the process of judicial review. (*Id.*) Defendants, however, have no authority for the proposition that Congress was required to place a commission at the head of the CFPB in order to facilitate judicial review, particularly since Congress has the authority to entirely preclude judicial review of agency actions, at least where there is no constitutional challenge at issue. *See Campbell v. Office of Pers. Mgmt.*, 694 F.2d 305, 307 (3d Cir. 1982) ("Congress does have the power to preclude judicial review of non-constitutional challenges to agency actions.").

elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent must be plain and unambiguous. To demand any less would be to risk concentrating in military hands a degree of adjudicative and punitive power in excess of that contemplated either by statute or by the Constitution." *Id.* The quotation upon which Defendants rely appears in a parenthetical in support of this conclusion. The quotation, however, provides no support for Defendants' claim that Congress acted impermissibly in placing a director at the head of the CFPB. Congress has not granted to the CFPB or its Director authority to manufacture charges without authorization from a statute or precedent. Rather, Congress has provided that the Director will lead the CFPB in enforcing the federal consumer financial laws, and will do so under the authority of the President to remove the Director for cause.

Defendants also argue that multi-member commissions allow for "collegial decisionmaking," open public meetings, and "expert" decisions, and are therefore better equipped to head agencies with substantial responsibilities such as the CFPB. (Defs' Mem. at 14-18.) However, absent some constitutional basis, this Court simply does not have the authority to second guess Congress' policy determination that a single director, rather than a commission, is the best choice to head the CFPB.

Finally, Defendants point out, correctly, that "'[j]ust because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute.'" (Defs' Mem. at 5 (quoting *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013)). This principle does not, however, mandate a conclusion that the CFPB is unconstitutional. Having considered the combined features of the CFPB, and for the reasons described above, the Court concludes that the CFPB complies with the separation of powers principles contained in Articles I, II, and III of the Constitution.

### B. Whether the CFPB Has Stated a Claim

#### 1. Legal Standard

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

#### 2. Counts I and III for Violation of the TSR

The TSR prohibits a seller or telemarketer from "[r]equesting or receiving payment of any fee or consideration for any debt relief service until . . . [t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "[t]he customer has made at least one payment"

pursuant to such agreement, plan, or contract. 16 C.F.R. § 310.4(a)(5)(i). The TSR also prohibits a seller or telemarketer from "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer" or "[a]ny material aspect of any debt relief service." *Id*. § 310.3(a)(2).

Count I of the Complaint asserts that Defendants requested and received payment for debt relief services before renegotiating, settling, reducing, or otherwise altering the terms of a consumer's debt. (Compl. ¶ 75.) Count III asserts that Defendants represented that consumers are not charged any advance fee for debt relief services, but in fact charged advance fees. (Compl. ¶¶ 81-82.) Defendants move to dismiss both counts for violation of the TSR on the basis that the Debt Relief Contract does not require the payment of up-front fees. (Defs' Mem. at 22.)

In its Complaint, Plaintiff does allege that consumers are not obligated to pay any up-front fees under the Debt Relief Contract. (Compl. ¶ 41.) Consumers are, however, obligated to pay up-front fees under the Bankruptcy Contract. (*Id*. ¶ 48.) According to the Complaint, by using both contracts, Defendants "disguise consumers' up-front payments for debt relief services provided by Morgan Drexen as payments for bankruptcy-related work purportedly performed by . . . [a]ttorneys." (*Id*. ¶ 14.)

The FTC, which promulgated the Telemarketing Sales Rule, justified the ban on advance fees for debt relief services in part on the context in which debt relief services are often offered. *See* 75 FR 48458. The FTC noted that debt relief services "frequently take place in the context of high pressure sales tactics, contracts of adhesion, and deception." *Id.* Moreover, some "telemarketers of debt relief services have exhorted consumers to fill out the enrollment documents and return the papers as quickly as possible," despite the inclusion of contractual provisions that were potentially detrimental to the interests of consumers. *Id.* Given these concerns, the TSR cannot be so narrowly construed as to allow a debt relief service to disguise up-front fees using deceptive sales techniques and complicated contractual arrangements. The Court, therefore, will look at the transactions

alleged in the Complaint in their entirety in determining whether the Complaint plausibly suggests that Defendants requested and received up-front fees for debt relief work.

According to the Complaint, Morgan Drexen advertises debt relief services, and specifically touts its services as a method for avoiding filing for bankruptcy. (Compl. ¶¶ 15-22.) When consumers call Morgan Drexen, they are again told of the benefits of debt relief services over bankruptcy. (*Id.* ¶¶ 23-30.) Nevertheless, when consumers sign up for debt relief services, they are asked to access a web portal and sign the Debt Relief Contract and the Bankruptcy Contract, both of which are four or five pages long, written in small font, and single spaced. (*Id.* ¶¶ 34-35.) The vast majority of consumers sign both contracts. (*Id.* ¶ 37.) Though Morgan Drexen performs debt relief work for consumers, little or no bankruptcy work is performed. (*Id.* ¶¶ 42, 49-50.) Nevertheless, the Bankruptcy Contract requires an engagement fee of between $1,000 and $1,500 and a flat monthly servicing charge of $50. (*Id.* ¶ 48.) Drawing all inferences in Plaintiff's favor, these allegations plausibly suggest that Defendants request and receive up-front payments not for bankruptcy work, but for debt relief work. Defendants' challenge to counts I and III for violation of the TSR must therefore be rejected.

**3. Counts I, III, IV, V, and VI for Violation of the CFPA**

The CFPB is not authorized, subject to certain exceptions, to "exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). This limitation does not apply to the "offering or provision of a consumer financial product or service . . . that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship" or "that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service." *Id.* § 5517(e)(2). An exception also exists "with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred

under subtitle F or H." *Id.* § 5517(e)(3). Defendants admit that Plaintiff's alleged TSR violations fit under this last exception. (Defs' Mem. at 23.)

Defendants contend that the CFPB has no authority to assert counts I, III, IV, V, and VI to the extent they are based on the CFPA because Morgan Drexen offers services as an "attorney support professional." (*Id.* at 23-25.) The Complaint, however, alleges facts which plausibly suggest that Morgan Drexen is not engaged in activities in support of an attorney as part of the practice of law.

According to the Complaint, "Morgan Drexen, not [an attorney], performs virtually all of the debt resolution work" for a consumer. (Compl. ¶ 42.) Morgan Drexen, moreover, directs creditors not to communicate with those attorneys associated with Morgan Drexen. (*Id.*) When Morgan Drexen has negotiated a settlement on behalf of a consumer, an attorney need not even respond to the settlement proposal before it is automatically deemed approved. (*Id.* ¶ 45.) Construing all inferences in Plaintiff's favor, these allegations plausibly suggest that Morgan Drexen does not actually support attorneys in the practice of law. At the very least, these allegations plausibly suggest that Morgan Drexen's services are not offered as part of, or incidental to, the practice of law. The Court therefore concludes that the CFPB has the authority to assert counts I, III, IV, V, and VI.

**4. Tenth Amendment**

Defendants contend that this action should be dismissed because the CFPB is attempting to intrude upon the practice of law in violation of the Tenth Amendment. (Reply at 25.)

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As the Supreme Court has explained, "the Tenth Amendment 'states but a truism that all is retained which has not been surrendered.'" *New York v. United States*, 505 U.S. 144, 156 (1992) (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941)). As a result, a violation of the Tenth Amendment cannot be derived from the text of the Tenth Amendment itself:

> The Tenth Amendment . . . restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which . . . is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs [a court] to determine . . . whether an incident of state sovereignty is protected by a limitation on an Article I power.

*Id.* 156-57. Because Defendants do not contend that the Dodd-Frank Act exceeds Congress' power under the Commerce Clause of Article I, their Tenth Amendment challenge fails.

## III. CONCLUSION

For the reasons discussed above, the Court DENIES Defendants' Motion.

DATED: January 10, 2014

JOSEPHINE L. STATON
_______________________________
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE