CARA PETERSEN, D.C. Bar #476990
Acting Deputy Enforcement Director For Litigation
R. GABRIEL D. O'MALLEY, MA Bar # 651432
(E-mail: gabriel.o'malley@cfpb.gov)
(Phone: 202-435-9747)
SHIRLEY CHIU, IL Bar # 6296079
(E-mail: shirley.chiu@cfpb.gov)
(Phone: 202-435-7592)
JAN SINGELMANN, DC Bar # 999087
(E-mail: jan.singelmann@cfpb.gov)
(Phone: 202-435-9670)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

KENT KAWAKAMI, CA Bar # 149803 – Local Counsel
(Phone: 213-894-4858)
(E-mail: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Consumer Financial Protection Bureau,

Plaintiff,

v.

Morgan Drexen, Inc.,
and
Walter Ledda, individually, and as owner, officer, or manager of Morgan Drexen, Inc.,

Defendants.

Case No. SACV13-01267 JLS (JEMx)

**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**HON. JOSEPHINE L. STATON**

**Hearing Date: November 21, 2014**
**Time: 2:00pm**
**Place: Courtroom 10-A (Santa Ana)**

## Table of Contents

**KEY TO SUMMARY JUDGMENT EXHIBITS…………………………………………...1**

**STATEMENT OF UNCONTROVERTED FACTS………………………………….10**

MORGAN DREXEN COMPANY BACKGROUND……………………………10

BACKGROUND: MORGAN DREXEN/ATTORNEY MODEL SINCE 2010....12

Morgan Drexen's Role in Providing Debt Settlement Services Since 2010... …………………………………………………………………………...…12

Attorneys Play a Very Limited Role in Providing Debt Settlement Services to Consumers……………………………………………………………….26

Role of Engagement Counsel…………………………………………..27

Role of Local Counsel…………………………………………………….30

MORGAN DREXEN CHARGES UP-FRONT FEES FOR DEBT SETTLEMENT SERVICES IN VIOLATION OF THE TELEMARKETING SALES RULE (TSR)………………...……………………………………………35

Morgan Drexen's Debt Settlement Model Prior to the October 27, 2010 Effective Date for the Telemarketing Sales Rule Amendment…………….35

Amendments to the Telemarketing Sales Rule…………………………….36

Morgan Drexen Changes its Model for Providing Debt Settlement Services …………………………………………………………………………...38

Fee Structure Under the Dual Program for Debt Settlement and "Bankruptcy Services"…………………………………………………………………42

Morgan Drexen Receives the Vast Majority of Fees Paid by Consumers…48

Dual Program Enrollment……………………………………………….51

Morgan Drexen Continues to Offer a Debt Settlement Only Program, but Few Consumers Enroll………………………………………………………..54

Morgan Drexen Also Offers Bankruptcy Only Program, but Few Consumers Enroll……………………………………………………………………….57

Post-TSR, Morgan Drexen Continues to Advertise for Debt Settlement Services……………………………………………………………………….57
Consumers Want Debt Settlement, not Bankruptcy Services……………..…..57
Nonetheless, Morgan Drexen Enrolls Consumers into the Dual Program....69
Morgan Drexen Continues to Provide the Same Debt Settlement Services to Consumers Enrolled in the Dual Program…………………………………70
Consumers Who are Enrolled in the Dual Program Receive Little, if Any, “Bankruptcy” Services……………………………………………………..71
Morgan Drexen, Not Attorneys, Performs Most of the “Bankruptcy” Work ………………………………………………………………………………...73
Attorneys Have Little to No Role In “Bankruptcy Services” Provided to Consumers……………………………………………………………………75
Engagement Counsel Do Not Conduct Bankruptcy Work…………………79
Attorney Vincent Howard……………………………………………...79
Attorney Kimberly Pisinski…………………………………………….82
Attorney Eric Rosen…………………………………………………….83
Attorney Joseph Saulski………………………………………………..85
Attorney Lawrence Williamson………………………………………..91
Attorney Rachelle McIntyre-Nicholson………………………………..92
Local Counsel Provide Little, If Any, Bankruptcy Work…………………93
Attorney Barbara Franklin……………………………………………..93
Attorney Garrett Elias…………………………………………………95
Attorney Carl Cottone………………………………………………….95
Attorney Eric Benzer…………………………………………….....…97
A Tiny Fraction of Consumers Actually File for Bankruptcy……...………97
According to Morgan Drexen, For Consumers Who do not File for Bankruptcy, the Preparation of a Petition is a Tool For Debt Settlement Negotiations…………………………………………………………………..99

Morgan Drexen's Threat of Bankruptcy Has Little to No Value for Consumers……………………………………………………………….99
Debt Settlement Negotiations with "Preferred Creditors": No Threat of Bankruptcy……………………………………………………………104
Cancellations………………………………………………………………...110
Consumer Complaints………………………………………………………112
WALTER LEDDA'S ROLE IN DESIGNING, IMPLEMENTING, AND PROFITING FROM THE DUAL PROGRAM…………………………………113
MORGAN DREXEN'S ADVERTISEMENTS FOR DEBT SETTLEMENT….120
How Long it Actually Takes Consumers to Become Debt Free………….129
DEBT SETTLEMENT CONSUMER PROFILE (in Debt Settlement Only or Dual Program)……………………………………………………………………....132
JUDGMENTS…………………………………………………………………...137
In Re Morgan Drexen, Inc. (Wisconsin)…………………………………….137
West Virginia v. Morgan Drexen, Inc. et al…………………………………152
Federal Trade Commission v. National Consumer Council, Inc. ………..158
**CONCLUSIONS OF LAW……………………………………………………..…161**

## I. KEY TO SUMMARY JUDGMENT EXHIBITS

| SJ Ex. Number: | Abbreviation: | Refers to: |
|---|---|---|
| **Morgan Drexen Advertisements** | | |
| SJ Ex. 1 | Ad. 1 | Advertisement for Morgan Drexen Services, MD-CA0005442. |
| SJ Ex. 2 | Ad. 2 | Advertisement for Morgan Drexen Services, MD-CA0005473 |
| SJ Ex. 3 | Ad. 3 | Advertisement for Morgan Drexen Services, MD-CA0005474 |
| SJ Ex. 4 | Ad. 4 | Advertisement for Morgan Drexen Services, MD-CA0005476 |
| SJ Ex. 5 | Ad. 5 | Advertisement for Morgan Drexen Services, MD-CA0005477 |
| SJ Ex. 6 | Ad. 6 | Advertisement for Morgan Drexen Services, MD-CA0005482 |
| SJ Ex. 7 | Ad. 7 | Advertisement for Morgan Drexen Services, MD-CA0005488 |
| SJ Ex. 8 | Ad. 8 | Advertisement for Morgan Drexen Services, MD-CA0005492 |
| SJ Ex. 9 | Ad. 9 | Advertisement for Morgan Drexen Services MD-CA0017984 |
| SJ Ex. 10 | Ad. 10 | Advertisement for Morgan Drexen Services, MD-CA0237408 |
| SJ Ex. 11 | Ad. 11 | Scripts of Advertisements for Morgan Drexen Services |
| **Responses to Civil Investigative Demand** | | |
| SJ Ex. 12 | Morgan Drexen Interrog. I | Morgan Drexen's Responses to the Bureau's Civil Investigative Demand Interrogatories on April 13, 2012 |

| | | |
|---|---|---|
| SJ Ex. 13 | Morgan Drexen Interrog. II | Morgan Drexen's Responses to the Bureau's Civil Investigative Demand Interrogatories on April 27, 2012 |
| SJ Ex. 14 | Morgan Drexen Interrog. III | Morgan Drexen's Responses to the Bureau's Civil Investigative Demand Interrogatories on May 7, 2012 |
| SJ Ex. 15 | Morgan Drexen Interrog. IV | Morgan Drexen's Responses to the Bureau's Civil Investigative Demand Interrogatories on May 11, 2012 |
| SJ Ex. 16 | Morgan Drexen Interrog. V | Morgan Drexen's Response to the Bureau's Civil Investigative Demand Interrogatory No. 13 |
| SJ Ex. 17 | Kovel Fuller Interrog. | Kovel Fuller's Response to the Bureau's Civil Investigative Demand |
| **Investigation Testimony** | | |
| SJ Ex. 18 | Ledda Hearing | Investigational Hearing of Walter Ledda, taken by Plaintiff on April 12, 2013 |
| SJ Ex. 19 | Katz Hearing I | Investigational Hearing of Jeffrey Katz, taken by Plaintiff on November 8, 2012 |
| SJ Ex. 20 | Katz Hearing II | Investigational Hearing of Jeffrey Katz, taken by Plaintiff on November 9, 2012 |
| SJ Ex. 21 | Wiegman Hearing | Investigational Hearing of Laura Wiegman, taken by Plaintiff on November 8, 2012 |
| SJ Ex. 22 | Walker Hearing | Investigational Hearing of David Walker, taken by Plaintiff on November 9, 2012 |
| **Discovery Responses** | | |
| SJ Ex. 23 | Morgan Drexen Interrog. VI | Defendant Morgan Drexen's Responses to Plaintiff's First Set of Interrogatories |
| **Depositions of Morgan Drexen Employees** | | |
| SJ Ex. 24 | Walker Dep. | Deposition of David Walker, taken by Plaintiff on September 10, 2014 |
| SJ Ex. 25 | Wiegman Dep. | Deposition of Laura Wiegman, taken by Plaintiff on September 9, 2014 |
| SJ Ex. 26 | Ledda Dep. | Deposition of Walter Ledda, taken by Plaintiff on September 12, 2014 |
| SJ Ex. 27 | Katz Dep. | Deposition of Jeffrey Katz, taken by Plaintiff on September 11, 2014 |
| SJ Ex. 28 | Katz Dep. Ex. 150 part I | Part 1 of Exhibit 150 of Jeffrey Katz Deposition |
| SJ Ex. 29 | Katz Dep. Ex. 150 part II | Part 2 of Exhibit 150 of Jeffrey Katz Deposition |

| | | |
|---|---|---|
| SJ Ex. 30 | Katz Dep. Ex. 152 | Jeffrey Katz Deposition Exhibit 152 |
| SJ Ex. 31 | Tran Ex. 92 | Linh Tran Deposition Exhibit 92 |
| **Depositions of Current and Former Attorneys Affiliated with Morgan Drexen** | | |
| SJ Ex. 32 | Howard Dep. I | Deposition of Vincent Howard, taken by Plaintiff on September 16, 2014 |
| SJ Ex. 33 | Rosen Dep. | Deposition of Eric Rosen, taken by Plaintiff on June 6, 2014 |
| SJ Ex. 34 | Pisinski Dep. | Deposition of Kimberly Pisinski, taken by Plaintiff on July 21, 2014 |
| SJ Ex. 35 | Saulski Dep. I | Deposition of Joseph Saulski, taken by Plaintiff on August 21, 2014 |
| SJ Ex. 36 | Saulski Dep. II | Deposition of Joseph Saulski, taken by Plaintiff on September 3, 2014 |
| SJ Ex. 37 | Cottone Dep. | Deposition of Carl Cottone, taken by Plaintiff on August 26, 2014 |
| SJ Ex. 38 | Benzer Dep. | Deposition of Eric Benzer, taken by Plaintiff on September 16, 2014 |
| **Depositions of Morgan Drexen Former Employees** | | |
| SJ Ex. 39 | Nagin Dep. | Deposition of Stephen Nagin, taken by Plaintiff on June 4, 2014 |
| SJ Ex. 40 | Nagin Dep. Ex. 9 | Stephen Nagin Deposition Exhibit 9 |
| SJ Ex. 41 | Tesoro Dep. | Deposition of Christina Tesoro, taken by Plaintiff on September 15, 2014 |
| **Deposition of Creditor** | | |
| SJ Ex. 42 | Cavalry Dep. | Deposition of Cavalry Portfolio Services, taken by Plaintiff on August 8, 2014 |
| **Deposition of Consumer** | | |
| SJ Ex. 43 | Whiteside Dep. | Deposition of Linda Whiteside, taken by Plaintiff on September 15, 2014 |
| **Other Depositions** | | |
| SJ Ex. 44 | Howard Dep. II | Deposition of Vincent Howard, taken by the Wisconsin Department of Justice on June 7, 2012 |
| SJ Ex. 45 | Yescas Dep. | Deposition of Raul Yescas, taken by the Wisconsin Department of Justice on March 7, 2012 |

| | | |
|---|---|---|
| SJ Ex. 46 | Williamson Dep. | Deposition of Lawrence Williamson, taken by the Wisconsin Department of Justice on May 7, 2012 |
| SJ Ex. 47 | Stockinger Dep. | Deposition of Tiffany Stockinger, taken by the Wisconsin Department of Justice on January 20, 2011 |
| SJ Ex. 48 | Adams Dep. | Deposition of Desmond Adams, taken by the Wisconsin Department of Justice on March 6, 2012 |
| SJ Ex. 49 | McIntyre-Nicholson Sworn Stmt. I | Sworn Testimony of Rachelle McIntyre-Nicholson, pages 1 through 114, taken by the West Virginia Attorney General's Office on December 22, 2010 |
| SJ Ex. 50 | McIntyre-Nicholson Sworn Stmt. II | Sworn Testimony of Rachelle McIntyre-Nicholson, pages 115 through 216, taken by the West Virginia Attorney General's Office on December 22, 2010 |
| **Other Documents** | | |
| SJ Ex. 51 | ACH Contract 1 | Consumer ACH Agreement Bates Labeled MD-CA0019808 |
| SJ Ex. 52 | ACH Contract 2 | Consumer ACH Agreement Bates Labeled MD-CA0020165 |
| SJ Ex. 53 | ACH Contract 3 | Consumer ACH Agreement Bates Labeled MD-CA0248516 |
| SJ Ex. 54 | ACH Contract 4 | Consumer ACH Agreement Bates Labeled MD-CA0249748 |
| SJ Ex. 55 | ACH Contract 5 | Consumer ACH Agreement Bates Labeled MD-CA0249932 |
| SJ Ex. 56 | ACH Contract 6 | Consumer ACH Agreement Bates Labeled MD-CA0250099 |
| SJ Ex. 57 | ACH Contract 7 | Template ACH Agreement Bates Labeled MD-CA0239041 |
| SJ Ex. 58 | Email 1 | Email from Joseph Acosta dated July 6, 2011 |
| SJ Ex. 59 | Email 2 | Email from David Walker to Dan Fulkerson on November 8, 2010 |
| SJ Ex. 60 | Email 3 | Email from Jeffrey Katz to Walter Ledda on January 10, 2011 |
| SJ Ex. 61 | Email 4 | Email from Cathea Walters to Walter Ledda on November 22, 2011 |
| SJ Ex. 62 | Email 5 | Email from Erich Schiefelbine to Walter Ledda on September 12, 2011 |
| SJ Ex. 63 | Email 6 | Email from Mark Kruitbosch to Walter Ledda on June 27, 2011 |

| | | |
|---|---|---|
| SJ Ex. 64 | Email 7 | Email from Susan Muzila to Walter Ledda on June 27, 2011 |
| SJ Ex. 65 | Email 8 | Email from Sean Roberts to Walter Ledda on June 14, 2011 |
| SJ Ex. 66 | Email 9 | Email from Susan Muzila to Walter Ledda on May 17, 2011 |
| SJ Ex. 67 | Email 10 | Email from Vincent Howard to Walter Ledda on January 25, 2011 |
| SJ Ex. 68 | Email 11 | Email from Susan Muzila to Walter Ledda on November 2, 2010 |
| SJ Ex. 69 | Email 12 | Email from Dede Knox to DS Paralegal and Walter Ledda on October 12, 2010 |
| SJ Ex. 70 | Email 13 | Email from Susan Muzila to Walter Ledda on September 21, 2010 |
| SJ Ex. 71 | Email 14 | Email from Rita Augusta to Adriana Signorino and Walter Ledda on September 14, 2010 |
| SJ Ex. 72 | Email 15 | Email from Susan Muzila to Walter Ledda on September 9, 2010 |
| SJ Ex. 73 | Email 16 | Email from Jeffrey Katz to Walter Ledda on August 2, 2010 |
| SJ Ex. 74 | Email 17 | Email from Walter Ledda to Sean Roberts on April 10, 2014 |
| SJ Ex. 75 | Email 18 | Email from Walter Ledda to Jeffrey Katz on November 19, 2012 |
| SJ Ex. 76 | Email 19 | Email from Walter Ledda to Jeffrey Katz on September 3, 2012 |
| SJ Ex. 77 | Email 20 | Email from Walter Ledda to Avi Gupta on August 31, 2012 |
| SJ Ex. 78 | Email 21 | Email from Walter Ledda to Avi Gupta on April 5, 2012 |
| SJ Ex. 79 | Email 22 | Email from Walter Ledda to Susan Muzila on June 13, 2011 |
| SJ Ex. 80 | Email 23 | Email from Walter Ledda to Stephen Nagin on September 22, 2010 |
| SJ Ex. 81 | Email 24 | Email from Susan Muzila to Avi Gupta on August 31, 2012 |
| SJ Ex. 82 | Email 25 | Email from Walter Ledda to Jeffrey Katz on July 19, 2012 |

| | | |
|---|---|---|
| SJ Ex. 83 | Email 26 | Email from Walter Ledda to Avi Gupta on April 5, 2012 |
| SJ Ex. 84 | Email 27 | Email from Walter Ledda to Avi Gupta on April 5, 2012 |
| SJ Ex. 85 | Email 28 | Email from Walter Ledda to Rita Augusta on October 25, 2011 |
| SJ Ex. 86 | Email 29 | Email from Walter Ledda to Susan Muzila on June 21, 2011 |
| SJ Ex. 87 | Email 30 | Email from Walter Ledda to Rita Augusta on January 31, 2011 |
| SJ Ex. 88 | Email 31 | Email from Susan Muzila to Walter Ledda on September 30, 2013 |
| SJ Ex. 89 | Email 32 | Email from Susan Muzila to Walter Ledda on September 19, 2012 |
| SJ Ex. 90 | Email 33 | Email from Susan Muzila to Jeffrey Katz on August 9, 2012 |
| SJ Ex. 91 | Email 34 | Email from Walter Ledda to Raychel Harvey-Jones on September 22, 2010 |
| SJ Ex. 92 | Email 35 | Email from Walter Ledda to David Walker on September 13, 2010 |
| SJ Ex. 93 | Email 36 | Email from Stephen Nagin to Walter Ledda on September 29, 2009 |
| SJ Ex. 94 | Email 37 | Email from Walter Ledda to Susan Muzila on June 4, 2010 |
| SJ Ex. 95 | Email 38 | Email from Walter Ledda to Jeffrey Katz on May 10, 2010 |
| SJ Ex. 96 | Email 39 | Email from Jeffrey Katz to Vincent Howard on August 3, 2010 |
| SJ Ex. 97 | Email 40 | Email from Vincent Howard to Jeffrey Katz on August 10, 2010 |
| SJ Ex. 98 | Email 41 | Email from Vincent Howard to Jeffrey Katz on August 17, 2010 |
| SJ Ex. 99 | Email 42 | Email from Jeffrey Katz to Vincent Howard on October 17, 2010 |
| SJ Ex. 100 | Email 43 | Email from Vincent Howard to Jeffrey Katz on March 31, 2011 |
| SJ Ex. 101 | Email 44 | Email from Laura Wiegman to Vincent Howard on April 12, 2012 |

| | | |
|---|---|---|
| SJ Ex. 102 | Email 45 | Email from Diane Davis to Adriana Signorino on May 18, 2012 |
| SJ Ex. 103 | Email 46 | Email from Del Meeks to Stephen Nagin September 28, 2009 |
| SJ Ex. 104 | Bankruptcy Scenarios | Document related to Bankruptcy Scenarios |
| SJ Ex. 105 | Confid'l Memo. | Confidential Memorandum prepared by CRESO Capital Partners |
| SJ Ex. 106 | Bankruptcy Letter 1 | Template Bankruptcy Letter |
| SJ Ex. 107 | Bankruptcy Letter 2 | Template Bankruptcy Letter |
| SJ Ex. 108 | Description of Services | Morgan Drexen description of bankruptcy services |
| SJ Ex. 109 | Financial Statement | Morgan Drexen Financial Statement December 31, 2010 and 2009 |
| SJ Ex. 110 | Statements of Income | Morgan Drexen Statements of Income December 31, 2011 and 2010 |
| SJ Ex. 111 | Tax Returns 1 | Morgan Drexen Tax Returns 2008 |
| SJ Ex. 112 | Tax Returns 2 | Morgan Drexen Tax Returns 2009 |
| SJ Ex. 113 | Rosen Response | Rosen Response to US Trustee's Motion for Civil Penalties, Disgorgement, and Injunctive Relief |
| SJ Ex. 114 | Debt Settlement Contract | Exemplar Debt Settlement Agreement |
| SJ Ex. 115 | Bankruptcy Contract | Exemplar Bankruptcy Fee Agreement |
| SJ Ex. 116 | Master Purchase Agreement | Master purchase agreement between Accord Financial and Morgan Drexen |
| SJ Ex. 117 | Cases Spreadsheet | Spreadsheet of Filed Bankruptcy Cases by State |
| **Orders and Judgments** | | |
| SJ Ex. 118 | Order Re Stip. | Order Re Stipulation of Facts, Docket No. 142 |

| | | |
|---|---|---|
| SJ Ex. 119 | FTC Order | Settlement Agreement and Final Order With Defendant Walter Joseph Ledda, *FTC v. National Consumer Council*, Case No. SA CV04-0474 CJC (JWJx), United States District Court Central District of California, March 29, 2005 |
| SJ Ex. 120 | FTC News Release | FTC News Release, "Debt Services Operations Settle FTC Charges," March 30, 2005 |
| SJ Ex. 121 | WV Order | Final Order, *State of West Virginia v. Morgan Drexen, et al.*, Civil Action No. 11-C-829, Circuit Court of Kanawha County, West Virginia, July 15, 2014 |
| SJ Ex. 122 | WI DFI Order | Decision and Order, *In re Morgan Drexen, Inc.*, Case No. 10-S-127, Administrator State of Wisconsin Department of Financial Institutions Division of Banking, April 25, 2013 |
| SJ Ex. 123 | WI DFI Exhibits Part 1 | Part 1 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| SJ Ex. 124 | WI DFI Exhibits Part 2 | Part 2 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| SJ Ex. 125 | WI DFI Exhibits Part 3 | Part 3 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| SJ Ex. 126 | WI DFI Exhibits Part 4 | Part 4 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| SJ Ex. 127 | WI DFI Exhibits Part 5 | Part 5 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| SJ Ex. 128 | WI DFI Exhibits Part 6 | Part 6 of Exhibits Cited by Administrative Court Judge in Support of Findings of Fact in WI DFI Order |
| **Regulations** | | |
| SJ Ex. 129 | TSR Amend. Final Rule | Federal Trade Commission Telemarketing Sales Rule, Final Rule, 16 CFR Part 310, August 10, 2010 |
| **Former Employee Declarations** | | |
| SJ Ex. 130 | Montijo Decl. | Harvey Montijo Declaration |
| SJ Ex. 131 | Cleary Decl. | Michael Cleary Declaration |
| SJ Ex. 132 | Hsieh Decl. | Ichen Hsieh Declaration |
| **Other Declarations** | | |
| SJ Ex. 133 | Elias Decl. | Garrett Elias Declaration |
| SJ Ex. 134 | Franklin Decl. | Barbara Franklin Declaration |

| | | |
|---|---|---|
| SJ Ex. 135 | Bender Decl. | Leslie Bender Declaration |
| SJ Ex. 136 | Unterberger Decl. | Susan Unterberger Declaration |
| SJ Ex. 137 | Albanese Decl. | Christopher Albanese Declaration |
| SJ Ex. 138 | Hanson Decl. | Tim Hanson Declaration |
| SJ Ex. 139 | Burge Decl. | Kim Burge Declaration |
| SJ Ex. 140 | Burge Decl. Ex. A Part 1 | Exhibit A Part 1 of Kim Burge Declaration |
| SJ Ex. 141 | Burge Decl. Ex. A Part 2 | Exhibit A Part 2 of Kim Burge Declaration |
| SJ Ex. 142 | Burge Decl. Ex. A Part 3 | Exhibit A Part 3 of Kim Burge Declaration |
| SJ Ex. 143 | Burge Decl. Ex. A Part 4 | Exhibit A Part 4 of Kim Burge Declaration |
| SJ Ex. 144 | Burge Decl. Ex. A Part 5 | Exhibit A Part 5 of Kim Burge Declaration |
| SJ Ex. 145 | Burge Decl. Ex. A Part 6 | Exhibit A Part 6 of Kim Burge Declaration |
| **Consumer Declarations** | | |
| SJ Ex. 146 | Adekoya Decl. | Hakeem Adekoya Declaration and Attachments |
| SJ Ex. 147 | Banks Decl. | Shirley Banks Declaration and Attachments |
| SJ Ex. 148 | Bowman Decl. | Sandra Bowman Declaration and Attachments |
| SJ Ex. 149 | Brown Decl. | Joan Brown Declaration and Attachments |
| SJ Ex. 150 | Felder Decl. | Ruby Felder Declaration and Attachments |
| SJ Ex. 151 | Moore Decl. | Thomas Moore Declaration |
| SJ Ex. 152 | Hazard Decl. | Linda Hazard Declaration and Attachments |
| SJ Ex. 153 | Newkirk Decl. | Marty Newkirk Declaration and Attachments |
| SJ Ex. 154 | Richardson Decl. | Cynthia Richardson Declaration |
| SJ Ex. 155 | Rixie Decl. | Deborah Rixie Declaration |
| **Other Declaration** | | |
| SJ Ex. 156 | O'Malley Decl. | Gabriel O'Malley Declaration |

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | Uncontroverted Fact ("UF") | Citation |
|---|---|---|
| | **MORGAN DREXEN COMPANY BACKGROUND** | |
| 1. | Morgan Drexen, Inc. is an independent company with its principal place of business at 675 Anton Boulevard, Costa Mesa, California 92626. | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |
| 2. | Morgan Drexen has also done business as "Morgan Drexen," "Morgan Drexen Integrated Services," and "Morgan Drexen V.C." | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |
| 3. | Morgan Drexen was incorporated on March 20, 2007 in Nevada and has been licensed to do business in California as a foreign corporation since August 13, 2007. | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3; Morgan Drexen Interrog. IV (SJ Ex. 15) Rog. 5 |
| 4. | Morgan Drexen's revenue in 2008 was $19,615,815. | Tax Returns 1 (SJ Ex. 111) |
| 5. | Morgan Drexen's revenue in 2009 was $36,018,152. | Tax Returns 2 (SJ Ex. 112) |
| 6. | Morgan Drexen's revenue in | Statements of Income (SJ Ex. 110) |

| | | |
|---|---|---|
| | 2010 was $44,198,217. | |
| 7. | Morgan Drexen's revenue in 2011 was $45,406,159. | Statements of Income (SJ Ex. 110) |
| 8. | Morgan Drexen's revenue in 2012 was $46,638,704. | Ledda Dep. (SJ Ex. 26) Ex. 161 at MD-CA0031619 |
| 9. | Morgan Drexen's revenue in 2013 was $33,667,459. | Ledda Dep. (SJ Ex. 26) Ex. 161 at MD-CA0031619 |
| 10. | Morgan Drexen revenue through March 2014 was $5,937,149. | Ledda Dep. (SJ Ex. 26) Ex. 161 at MD-CA0031619 |
| 11. | In 2009, Morgan Drexen earned $3,019,306 in profit. | Financial Statement (SJ Ex. 109) |
| 12. | Morgan Drexen's Board of Directors has consisted of two members: Walter Ledda – President (May 21, 2007 – present); and Rita Augusta – Secretary (May 21, 2007 – present). | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3; Ledda Dep. (SJ Ex. 26) 38:13-16 (Board of Directors consists of Walter Ledda and Rita Augusta). |
| 13. | Walter Ledda has served as President and Chief Executive Officer of Morgan Drexen from May 21, 2007 to the present. | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |
| 14. | David Walker has served as the Chief Financial Officer of Morgan Drexen from November 8, 2010 to the present. | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |
| 15. | Rita Augusta has served as the Chief Operating Officer from | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |

| | | |
|---|---|---|
| | May 18, 2007 to the present. | |
| 16. | Walter Ledda owned at least 80% of Morgan Drexen's shares when the company was founded. | Ledda Dep. (SJ Ex. 26) 21:16-25 (he stated that his ownership interest was in the "80s or 90s" percentage-wise.). |
| 17. | As of April 27, 2012, Morgan Drexen had four shareholders:<br>Walter Ledda: 76.4%<br>Avi Gupta: 14.4%<br>Mark Kruitbosch: 5.2%<br>Rita Augusta: 4.1%. | Morgan Drexen Interrog. II (SJ Ex. 13) Rog. 3 |
| 18. | On November 11, 2013, Walter Ledda moved all of his shares in Morgan Drexen into a family trust, of which he is the beneficiary, and which he controls. | Ledda Dep. (SJ Ex. 26) 22:1-23:17, Ex.144 |
| **BACKGROUND: MORGAN DREXEN/ATTORNEY MODEL SINCE 2010** | | |
| **Morgan Drexen's Role in Providing Debt Settlement Services Since 2010** | | |
| 19. | Morgan Drexen purports to be a service provider for attorneys who provide debt settlement and bankrupty services to consumers. | Morgan Drexen Interrog. VI (SJ Ex. 23) |
| 20. | Morgan Drexen advertises for debt settlement services. | Katz Dep. (SJ Ex. 27) 9:2-6, 28:20-32:14, 32:8-35:25; Nagin Dep. (SJ Ex. 39) 42:19, Ex. Nagin 3 at 4-5 of contract; Walker Dep. (SJ Ex. 24) 54:22-24, 55:1-4, 64: 21 – 65:3-9, Ex. |

| | | |
|---|---|---|
| | | Walker 137, Ex. Walker 139 at MD-CA0342596; Walker Hearing (SJ Ex. 22) 99:15-21, 107: 1-4, 128:20 – 129:17, Ex. Walker 44; Stockinger Dep. (SJ Ex. 47) 40:1-15; Adekoya Decl. (SJ Ex. 146) ¶ 2; Banks Decl. (SJ Ex. 147) ¶ 2; Felder Decl. (SJ Ex. 150) ¶ 2; Hazard Decl. (SJ Ex. 152) ¶ 2; Moore Decl. (SJ Ex. 151) ¶ 2; Newkirk Decl. (SJ Ex. 153) ¶ 2; Rixie Decl. (SJ Ex. 156) ¶ 3; Whiteside Dep. (SJ Ex. 43) 9:6-17; Order Re Stip. (SJ Ex. 118); Ad. 1 (SJ Ex. 1); Ad. 2 (SJ Ex. 2) Ad. 3 (SJ Ex. 3); Ad. 4 (SJ Ex. 4); Ad. 5 (SJ Ex. 5) Ad. 6 (SJ Ex. 6); Ad. 7 (SJ Ex. 7); Ad. 8 (SJ Ex. 8) Ad. 9 (SJ Ex. 9); Ad. 10 (SJ Ex. 10) |
| 21. | Morgan Drexen develops the concept for debt settlement advertisements. | Katz Dep. (SJ Ex. 26) 10:4-17; Walker Dep. (SJ Ex. 14) Ex. 139 at MD-CA0342596 |
| 22. | Morgan Drexen drafts the copy for debt settlement advertisements. | Katz Dep. (SJ Ex. 27) 10:10-16, 18:1-4 |
| 23. | Morgan Drexen films debt settlement advertisements. | Katz Dep. (SJ Ex. 27) 10:18-11:10, 12:4-7 |
| 24. | Morgan Drexen edits debt settlement advertisements to | Katz Dep. (SJ Ex. 27) 10:4-17, 10:18-11:10, 12:4-7 |

| | | |
|---|---|---|
| | prepare them for airing. | |
| 25. | Morgan Drexen develops advertisements that are intended to be used for multiple attorneys. | Katz Dep. (SJ Ex. 27) 16:12-25; Stockinger Dep. (SJ Ex. 47) 37:5 -6, 37:17-38:1 (Morgan Drexen advertises on national, and commercials in Wisconsin have Stockinger's name in them) |
| 26. | Morgan Drexen's General Counsel, Jeffrey Katz, approves each advertisement. | Katz Dep. (SJ Ex. 27) 17:17-19, 18:1-13, 19:1-8, 19:20-20:1, 22:6-23:9, 23:21-25:11; Morgan Drexen Interrog. IV (SJ Ex. 15) |
| 27. | Walter Ledda reviews each advertisement. | Katz Dep. (SJ Ex. 27) 22:6-23:9 |
| 28. | At Walter Ledda's direction, Morgan Drexen has its outside counsel review some, but not all, advertisements. | Katz Dep. (SJ Ex. 27) 21:1-12 |
| 29. | Morgan Drexen contracts with third party vendors to place the advertisements on air. | Kovel Fuller Interrog. (SJ Ex. 17) Rog. 1 |
| 30. | Morgan Drexen pays for the advertising out of its own bank account. | Walker Dep. (SJ Ex. 24)55:25-56:8, Ex. 137 |
| 31. | At one point between October 2010 and the present, Morgan Drexen spent between $800,000 and $1,000,000 per month on | Walker Dep. (SJ Ex. 24) Ex. 139 at MD-CA0342600 |

| | | |
|---|---|---|
| | marketing. | |
| 32. | Each Morgan Drexen advertisement contains a unique phone number. | Howard Dep. II (SJ Ex. 44) 130:11-22; Williamson Dep. (SJ Ex. 46) 189:2-7 (Morgan Drexen created advertisements for attorney Williamson and answered the phone when people called the 1-800 number in the ad.); Stockinger Dep. (SJ Ex. 47) 37:17-38:1 (commercials with attorney Stockinger's name have 1-800 number with main line to Morgan Drexen) |
| 33. | Morgan Drexen employees answer the telephone calls made by consumers calling in response to Morgan Drexen advertisements. | Katz Dep. (SJ Ex. 27) 43:5-10; Wiegman Dep. (SJ Ex. 25) 9:3-10:1; Pisinski Dep. (SJ Ex. 34) 119:12-25; Katz Hearing I (SJ Ex. 19) 134:17-136:11; 140:12-141:7; 165:1-7; Williamson Dep. (SJ Ex. 46) 189:2-7; Stockinger Dep. (SJ Ex. 47) 37:17-38:1 (commercials with attorney Stockinger's name have 1-800 number with main line to Morgan Drexen); Adekoya Decl. (SJ Ex. 146) ¶ 4; Banks Decl. (SJ Ex. 147) ¶ 3; Brown Decl. (SJ Ex. 149) ¶ 3; Felder Decl. (SJ Ex. 150) ¶ 2; Hazard Decl. (SJ Ex. 152) ¶ 4; Moore Decl. (SJ Ex. 151) ¶ 4; Newkirk Decl. (SJ Ex. 153) |

| | | |
|---|---|---|
| | | ¶ 3; Rixie Decl. (SJ Ex. 155) ¶ 5; Montijo Decl. (SJ Ex. 130) ¶ 6-8; Whiteside Dep. (SJ Ex. 43) 10:22-11:3 |
| 34. | Morgan Drexen creates websites for attorneys. | McIntyre-Nicholson Sworn Stmt. II (SJ Ex. 50) 237:2-7 (Morgan Drexen set McIntyre Nicholson up with a website, and she did not get to choose how she wanted the website to look); Stockinger Dep. (SJ Ex. 47) 44:21-52:3 (Morgan Drexen drafted every page of attorney's website except the page with her bio and photo) |
| 35. | Morgan Drexen conducts the intake interview with consumers. | Katz Dep. Ex. 152 (SJ Ex. 30) LIS PPT; Wiegman Dep. (SJ Ex. 25) 9:3-10:1; Pisinski Dep. (SJ Ex. 34) 119:12-25; Saulski Dep. (SJ Ex. 35) 139:5-7, 152:4-153:3; Pisinski Dep. (SJ Ex. 34) Ex. 42 (Howard Law contract with Kimberly Pisinski describing Morgan Drexen's role); Adekoya Decl. (SJ Ex. 146) ¶ 4-5; Banks Decl. (SJ Ex. 147) ¶ 3-4; Bowman Decl. (SJ Ex. 148) ¶ 3-9; Brown Decl. (SJ Ex. 149) ¶ 3-5; Felder Decl. (SJ Ex. 150) ¶ 3-5; Hazard Decl. (SJ Ex. 152) ¶ 4-9; |

| | | |
|---|---|---|
| | | Moore Decl. (SJ Ex. 151) ¶ 4-6; Newkirk Decl. (SJ Ex. 153) ¶ 3-5; Richardson Decl. (SJ Ex. 154) ¶ 2-9; Rixie Decl. (SJ Ex. 155) ¶ 5-8; Pisinski Dep. (SJ Ex. 34) Ex. 40 at PISINSKI000122 (listing Morgan Drexen services, including client intake); Howard Dep. I (SJ Ex. 42) 62:10-63:13 (stating that Morgan Drexen fee schedule in Dep. Ex. 40 reflects services Morgan Drexen provided to Howard Nassirri firm); Katz Hearing I (SJ Ex. 19) 155:3-156:20, 160:9-164:25; Rosen Dep. (SJ Ex. 33) 35:12; Walker Dep. (SJ Ex. 24) Ex. 139 at MD-CA0342595; Stockinger Dep. (SJ Ex. 47) at 64:1-22; Montijo Decl. (SJ Ex. 130) ¶ 12-23 |
| 36. | Morgan Drexen is responsible for getting consumers to sign contracts for services. | Katz Hearing I (SJ Ex. 19) 155:3-156:20; Adekoya Decl. (SJ Ex. 146) ¶ 12, 14; Banks Decl. (SJ Ex. 147) ¶ 7-9, Ex. B; Bowman Decl. (SJ Ex. 148) ¶ 6; Brown Decl. (SJ Ex. 149) ¶ 6-8; Felder Decl. (SJ Ex. 150) ¶ 5, 7; Hazard Decl. (SJ Ex. 152) ¶ 7-8, 11; Moore Decl. (SJ Ex. 151) ¶ 7-9; |

| | | |
|---|---|---|
| | | Newkirk Decl. (SJ Ex. 153) ¶ 6; Richardson Decl. (SJ Ex. 154) ¶ 7; Rixie Decl. ¶ 9-10; Montijo Decl. (SJ Ex. 130) ¶ 14-18, 23, 31-32 |
| 37. | Morgan Drexen determines consumers' monthly payments under the debt settlement program. | Morgan Drexen Interrog. VI (SJ Ex. 23) at 6; Howard Dep. I (SJ Ex. 32) Ex. 257 at VH-8/9-000009 (indicating that Morgan Drexen determines the consumer's monthly payment amount); Katz Hearing I (SJ Ex. 19) 227:10-16; Walker Dep. (SJ Ex. 24) Ex. 139 at MD-CA0342595; Katz Hearing I (SJ Ex. 19) Ex. 13; Stockinger Dep. (SJ Ex. 47) 64:1-22 (Morgan Drexen looks at consumer's income and debt, and then determines payment); Whiteside Dep. (SJ Ex. 43) 13:2-10; Adekoya Decl. (SJ Ex. 146) ¶ 7; Banks Decl. (SJ Ex. 147) ¶ 4; Bowman Decl. (SJ Ex. 148) ¶ 7-9; Brown Decl. (SJ Ex. 149) ¶ 8; Felder Decl. (SJ Ex. 150) ¶ 6; Hazard Decl. (SJ Ex. 152) ¶ 9; Moore Decl. (SJ Ex. 151) ¶ 4; Newkirk Decl. (SJ Ex. 153) ¶ 4; Richardson Decl. (SJ Ex. 154) ¶ 9; Rixie Decl. (SJ Ex. 155) ¶ 8; |

| | | |
|---|---|---|
| | | Montijo Decl. (SJ Ex. 130) ¶ 20 |
| 38. | Morgan Drexen obtains paperwork from consumers to enroll debts into the debt settlement programs. | Saulski Dep. I (SJ Ex. 35) 141:11-14, 152:4-153:3; Pisinski Dep. (SJ Ex. 34) Ex. 42 (Howard Law contract with Kimberly Pisinski describing Morgan Drexen's role); Katz Hearing I (SJ Ex. 19) 218:6-16, 224:20-226:10; Whiteside Dep. (SJ Ex. 43) 18:6-16; Adekoya Decl. (SJ Ex.146) ¶ 15, Banks Decl. (SJ Ex. 147) Ex. B; Bowman Decl. (SJ Ex. 148) ¶ 6; Brown Decl. (SJ Ex. 149) ¶ 6-7; Felder Decl. (SJ Ex. 150) ¶ 7; Hazard Decl. (SJ Ex. 152) ¶7-8, 11; Moore Decl. (SJ Ex. 151) ¶ 7-9; Newkirk Decl. (SJ Ex. 153) ¶ 6; Richardson Decl. (SJ Ex. 154) ¶ 7; Rixie Decl. (SJ Ex. 155) ¶ 9-10 |
| 39. | Morgan Drexen has access to, administers, and reconciles the funds in consumers' trust accounts. | Nagin Dep. (SJ Ex. 39) 113: 21-23; Walker Dep. (SJ Ex. 24) 14:11-17, Ex. 135; Walker Hearing (SJ Ex. 22) 34:10; Williamson Dep. (SJ Ex. 46) 85:6-10 (Morgan Drexen reconciles Williamson's clients' trust accounts and processes settlements that are approved by local counsel.) |
| 40. | As part of administering | Saulski Dep. I (SJ Ex. 35) 141:15-17, |

| | | |
|---|---|---|
| | consumers' trust accounts, Morgan Drexen sets up automatic withdrawals from consumers' bank accounts. | 152:4-153:3; Pisinski Dep. (SJ Ex. 34) Ex. 42 (Howard Law contract with Kimberly Pisinski describing Morgan Drexen's role), Ex. 40 at PISINSKI000122 (listing Morgan Drexen services, including ACH services); Whiteside Dep. (SJ Ex. 43) 45:16-22; Adekoya Decl. (SJ Ex. 146) ¶ 6; Banks Decl. (SJ Ex. 147) ¶ 4; Bowman Decl. (SJ Ex. 148) ¶ 9; Brown Decl. (SJ Ex. 149) ¶ 7; Felder Decl. (SJ Ex. 150) ¶ 5; Hazard Decl. (SJ Ex. 152) ¶ 8-9; Moore Decl. (SJ Ex. 151) ¶ 7, 9; Newkirk Decl. (SJ Ex. 153) ¶ 5; Richardson Decl. (SJ Ex. 154) ¶ 8; Rixie Decl. (SJ Ex. 155) ¶ 8 |
| 41. | Morgan Drexen generates and sends to consumers monthly statements of their trust account activity. | Pisinski Dep. (SJ Ex. 34) 60:1-8; Stockinger Dep. (SJ Ex. 47) 88:11-14 |
| 42. | Morgan Drexen assigns consumers to attorneys. | Saulski Dep. II (SJ Ex. 36) 229:1-18, 231:1-17, 343:3-23 (Morgan Drexen assigning clients to Attonrey Saulski); Nagin Dep. (SJ Ex. 39) 47:14-17; 126:20-24; 127:11-13 |

| | | |
|---|---|---|
| 43. | Morgan Drexen sends letters to consumers instructing them to call Morgan Drexen rather than their assigned attorney if they have any questions. | Cottone Dep. (SJ Ex. 37) Ex. 70 (all correspondence to consumer states to contact Morgan Drexen client coordinator or to contact the attorney's mailing address on the letterhead, which is Morgan Drexen's address and phone number) |
| 44. | Morgan Drexen sends letters to creditors in connection with debt settlement negotiations. | Howard Dep. (SJ Ex. 32) 220:24-223:17 (discussing letters to creditors in SJ Ex. 28 at MD-CA0475096-475103); Cavalry Dep. (SJ Ex. 42) 14:20-25; Unterberger Decl. (SJ Ex. 136) ¶ 6, Ex. A; Katz Hearing I (SJ Ex. 136) 34:5-22 (Morgan Drexen sends system generated letters to creditors) |
| 45. | Morgan Drexen directs creditors to communicate with Morgan Drexen, not attorneys. | Unterberger Decl. (SJ Ex. 136) Ex. A (April 11, 2011 letter to creditor from attorney stating "[p]lease do not call me. Speak with the law firm's authorized agent [Morgan Drexen] instead."); Katz Hearing I (SJ Ex. 19) 34:5-22 (Morgan Drexen sends system generated letters to creditors telling them to not contact the consumer, but to contact to Morgan Drexen); Stockinger Dep. (SJ Ex. 47) 117: 14-23 (Morgan Drexen sends |

| | | |
|---|---|---|
| | | letter to creditor telling it to send all communications to Morgan Drexen.); Katz Dep. Ex. 150 part I (SJ Ex. 28) at MD-CA0475096-MD-CA0475103 (letters to creditors) |
| 46. | Generally, Morgan Drexen, not attorneys, negotiates directly with creditors to settle consumers' debts. | Katz Dep. (SJ Ex. 27) 51:24-62:1 ("It is – again, this [debt settlement] is what the attorneys rely upon the Morgan Drexen staff to do."); Saulski Dep. (SJ Ex. 35) 145:19-21, 152:4-153:3; Pisinski Dep. (SJ Ex. 34) 97:2-6 (Morgan Drexen communicated with paralegals of "debt person".); Benzer Dep. (SJ Ex. 38) 62:24-63:5; Howard Dep. (SJ Ex. 32) 62:10-63:13 (stating that Morgan Drexen fee schedule in Dep. Ex. 40 reflects services Morgan Drexen provided to Howard Nassirri firm), 68:16-69:1; Pisinski Dep. (SJ Ex. 34) Ex. 40 at PISINSKI000122 (listing Morgan Drexen services, including negotiating with creditors), Ex. 42 (Howard Law contract with Kimberly Pisinski describing Morgan Drexen's role); Unterberger Decl. (SJ Ex. 136) ¶¶ 5-15; Cavalry Dep. (SJ Ex. 42) 9:15-10:18; 18:22-20:7; Rosen Dep. |

| | | |
|---|---|---|
| | | (SJ Ex. 33) 80:5; Nagin Dep. (SJ Ex. 39) 87:20 – 88:4; Franklin Decl. (SJ Ex. 134) ¶ 16; Elias Decl. (SJ Ex. 133) ¶ 8; Morgan Drexen Interrog. VI (SJ Ex. 23) Rog. 1 at p. 6 (Morgan Drexen sends offers to creditors); Stockinger Dep. (SJ Ex. 47) 121:25-122:2 (Morgan Drexen does the debt settlement negotiation); Cleary Decl. (SJ Ex. 131) ¶ 2-4; Hsieh Decl. (SJ Ex. 132) ¶ 2-3 |
| 47. | Generally, Morgan Drexen determines which debts to settle first. | Katz Dep. (SJ Ex. 27) 54:2-55:13; Adams Dep. (SJ Ex. 48) 78:5-10; Saulski Dep. I (SJ Ex. 35) 146:5-15; Franklin Decl. (SJ Ex. 134) ¶ 10; Elias Decl. (SJ Ex. 133) ¶ 8; Cleary Decl. (SJ Ex. 131) ¶ 5; Hsieh Decl. (SJ Ex. 132) ¶ 5 |
| 48. | Generally, Morgan Drexen determines which negotiation tactics to employ. | Katz Dep. (SJ Ex. 27) 56:23-62:1, 69:20-70:6; Cleary Decl. (SJ Ex. 131) ¶ 6-7; Hsieh Decl. (SJ Ex. 132) ¶ 5, 7-9 |
| 49. | Morgan Drexen utilizes at least eight different strategies in order to negotiate a debt settlement:<br><br>(1) Morgan Drexen times a debt settlement offer towards the end | Katz Dep. (SJ Ex. 27) 56:23-62:1, 69:20-70:6 |

| | | |
|---|---|---|
| | of the 120 days that a debt settlement agency holds an account so that the agency has an incentive to accept it before having to give up the account;<br><br>(2) Morgan Drexen advises the creditor that the consumer is judgment proof;<br><br>(3) Morgan Drexen informs the creditor that the statute of limitations on collecting the debt has run;<br><br>(4) Morgan Drexen requires the creditor to validate the debt, and alters its debt negotiations strategy if the creditor does not validate the debt;<br><br>(5) Morgan Drexen employs various strategies depending on whether the debt is a business debt, personal debt, or a debt where there is a co-signer who is also responsible for the debt; | |

| | | |
|---|---|---|
| | (6) Morgan Drexen assesses prior offers from the creditor relating to the instant account, and compares the offers to the offers the creditor typically makes;<br><br>(7) Because debt settlement is a sequential process – *i.e.*, one debt is settled at a time – Morgan Drexen pits creditors against one another; and<br><br>(8) Morgan Drexen discusses the particular hardships of the consumer. | |
| 50. | When Morgan Drexen receives a debt settlement offer from a creditor, it notifies the local attorneys via e-mail that the settlement is ready for review on Morgan Drexen's portal. | Benzer Dep. (SJ Ex. 38) 59:6-60:12, 115:4-116:2; Cottone Dep. (SJ Ex. 37) 40:2-24; Pisinski Dep. (SJ Ex. 34) Ex. 39 (indicating that local counsel will receive an email from Morgan Drexen when a settlement is ready for review); Cleary Decl. (SJ Ex. 131) ¶ 11 |
| 51. | If a negotiation is successful, Morgan Drexen sends the payment to the creditors. | Pisinski Dep. (SJ Ex. 34) Ex. 40 at PISINSKI000122 (listing Morgan Drexen services, including issuing checks to creditors); |

| | | |
|---|---|---|
| | | Howard Dep. (SJ Ex. 32) 62:10-63:13 [stating that Morgan Drexen fee schedule in Pisiniski Dep. (SJ Ex. 34) Ex. 40 reflects services Morgan Drexen provided to Howard Nassirri firm]; Rosen Dep. (SJ Ex. 33) 88:15; Williamson Dep.(SJ. Ex. 46) 85:6-10 (Morgan Drexen reconciles Williamson's clients' trust accounts and processes settlements that are approved by local counsel.) |
| 52. | Morgan Drexen invoices and collects fees from consumers paid to its affiliated attorneys, and then pays itself from these proceeds. | Saulski Dep. II (SJ Ex. 36) 180:2-181:10; Pisinksi (SJ Ex. 34) 189:22-190:6 |
| 53. | Since September 2011, Morgan Drexen's monthly receivable has ranged from $1.5 million per month to $4.5 million per month. | Walker Dep. (SJ Ex. 24) 97:3-4 |
| 54. | Morgan Drexen sells/transfers the rights to accounts receivable from attorneys to the factoring financing companies with which it has contracts. | Master Purchase Agreement (SJ Ex. 116) |
| **Attorneys Play a Very Limited Role in Providing Debt Services to Consumers** | | |

| Role of Engagement Counsel | | |
|---|---|---|
| 55. | Engagement Counsel are attorneys who have contracted directly with Morgan Drexen for services. | Katz Dep. (SJ Ex. 27) 168:11-16; Ledda Dep. (SJ Ex. 26) 92:25-93:2; Howard Dep. I (SJ Ex. 32) 46:8-14; Pisinski Dep. (SJ Ex. 34) Ex. 42 (July 11, 2011 Howard Law Contract with Kimberly Pisinski defining Engagement Counsel); Nagin Dep. (SJ Ex. 39) 39:25 – 40:1; Morgan Drexen Interrog. I (SJ Ex. 12) Rog.14 |
| 56. | Morgan Drexen recruits Engagement Counsel. | Email 42 (SJ Ex. 99) |
| 57. | Morgan Drexen has had contracts with at least 69 Engagement Counsel. | Morgan Drexen Interrog. V (SJ Ex. 16) [spreadsheet produced by Morgan Drexen in response to CID Interrogatory 13 identifying attorneys]; Walker Dep. (SJ Ex. 24) 21:24-25; Ledda Dep. (SJ Ex. 26) 139:13-21 |
| 58. | By the terms of these contracts, Morgan Drexen maintained significant control over the provision of debt settlement services. | Saulski Dep. I (SJ Ex. 35) Ex. 62; WI DFI Order (SJ Ex. 122) ¶¶ 15 -17 |
| 59. | For example, the contract between Morgan Drexen and Engagement Counsel Joseph | Saulski Dep. I (SJ Ex. 35) Ex. 62 ¶¶ 2-3, 5-6, 8-10, 12-13, 16 |

| | | |
|---|---|---|
| | Saulski, signed in February 2010, granted Morgan Drexen the following control:<br><br>• Saulski was to provide "supervision" of Morgan Drexen's work, but Morgan Drexen retained the sole right to "supervise its own administrative staff and other employees without SAULSKI's supervision, interference, or control."<br><br>• A "QC Recorded Questionnaire," which Morgan Drexen developed "at its own expense, with its own experience," and which Morgan Drexen could modify at its own discretion, was mandated for performing client intake.<br><br>• Morgan Drexen prepared advertisements that Saulski could only disapprove of "for cause."<br><br>• Morgan Drexen maintained sole discretion to provide the services described in the contract through any entity it deemed appropriate.<br><br>• Saulski was to be "advanced" | |

| | | |
|---|---|---|
| | money each month "from all fees received by [Morgan Drexen] from the SAULSKI client base."<br><br>• In the event that Saulski terminated the contract with Morgan Drexen prior to its expiration, all payments due to Morgan Drexen became immediately due and payable and constituted a lien against any fees generated from clients.<br><br>• Saulski was obligated to provide timely cooperation to Morgan Drexen.<br><br>• Morgan Drexen had the right to charge Saulski $1,100 for each consumer supported by Morgan Drexen in the event that Saulski choose to "compete with [Morgan Drexen] and take clients previously serviced by [Morgan Drexen]."<br><br>• Provided that certain conditions in the contract were met, Morgan Drexen had the right to assign its contract with Saulski to any third party without Saulski's approval. | |

| | | |
|---|---|---|
| | • Morgan Drexen was provided a security interest in its share of any monies paid by consumers. | |
| 60. | Morgan Drexen e-mails Engagement Counsel with list of new consumers who have enrolled through Morgan Drexen. | Saulski Dep. II (SJ Ex. 36) 342:22 - 343:23; Stockinger Dep. (SJ Ex. 47) 83:10-24 |
| 61. | Sometimes, the Engagement Counsel is licensed to practice law in the jurisdiction where the consumer resides. In this situation, the Engagement Counsel's sole role in the provision of debt settlement services is to review settlements negotiated by Morgan Drexen. | Stockinger Dep. (SJ Ex. 47) 122:9-12 (she reviews and approves settlements, as engagement and local counsel in WI.) |
| 62. | When Engagement Counsel does review settlements, it takes little time to do so. | Rosen Dep. (SJ Ex. 33) 86:9-13 |
| **Role of Local Counsel** | | |
| 63. | Local Counsel are attorneys whom Engagement Counsel have retained to provide services to consumers in jurisdictions where the Engagement Counsel are not licensed to practice law. | Morgan Drexen Interrog. I (SJ Ex. 12) Rog. 14; Pisinski Dep. (SJ Ex. 34) Ex. 39 (Feb. 6, 2009 Kimberly Pisinski contract to act as local counsel to Howard Nassiri, LLP), Ex. 42 (July 11, 2011 Kimberly Pisinski |

| | | |
|---|---|---|
| | | contract to act as local counsel to Howard Nassiri, LLP); Howard Dep. I (SJ Ex. 32) 46:15-21; 47:6-20; Katz Dep. (SJ Ex. 27) 168:17-24; Rosen Dep. (SJ Ex. 33) 29:3; Franklin Decl. (SJ Ex. 134) ¶ 3 |
| 64. | Morgan Drexen recruits Local Counsel. | Email 43 (SJ Ex. 100) |
| 65. | Morgan Drexen provides services to Local Counsel on matters in which Local Counsel are assisting Engagement Counsel. | Morgan Drexen Interrog. I (SJ Ex. 12) Rog. 14 |
| 66. | Engagement Counsel who have retained Local Counsel have little – if any – role in providing services to consumers. | Howard Dep. I (SJ Ex. 32) Ex. 251 at 12 ("'Engagement Attorneys' rarely provide services to 'Clients,' if at all.")<br>Howard Dep. II (SJ. Ex. 44) 106:4-107:5 (Engagement Counsel explains that it is up to Local Counsel to determine whether to accept a settlement); Williamson Dep. (SJ Ex. 46) 68:20-69:18 (As engagement counsel, Williamson's role was to supervise the "non-law related aspect |

| | | |
|---|---|---|
| | | of the functions that local counsel would be performing." He would not make legal decisions in Local Counsel's state.), 69:19-70:11 |
| 67. | Generally, Local Counsel play a very limited role in providing services to consumers. | Howard Dep. I (SJ Ex. 32) Ex. 251 at p. 9-10 (describing role of local counsel); Pisinski Dep. (SJ Ex. 34) Ex. 39 (only duties described in contract for local counsel are reviewing debt settlement offers); Rosen Dep. (SJ Ex. 113) 31:6; Franklin Decl. (SJ Ex. 134) ¶ 16; Elias Decl. (SJ Ex. 133) ¶ 8-9; McIntyre-Nicholson Sworn Stmt. I (SJ Ex. 49) 25:12-17; 27:15-19 (only reviewed debt settlement offers and advising Pro Se consumers who have been sued, only talked to consumers when sued by creditors), 27:3-13; 27:16-19 (if consumer had question about debt settlement, she would refer them to Morgan Drexen.) |
| 68. | Local Counsel's primary function is to review settlements. | Cottone Dep. (SJ Ex. 37) 44:19-45:1 (80% of DS time reviewing offers and 20% statutory analysis); Howard Dep. I (SJ Ex. 32) Ex. 251 at p. 9-10 (describing role of local counsel); Pisinski Dep. (SJ Ex. 34) Ex. 39 (only |

| | | |
|---|---|---|
| | | duties described in contract for local counsel are reviewing debt settlement offers); Benzer Dep. (SJ Ex. 38) 63:2-5 (only role in debt settlement was approval); Rosen Dep. (SJ Ex. 33) ¶ 31:6; Franklin Decl. (SJ Ex. 134) ¶ 16 McIntyre-Nicholson Sworn Stmt. I (SJ Ex. 49) 81:9-22; 98:14-17 (Consumers already approved offers by the time offers came to her for review. She was just giving the final "okay."); Elias Decl. (SJ Ex. 133) ¶ 16 – 19 |
| 69. | Local Counsel spend little time reviewing settlements. | Cottone Dep. (SJ Ex. 37) 45:18-20 (5-10 minutes to review); Franklin Decl. (SJ Ex. 134) ¶ 16 Elias Decl. (SJ Ex. 133) ¶ 9 (spent approximately 2 minutes reviewing settlements) |
| 70. | Local Counsel rarely reject settlements. | Saulski Dep. I (SJ Ex. 35) 40:6-16 (accepted 98-99%); Cottone Dep. (SJ Ex. 37) 43:6-44:6 (accepted at least 95%); Benzer Dep. (SJ Ex. 38) 57:9—58:6 (approved 100% of settlements and didn't reject any); McIntyre-Nicholson Sworn |

| | | |
|---|---|---|
| | | Stmt. I (SJ Ex. 49) 186:7-187:6; Elias Decl. ¶ 9 |
| 71. | For a certain time period, a Local Counsel's failure to respond was considered an approval of the settlement. | Howard Dep. II (SJ Ex. 44) 171:10-172:1 |
| 72. | Morgan Drexen has worked with at least 62 Local Counsel. | Morgan Drexen Interrog. V (SJ Ex. 16) [spreadsheet produced by Morgan Drexen in response to CID Interrogatory 13 identifying attorneys] |
| 73. | Engagement Counsel pay Local Counsel $500/month for the assignment of up to 300 consumers, and an additional $2.50 per consumer/month for each additional consumer. | Saulski Dep. I (SJ Ex. 35); Saulski Dep. at 32:11-15, Ex. 61; Benzer Dep. (SJ Ex. 38) Ex. 207; Cottone Dep. (SJ Ex. 37) Ex. 69; Pisinski Dep. (SJ Ex. 34) Ex. 39; Howard Dep. I (SJ Ex. 32) 53:14-54:24; Nagin Dep. (SJ Ex. 39) Ex. 3 at MD-CA0007873; Franklin Decl. (SJ Ex. 134) ¶ 5; Elias Decl. (SJ Ex. 133) ¶ 5 |
| 74. | Engagement Counsel pay Local Counsel a flat fee of $250/month to review up to 50 settlements, and an additional amount of between $2 - $5 for each | Saulski Dep. I (SJ Ex. 35) Ex. 61; Benzer Dep. (SJ Ex. 38) Ex. 207; Cottone Dep. (SJ Ex. 37) Ex. 69; Pisinski Dep. (SJ Ex. 34) Ex. 39; Howard Dep. I (SJ Ex. 32) 53:14- |

| | | |
|---|---|---|
| | additional settlement reviewed. | 54:24; 58:24-59:14; Nagin Dep. (SJ Ex. 39) Ex. 3 at MD-CA0007873; Franklin Decl. (SJ Ex. 134) ¶ 5; Elias Decl. (SJ Ex. 133) ¶ 5 |
| **MORGAN DREXEN CHARGES UP-FRONT FEES FOR DEBT SETTLEMENT SERVICES IN VIOLATION OF THE TELEMARKETING SALES RULE (TSR)** | | |
| **Morgan Drexen's Debt Settlement Model Prior to the October 27, 2010 Effective Date for the Telemarketing Sales Rule Amendment** | | |
| 75. | Prior to the October 27, 2010 effective date for the Telemarketing Sales Rule ("TSR"), consumers enrolled in Morgan Drexen's debt settlement program were charged an up-front engagement fee and monthly fee for debt settlement services. | Katz Dep. (SJ Ex. 27) 29:3-18, Ex. 158; Stockinger Dep. (SJ Ex. 47) 107:16-21; Montijo Decl. (SJ Ex. 130) ¶ 5 |
| 76. | The engagement fee for debt settlement was 6.25% of the consumer's enrolled debt. | Katz Dep. (SJ Ex. 27) Ex. 158 |
| 77. | Generally, Morgan Drexen collected the engagement fee from the consumer's monthly payments before the consumer began accumulating funds in his/her trust account to be used | Katz Dep. (SJ Ex. 27) Ex. 158; Wiegman Hearing (SJ Ex. 21) 92:3-14; Stockinger Dep. (SJ Ex. 47) 107:16-21; Montijo Decl. (SJ Ex. 130) ¶ 5. |

| | | |
|---|---|---|
| | for settling debts. | |
| 78. | Consumers paid the engagement fee over a number of months depending on the amount they could afford. | Katz Dep. (SJ Ex. 27) Ex. 158; Pisinski Dep. (SJ Ex. 34) 67:21-24; MD-CA0479653 (Ledda's vision document. "Monthly payments are calculated on the consumer's disposable income.") |
| 79. | Consumers paid a monthly maintenance fee of $45 - $55. | Katz Dep. (SJ Ex. 27) Ex. 158; Saulski Dep. I (SJ Ex. 35) 96:14-97:7. |
| | **Amendments to Telemarketing Sales Rule** | |
| 80. | In 2009, Morgan Drexen became aware of proposed amendments to the TSR. | Ledda Dep. (SJ Ex. 26) 138:13-15 |
| 81. | On October 23, 2009, Morgan Drexen submitted comments to the Federal Trade Commission concerning the proposed debt relief amendments to the TSR. | Nagin Dep. Ex. 9 (SJ Ex. 40) |
| 82. | Morgan Drexen considered the proposed TSR amendment's ban on advance fees for debt settlement a threat to its business model. | Ledda Dep. (SJ Ex. 26) 138:16-141:15; Nagin Dep. (SJ Ex. 39) 161:10; Walker Dep. (SJ Ex. 24) 152:10-19; Email 36 (SJ Ex. 93) (email from Nagin to Del Meeks at Cash Call, "If the FTC's Rule amendments are enacted the proposed Rule amendments *materially* would |

| | | |
|---|---|---|
| | | impair MD's ability to operate.") Email 46 (SJ Ex. 103) [email from Nagin to Del Meeks "The FTC is proposing a change in the Telemarketing Sales Rule that would have a *materially adverse* affect on Morgan Drexen's continued viability."] |
| 83. | Prior to the amendment of the TSR, approximately 50% of the fees that Morgan Drexen received were derived from up-front engagement fees paid by consumers under the debt settlement contract. | Walker Dep. (SJ Ex. 24) 150:20-151:5; Ex. 137 |
| 84. | In its October 23, 2009, submission to the FTC, Morgan Drexen stated, ". . . cessation of revenue as proposed in the Commission's Rule amendments would deleteriously affect . . .[Morgan Drexen] . . ." | Nagin Dep. Ex. 9 (SJ Ex. 40) at CFPB0006311-12 |
| 85. | The amended TSR went into effect on October 27, 2010. | TSR Amend. Final Rule (SJ Ex. 129) |
| 86. | The amended TSR prohibits, among other things,"[r]equesting or receiving payment of any fee or consideration for any debt | TSR Amend. Final Rule (SJ Ex. 129) |

| | | |
|---|---|---|
| | relief service until . . .[t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "[t]he customer has made at least one payment pursuant to such agreement, plan, or contract." | |
| **<u>Morgan Drexen Changes its Model for Providing Debt Settlement Services</u>** | | |
| 87. | In response to the amended TSR, Morgan Drexen developed a new model for providing debt settlement services. | Katz Dep. (SJ Ex. 27) 29:3-18, Ex. 158 (describing "Post FTC-2010 TSR Amendment[,] CONFIDENTIAL: Proposed Business Model Supported by Morgan Drexen, Inc.), Ex. 156; MD-CA0342598 (CRESO report indicating MD changed business model in response to TSR). MD-CA0344287 (Walker email to potential financier "we have changed our business model so that it is in compliance with the FTC's amendment.") Stockinger Dep. (SJ Ex. 47) 132:2- |

| | | |
|---|---|---|
| | | 20; Montijo Decl. (SJ Ex. 130) ¶ 6-7 (noting that around the time the law changed, Morgan Drexen picked 5-6 Legal Intake Specialists to participate in a pilot program to sell bankruptcy services instead of debt settlement services, and after this, instructed Legal Intake Specialists to sell both bankruptcy and debt settlement services). |
| 88. | Morgan Drexen's CEO, Walter Ledda, came up with the vision for the "dual program," which bundles debt settlement services with bankruptcy-related services. | Email 38 (SJ Ex. 95); MD-Description of Services (SJ Ex. 108) [Ledda stated that dual program "bundles debt settlement services" with bankruptcy services]; Katz Dep. (SJ Ex. 27) 225:4-226:19 (Ledda's vision was "not to dissimilar from what existed in 2007. It was the notion of a – it was a debt settlement agreement, which still had an engagement fee. You now had bankruptcy, with Morgan Drexen being adequately staffed to support the production of this petition.") Ledda Dep. (SJ Ex. 26) 63:18-64:1; Nagin Dep. (SJ Ex. 39) 210: 23 – 211:2 ("[Ledda] was the one that came up with we're going to |

| | | |
|---|---|---|
| | | introduce bankruptcy services in a month's time or something, and he assigned Susan Muzila to work on that, and he pushed to develop that on a fast track.")<br>Montijo Decl. (SJ Ex. 130) ¶ 7 (describing generally that Legal Intake Specialists were instructed to sell both debt settlement and bankruptcy-related services.) |
| 89. | Morgan Drexen's CEO, Walter Ledda, described the program as follows: "Imagine knowing that you have settled all of your debt [and] avoided the scar of Bankruptcy . . . ." | Email 38 (SJ Ex. 95) |
| 90. | Walter Ledda considered consumers filing for a Chapter 7 bankruptcy petition a "desperate act" and "the ultimate last resort." | Email 23 (SJ Ex. 80) ["Bankruptcy is a final and desperate act to be used as the ultimate last resort. Consider that Nuclear War is a final and desperate act to be used as the ultimate last resort."] |
| 91. | Walter Ledda e-mailed Morgan Drexen employees:<br><br>"'Preventative Bankruptcy' is the law firms' goal…This is to help consumers AVOID | Email 34 (SJ Ex. 91) [punctuation and emphasis in original] |

| | | |
|---|---|---|
| | bankruptcy. They (Law Firms) accomplish this (Goal) by engaging (Bankruptcy Services) in 'Parallel' with (Non-Formal Chapter 13 Debt Resolution Services). Simply stated: **The Bankruptcy supports the efforts of the Non-formal.**<br><br>REMEMBER!....Preparing for the worst case scenario (Bankruptcy) supports the goal of the best case scenario Non-Formal Chapter 13 Debt Resolution (Settling the debts without bankruptcy)." | |
| 92. | Morgan Drexen participated in drafting the debt settlement agreement and the bankruptcy services agreement for the dual program for debt settlement and bankruptcy services. | Email 39 (SJ Ex. 96) [Morgan Drexen's General Counsel split the existing contract into two contracts] |
| 93. | Morgan Drexen participated in drafting the post-TSR agreement between Engagement Counsel and Local Counsel. | Email 40 (SJ Ex. 97) |
| 94. | Morgan Drexen participated in drafting the agreements to be | Email 41 (SJ Ex. 98); Email 44 (SJ Ex. 101) |

| | | |
|---|---|---|
| | used between Engagement Counsel Vincent Howard and other Engagement Counsel for use of Mr. Howard's Local Counsel. | |
| 95. | Morgan Drexen coordinated the roll-out of the post-TSR debt settlement model, which included recruiting bankruptcy Engagement Counsel. | Email 42 (SJ Ex. 99) |
| 96. | Morgan Drexen believed that, with its up-front fee and increased contingency fee, the dual model would result in the TSR having only a slightly negative impact on Morgan Drexen. | Walker Dep. (SJ Ex. 24) 157:1-8 |
| 97. | Morgan Drexen projected that the majority of consumers would sign up for the dual program for debt settlement and bankruptcy services. | Walker Dep. (SJ Ex. 24) 157:14-16 |
| 98. | According to one attorney, consumers no longer had the option of simply hiring her to perform only debt settlement work. | Pisinski Dep. (SJ Ex. 34) 89:21-24 |
| **<u>Fee Structure under the Dual Program for Debt Settlement and</u>** | | |

| **"Bankruptcy Services"** | | |
|---|---|---|
| 99. | Under the dual program for debt settlement and bankruptcy services ("dual program"), consumers are required to enter into separate debt settlement and "bankruptcy services" contracts. | Katz Dep. (SJ Ex. 27) Ex. 158; Ledda Dep. (SJ Ex. 26) 75:22-76:4 (bankruptcy engagement fee), 82:4-15 (monthly fee); Franklin Decl. (SJ Ex. 134) ¶ 14, Ex. D; Banks Decl. (SJ Ex. 147) Ex. B.; Bowman Decl. (SJ Ex. 148) Ex. D; Montijo Decl. (SJ Ex. 130) ¶ 14-15; 31-32; Katz Dep. Ex. 150 part I (SJ Ex. 28) at MD-CA0475169-172 (debt resolution agreement) and MD-CA0475173-175 (bankruptcy agreement) |
| 100. | Under the debt settlement contract, the consumer pays no up-front fees. When a debt is settled, the consumer pays a contingency fee of 18% of the enrolled debt balance at the time of engagement. | Debt Settlement Contract (SJ Ex. 114) [exemplar of 2011 debt settlement contract produced by Morgan Drexen]; Katz Dep. (SJ Ex. 27) Ex. 158; Katz Dep. Ex. 150 part I (SJ Ex. 28) at MD-CA0475169-172 (debt resolution agreement); Franklin Decl. (SJ Ex. 134) ¶ 14. Ex. D; Stockinger Dep. (SJ Ex. 47) 135:8-20; 136:13-24 (only charged 18% for each debt settlement under the new contract because hybrid program is "bundled service."); Bowman Decl. (SJ Ex. 148) Ex. D |
| 101. | Under the "bankruptcy services" | Bankruptcy Contract (SJ Ex. 115) |

| | | |
|---|---|---|
| | contract, the consumer must pay an up-front engagement fee and a monthly maintenance fee. | (exemplar bankruptcy contract produced by Morgan Drexen); Katz Dep. (SJ Ex. 27) Ex. 158; Katz Dep. Ex. 150 part I (SJ Ex. 28) at MD-CA0475173-175 (bankruptcy agreement); Howard Dep. I (SJ Ex. 32) 121:7-122:18 (charge engagement fees at outset of engagement "because they might not have it later on."); Walker Dep. (SJ Ex. 24) 28:22 – 29:18; Franklin Decl. (SJ Ex. 134) ¶ 14, Ex. D; Stockinger Dep. (SJ Ex. 47) 135:1-7 (there is an up-front fee for the hybrid program for the preparation of a bankruptcy petition.); Bowman Decl. (SJ Ex. 148) Ex. D |
| 102. | The engagement fee under the contract for "bankruptcy services" is calculated as a percentage of the consumer's debt. | Katz Dep. (SJ Ex. 27) 142:2-18, 143:2-144:19; Ledda Dep. (SJ Ex. 26) at MD-CA0444360 (Ledda 1/3/12 email with bankruptcy fee table), 76:5-9 (fee based on consumer debt); Katz Hearing I (SJ Ex. 19) 249:2-12; Walker Dep. (SJ Ex. 24) 30:19-21 |
| 103. | The engagement fee under the "bankruptcy services contract" ranges from $1,000 - $3,250. | Katz Dep. (SJ Ex. 27) 142:2-18, 143:2-144:19 (explaining Dep. Ex. 151); Ledda Dep. (SJ Ex. 26) at MD-CA0444360 (Ledda 1/3/12 email with |

| | | |
|---|---|---|
| | | bankruptcy fee table), 76:5-9 (fee based on consumer debt); Katz Hearing I (SJ Ex. 19) 249:2-12; Stockinger Dep. (SJ Ex. 47) 135:1-7 (on average the fee is about $1,500.) Banks Decl. (SJ Ex. 147) Ex A; Bowman Decl. (SJ. Ex. 148) ¶ 11; Ex. B, Ex. D; Felder Decl. (SJ Ex. 150) Ex. A; Hazard Decl. (SJ Ex. 152) Ex. A; Richardson Decl. (SJ Ex. 154) ¶ 11; Rixie Decl. (SJ Ex. 155) ¶ 13; Hanson Decl. (SJ Ex. 138) ¶ 31-32 (95% of consumers paid a "Bankruptcy Planning and Preparation" fee between $1,000 and $3,250) |
| 104. | Generally, the consumers' monthly payments first go towards paying the engagement fee under the bankruptcy contract. | Katz Dep. (SJ Ex. 27) 183:10-13 Pisinski Dep. (SJ Ex. 34) 67:12-24; 71:7-12 ("we would not have started settling debts until after they paid the engagement fee, yes."); Nagin Dep. (SJ Ex. 39) Ex. 3; Katz Dep. (SJ Ex. 27) Ex. 158 at MD-CA0479653 (Ledda's vision document "All payments are first credited to fund the first $1,500 of the Bankruptcy Fees then to the Monthly Servicing Fees. The remainder will accumulate in the |

| | | |
|---|---|---|
| | | Client Trust account for settlements and Contingent Settlement Fees.") Saulski Dep. I (SJ Ex. 35) 120:4-25 (Consumers that signed up for bankruptcy services made payments that were first applied to the "bankruptcy" engagement fee unless there was an immediate settlement; consumers often started paying the bankruptcy engagement fee before he was even able to have a conversation with them.); Adekoya Decl. (SJ Ex. 146) ¶ 18, 19, Ex. A; Banks Decl. (SJ Ex. 147) Ex A.; Bowman Decl. (SJ Ex. 148) Ex. B; Brown Decl. (SJ Ex. 149) ¶ 4, 8; Felder Decl. (SJ Ex. 150) ¶ 14, Ex. A; Hazard Decl. (SJ Ex. 152) Ex. A.; Moore Decl. (SJ Ex. 151) ¶ 10; Richardson Decl. (SJ Ex. 154) ¶ 11; Rixie Decl. (SJ Ex. 155) ¶ 7; Montijo Decl.(SJ Ex. 130) ¶ 35 |
| 105. | The engagement fee under the bankruptcy contract is charged whether the client files bankruptcy or not and is non-refundable. | Bankruptcy Contract (SJ Ex. 115); Email 12 (SJ Ex. 69); Adekoya Decl. (SJ Ex. 146) ¶ 19-20; Banks Decl. (SJ Ex. 147) Ex A; Bowman Decl. (SJ Ex. 148) Ex. D; Richardson Decl. (SJ Ex. 154) ¶ 11, 13; Rixie Decl. (SJ Ex. 155) ¶ 13 |

| | | |
|---|---|---|
| 106. | Consumers also pay a monthly maintenance fee in the range of $50 under the "bankruptcy services" contract. | MD0017854-17867 (exemplar bankruptcy contract produced by Morgan Drexen) MD-CA0442681; Katz Dep. (SJ Ex. 27) Ex. 158; Katz Dep. Ex. 150 part I (SJ Ex. 28) at MD-CA0475173-175 (bankruptcy agreement); Wiegman Hearing (SJ Ex. 21) 57:5-15; Walker Hearing (SJ Ex. 22) 19:16 Franklin Decl.(SJ Ex. 134) ¶ 14. Ex. D; Adekoya Decl. (SJ Ex. 146) Ex. A, Banks Decl. (SJ Ex. 147) Ex. A; Bowman Decl. (SJ Ex. 148) Ex. B, D.; Brown Decl. (SJ Ex. 149) ¶ 4; Felder Decl. (SJ Ex. 150) Ex. A; Hazard Decl. (SJ Ex. 152) Ex. A; Moore Decl. (SJ Ex. 151) ¶ 10 |
| 107. | Morgan Drexen also has consumers enter into an agreement for ACH withdrawals that allows the fees paid for "bankruptcy services" to be used for debt settlement. | Wiegman Hearing (SJ Ex. 24) 53:7-11 ACH Contract 7 (SJ Ex. 57); ACH Contract 1 (SJ Ex. 51); ACH Contract 2 (SJ Ex. 52); ACH Contract 3 (SJ Ex. 53); ACH Contract 4 (SJ Ex. 54); ACH Contract 5 (SJ Ex. 55); ACH Contract 6 (SJ Ex. 56) |
| 108. | Unless a settlement is reached with a creditor prior to the engagement fee being paid off, | Walker Dep (SJ Ex. 24) 34:3, Ex. 138 at CFPB0021957; Walker Hearing (SJ Ex. 22) 21:13; Saulski Dep. I (SJ |

| | | |
|---|---|---|
| | money in that account is first applied to outstanding fees, and only then placed in a trust, which Morgan Drexen administers, to be used to settle the consumer's debt. | Ex. 35) 120:13-25; Adekoya Decl. (SJ Ex. 146) ¶ 18, Ex. A.; Banks Decl. (SJ Ex. 147) Ex. A; Bowman Decl. (SJ Ex. 148) Ex. B; Brown Decl. (SJ Ex.149) ¶ 13; Felder Decl. (SJ Ex. 150) Ex. A; Hazard Decl. (SJ Ex. 152) Ex. A; Richardson Decl. (SJ Ex. 154) ¶ 11; Rixie Decl. (SJ Ex. 155) ¶ 7, 13; Montijo Decl. (SJ Ex. 130) ¶ 35. |
| 109. | If the consumer has different attorneys assigned for debt settlement and "bankruptcy services," and a settlement is achieved, funds from the consumer's trust account with his/her "bankruptcy services" attorney can be transferred to cover the settlement payment and the debt settlement attorney's fees and costs of settlement, including Morgan Drexen's fees. | Katz Dep. (SJ Ex. 27) Ex. 158; ACH Contract 7 (SJ Ex. 57) |
| **<u>Morgan Drexen Receives the Vast Majority of Fees Paid by Consumers</u>** | | |
| 110. | The vast majority of money paid by consumers is ultimately paid to Morgan Drexen. | Walker Dep. (SJ Ex. 24) 69:19-21; 74:2-10, Ex. 138 |

| | | |
|---|---|---|
| 111. | Morgan Drexen receives 85% – 95% of fees paid by consumers. | Walker Dep. (SJ Ex. 24) 69:19-21; 74:2-10. |
| 112. | Generally, attorneys keep between 5% - 15% of the fees paid by consumers. | Walker Dep. (SJ Ex. 24) 69:19-21; 74:2-10 |
| 113. | In 2011 or 2012, Morgan Drexen created a model that estimated that Engagement Counsel would earn approximately $2 - $5 per consumer who signed up for Morgan Drexen's services for each month the consumer remained in a program. | Walker Dep. (SJ Ex. 24) 104:8-12; 105:21; 106:6-9. |
| 114. | Morgan Drexen bills attorneys on a daily basis and is typically paid on a daily basis. | Walker Dep. (SJ Ex. 24) 37:22 – 38:14 |
| 115. | Most Engagement Counsel receive a monthly distribution from the money paid by consumers each month. | Walker Dep. (SJ Ex. 24)18:23 – 19:25<br>Stockinger Dep. (SJ. Ex 47) 175:24-176:17 (Stockinger gets paid with fees "less things paid out". Testified that she receives part of engagement fee less whatever is owed to Morgan Drexen.) |
| 116. | In general, Engagement Counsel receive a minimum monthly amount of $1,250 from fees paid by consumers that increases | Walker Dep. (SJ Ex. 24) 12:22 – 21:11, Ex. 135 |

| | | |
|---|---|---|
| | when the number of clients under them exceeds a base amount, typically 300-500 clients, at which point they receive an additional amount for each client in excess of the base. | |
| 117. | When the number of settlements in a month increases beyond a base amount, typically 250, there is an additional amount per settlement above the base that the Engagement Counsel receive from the fees paid by consumers. | Walker Dep. (SJ Ex. 24) 20:12 – 21:11, Ex. 135 |
| 118. | Engagement Counsel rarely receive more than the agreed-to minimum monthly distribution from fees paid by consumers. | Walker Dep. (SJ Ex. 24) 24:2 – 25:10, Ex. 135 |
| 119. | Morgan Drexen cannot recall an instance where an Engagement Counsel has been paid more than the agreed-to minimum monthly distribution from fees paid by consumers. | Walker Dep. (SJ Ex. 24) 24:2 – 25:10 |
| 120. | Generally, after attorneys take their distribution, there is not enough money left from consumer payments for them to pay Morgan Drexen for all of the | Nagin Dep. (SJ Ex. 39) 121:4-11, Ex. 4; Walker Dep. (SJ Ex. 24) 25:15-26:1, Ex. 135 |

| | | |
|---|---|---|
| | services it billed for the month. | |
| 121. | Morgan Drexen assumes the risk of non-payment from consumers. | Walker Dep. (SJ Ex. 24) 40:13-15 |
| 122. | If, in a given month, attorneys do not have sufficient funds to pay Morgan Drexen's fees, Morgan Drexen will defer payment until the following month. | Saulski Dep. (SJ Ex. 35) 146:5-15; (MD invoicing Saulski for more than what he received in revenue each month); Walker Dep. (SJ Ex. 24) 41:1-22; 50:12-18, Ex. 136 |
| 123. | Morgan Drexen does not collect payments due from an attorney if the consumers assigned to that attorney do not pay enough so that the attorney has money to pay Morgan Drexen from funds received from consumers. | Walker Dep. (SJ Ex. 24) 40:13-25; Walker Hearing (SJ Ex. 22) 83:1-4 |
| | **<u>Dual Program Enrollment</u>** | |
| 124. | Of the 62,654 consumers who enrolled in any program offered by Morgan Drexen between October 27, 2010 and August 31, 2014, the last date for which Morgan Drexen produced data, 59,507 consumers, or approximately 95%, enrolled in the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 28. |
| 125. | Of the 59,507 consumers who | Hanson Decl. (SJ Ex. 138) ¶ 35. |

| | | |
|---|---|---|
| | have enrolled in the dual program between October 27, 2010 and August 31, 2014, 534 consumers , or approximately 0.897%, have filed a Chapter 7 bankruptcy petition. | |
| 126. | Overall, 61,476 consumers have enrolled in the dual program from the time Morgan Drexen began offering that program to August 31, 2014. Of those 61,476 consumers, 584 consumers, or approximately 0.95%, have filed a Chapter 7 bankruptcy petition. | Hanson Decl. (SJ Ex. 138) ¶ 36. |
| 127. | Of the 62,654 consumers who enrolled in any program offered by Morgan Drexen between October 27, 2010 and August 31, 2014, only 2,698 consumers, or approximately 4.3%, enrolled in the bankruptcy only program. | Hanson Decl. (SJ Ex. 138) ¶ 30. |
| 128. | Of the 59,507 consumers who enrolled in the dual program between October 27, 2010 and August 31, 2014, 55,459 consumers were charged a "Bankruptcy Planning and Preparation Fee" (*i.e.*, the bankruptcy engagement fee). The average Bankruptcy | Hanson Decl. (SJ Ex. 138) ¶ 31. |

| | | |
|---|---|---|
| | Planning and Preparation Fee charged to each consumer was approximately $1,357, with the mean fee charged being $1,295. | |
| 129. | Of the 55,549 consumers who were charged a "Bankruptcy Planning and Preparation Fee":<br>• Approximately 0.6% had a "Bankruptcy Planning and Preparation Fee" less than $1,000;<br>• Approximately 73.1% had a "Bankruptcy Planning and Preparation Fee" between $1,000 and $1,499;<br>• Approximately 17.8% had a "Bankruptcy Planning and Preparation Fee" between $1,500 and $1,999;<br>• Approximately 5.0% had a "Bankruptcy Planning and Preparation Fee" between $2,000 and $2,500; and<br>• Approximately 3.5% had a "Bankruptcy Planning and Preparation Fee" greater than $2,500. | Hanson Decl. (SJ Ex. 138) ¶ 32 |
| 130. | Of the 59,507 consumers who enrolled in the dual program since October 27, 2010, all 59,507 were charged a "Monthly Flat Fee" (*i.e.*, the monthly maintenance fee), which ranged from $17.50 to $100 per month. | Hanson Decl. (SJ Ex. 138) ¶ 33. |

| | | |
|---|---|---|
| | Most consumers (approximately 69.4%) were charged a monthly maintenance fee in the amount of $50 per month. | |
| 131. | In total, between October 27, 2010 and August 31, 2014, 59,507 consumers who were enrolled in the dual program paid approximately $90.7 million in Bankruptcy Planning and Preparation Fees and monthly maintenance fees before making their first payment to a creditor. For the period from July 21, 2011 through August 31, 2014, 53,518 consumers were enrolled in the dual program and paid Morgan Drexen Bankruptcy Planning and Preparation Fees and monthly maintenance fees prior to Morgan Drexen making the first payment to a creditor. | Hanson Decl. (SJ Ex. 138) ¶ 34. |
| **Morgan Drexen Continues to Offer a Debt Settlement Only Program, but Few Consumers Enroll** | | |
| 132. | Since October 27, 2010, Morgan | Katz Dep. (SJ Ex. 27), Ex. 158 (MD |

| | | |
|---|---|---|
| | Drexen has also offered a debt settlement only program. | Post-TSR business model) |
| 133. | Of the 62,654 consumers who enrolled in any program offered by Morgan Drexen between October 27, 2010 and August 31, 2014, 449 consumers, or approximately 0.7%, enrolled in the debt settlement only program. | Hanson Decl. (SJ Ex. 138) ¶ 29. |
| 134. | Under the debt settlement only program, the consumer does not pay any up-front fees, but when a debt is settled, the consumer must pay a contingency fee of 36% of the enrolled debt at the time of engagement. | Debt Settlement Contract (SJ Ex. 114) at MD001017-1024 (examplar of 2011 debt settlement only contract produced by Morgan Drexen). Morgan Drexen May 7, 2012 production cover letter (indicating that Morgan Drexen implemented MD001017-1024 in October 2010) Katz Dep. (SJ Ex. 27), Ex. 158 (MD Post-TSR business model) |
| 135. | When asked why the contingency fee is 36% for consumers enrolled in the debt settlement only program and only 18% for consumers enrolled in the dual program, Engagement Counsel Vincent Howard explained that consumers in the | Howard Dep. I (SJ Ex. 44) 160:13-162:19. |

| | | |
|---|---|---|
| | dual program get the discounted 18% contingency fee rate because the debt settlement services are bundled with the bankruptcy services. | |
| 136. | Engagement Counsel Tiffany Stockinger explained why consumers in the dual program get charged 18% contingency fee instead of the 36% under the debt settlement only program: "Instead of charging 36 percent, they only get charged 18 percent because they paid for that possible bankruptcy petition . . . . [W]e charge less because it's a bundled service." | Stockinger Dep. (SJ Ex. 47) at 135:8-20; 136:13-24 |
| **Morgan Drexen Also Offers a Bankruptcy Only Program, but Few Consumers Enroll** | | |
| 137. | Morgan Drexen offers a bankruptcy only program, where no debt settlement work is performed. | Katz Dep. (SJ Ex. 27) 206:15-22, Ex. 158 (MD Post-TSR business model) Howard Dep. I (SJ Ex. 44) 158:18-159:2. |
| 138. | Of the 62,654 consumers who enrolled in any program offered by Morgan Drexen between October 27, 2010 and August 31, | Hanson Decl. (SJ Ex. 138) ¶ 30. |

| | | |
|---|---|---|
| | 2014, the last date for which Morgan Drexen produced data, 2,698 consumers, or approximately 4.3%, enrolled in the bankruptcy only program. | |
| **Post-TSR, Morgan Drexen Continues to Advertise For Debt Settlement Services** | | |
| 139. | Since the TSR went into effect on October 27, 2010, Morgan Drexen has aired television and radio advertisements for debt relief services that did not make any mention of or use the word bankruptcy. | Ad. 3 (SJ Ex. 3); Ad. 4 (SJ Ex. 4); Ad. 5 (SJ Ex. 5) Ad. 6 (SJ Ex. 6); Ad. 7 (SJ Ex. 7); Ad. 8 (SJ Ex. 8) Ad. 9 (SJ Ex. 9); Ad. 10 (SJ Ex. 10) |
| 140. | Morgan Drexen also aired radio advertisements for debt relief services for which the only reference to bankruptcy is the statement: “Start your life over without filing bankruptcy.” | Ad. 1 (SJ Ex. 1); Ad. 2 (SJ Ex. 2) |
| 141. | From August 31, 2013 to March 20, 2014, at least 662 consumers enrolled in a Morgan Drexen program in response to the advertisements. | Hanson Decl. (SJ Ex. 138) ¶ 47-48. Order Re Stip (SJ Ex. 118)(Doc. No. 142). |
| **Consumers Want Debt Settlement, not Bankruptcy Services** | | |
| 142. | Generally, consumers who call | Tesoro Dep. (SJ Ex. 41) 26:10 – 27:2; |

| | | |
|---|---|---|
| | Morgan Drexen do so because they are interested in signing up for the debt settlement program. | Whiteside Dep. (SJ Ex. 43) 10:5-15; 11:24-12:5; 17:3-15. Adekoya Decl. (SJ Ex. 146) ¶ 4; Banks Decl. (SJ Ex. 147) ¶ 3; Bowman Decl. (SJ Ex. 148) ¶ 9, 12; Brown Decl. (SJ Ex. 149) ¶ 3; Felder Decl. (SJ Ex. 150) ¶ 3; Hazard Decl. (SJ Ex. 152) ¶ 6; Moore Decl. (SJ Ex. 151) ¶ 4-5; Newkirk Decl. (SJ Ex. 153) ¶ 3-4; Richardson Decl. (SJ Ex. 154) ¶ 6; Rixie Decl. (SJ Ex. 155) ¶ 8; Montijo Decl. (SJ Ex. 130) ¶ 8, 31; Franklin Decl. (SJ Ex. 134) ¶ 22 |
| 143. | According to Morgan Drexen, 90% of consumers who call in are interested in debt settlement. | Wiegman Dep. (SJ Ex. 25) 111:9-21 (Of the calls Wiegman monitored, 90% of consumers called because they were interested in settling their debts). |
| 144. | According to at least one attorney, nearly all clients he spoke to were only interested in debt settlement. | Cottone Dep. (SJ Ex. 37) 53:17-22 (Of the 20-30 clients he spoke to, nearly all were only interested in debt settlement). |
| 145. | Consumers have explicitly told Legal Intake Specialists that they have no interest in signing up for bankruptcy-related services and only want debt settlement services, but were still enrolled | Adekoya Decl. (SJ Ex. 146) ¶ 9; Banks Decl. (SJ Ex. 147) ¶ 7-8; Bowman Decl. (SJ Ex. 148) ¶ 12, Ex. C; Brown Decl. (SJ Ex. 149) ¶ 9; Felder Decl. (SJ Ex. 150) ¶ 3; Hazard Decl. (SJ Ex. 152) ¶ 6-7; Moore Decl. |

| | | |
|---|---|---|
| | in the dual program. | (SJ Ex. 151) ¶ 8; Newkirk Decl. (SJ Ex. 153) ¶ 4; Richardson Decl. (SJ Ex. 154) ¶ 4, 7; Rixie Decl. (SJ Ex. 155) ¶ 7-8.<br>Montijo Decl. (SJ Ex. 130) ¶ 8, 31.<br>Whiteside Dep. (SJ Ex. 43) 11:24-12:5 |
| 146. | Consumers have written in the client questionnaires that they submitted to Morgan Drexen that they do not want bankruptcy services, but were still enrolled in the dual program. | Brown Decl. (SJ Ex. 149) ¶ 10 ("Not filing bankruptcy"), Ex. A;<br>Felder Decl. (SJ Ex. 150), Ex. B ("I didn't want bankruptcy, I want to pay off my Bank of America credit card."); Hazard Decl. (SJ Ex. 152), Ex. B ("N/A");<br>Katz Dep. Ex. 150 part 1 (SJ Ex. 28) at MD-CA0475141 (Consumer Linda Hazard wrote "N/A" on client questionnaire when asked why she wanted file bankruptcy). |
| **<u>Nonetheless, Morgan Drexen Enrolls Consumers into the Dual Program</u>** | | |
| 147. | A Morgan Drexen Legal Intake Specialist takes phone calls and receives information from consumers who are interested in enrolling in one of Morgan Drexen's services. | Morgan Drexen Interrog. II (SJ Ex. 13) (Morgan Drexen Response to CID Interrogatory 7 - describing function of Legal Intake Specialists).<br>Tesoro Dep. (SJ Ex. 41) 16:25 – 17:8;<br>Yescas Dep. (SJ Ex. 45), Ex. 9;<br>Adekoya Decl. (SJ Ex. 146) ¶ 4-5; |

| | | |
|---|---|---|
| | | Banks Decl. (SJ Ex. 147) ¶ 3-4;<br>Bowman Decl. (SJ Ex. 148) ¶ 3-9;<br>Brown Decl. (SJ Ex. 149) ¶ 3-5;<br>Felder Decl. (SJ Ex. 150) ¶ 3-5;<br>Hazard Decl. (SJ Ex. 152) ¶ 4-9;<br>Moore Decl. (SJ Ex. 151) ¶ 4-6;<br>Newkirk Decl. (SJ Ex. 153) ¶ 3-5;<br>Richardson Decl. (SJ Ex. 154) ¶ 2-9;<br>Rixie Decl. (SJ Ex. 155) ¶ 5-8<br>Montijo Decl. (SJ Ex. 130) ¶ 20-21, 27-28;<br>Wiegman Dep. (SJ Ex. 25) 9:3-10:1, Ex. 132 |
| 148. | Legal Intake Specialists work between 50-70 hours a week. | Tesoro Dep. (SJ Ex. 41) 72:18-19<br>Montijo Decl. (SJ Ex. 130) ¶ 8 (notes that he worked 70 hours a week) |
| 149. | In 2010, Morgan Drexen employed approximately 60-70 Legal Intake Specialists. | Walker Dep. (SJ Ex. 24) 189: 5-7 |
| 150. | At some point in 2011 or 2012, Morgan Drexen employed up to 110 Legal Intake Specialists. | Walker Dep. (SJ Ex. 24) 189: 5-7 |
| 151. | In 2013, Morgan Drexen began decreasing the number of Legal Intake Specialists it employed. | Walker Dep. (SJ Ex. 24) 189: 8-12 |
| 152. | Morgan Drexen currently | Wiegman Dep. (SJ Ex. 25) 19:19-24. |

| | | |
|---|---|---|
| | employs approximately 40 Legal Intake Specialists. | |
| 153. | Legal Intake Specialists send consumers contracts for services or they direct consumers to a website where they can view contracts electronically. | Wiegman Dep. (SJ Ex. 25) 66:20-67:3; Adekoya Decl. (SJ Ex. 146) ¶ 12, 14, Banks Decl. (SJ Ex. 147) ¶ 7-9, Ex. B; Bowman Decl. (SJ Ex. 148) ¶ 6; Brown Decl. (SJ Ex. 149) ¶ 6-8; Felder Decl. (SJ Ex. 150) ¶ 5, 7; Hazard Decl. (SJ Ex. 152) ¶ 7-8, 11; Moore Decl. (SJ Ex. 151) ¶ 7-9; Newkirk Decl. (SJ Ex. 153) ¶ 6; Richardson Decl. ¶ 7; Rixie Decl. (SJ Ex. 155) ¶ 9-10<br>Montijo Decl. (SJ Ex. 130) ¶ 15 |
| 154. | Legal Intake Specialists sometimes make a series of recorded quality control disclosures to consumers at the time of enrollment. | Wiegman Dep. (SJ Ex. 25) 88:25-89:8; Adekoya Decl. (SJ Ex. 146) ¶ 5, 11; Banks Decl. (SJ Ex. 147) ¶ 5; Bowman Decl. (SJ Ex. 148) ¶ 5.<br>Montijo Decl. (SJ Ex. 130) ¶ 21-22.<br>Whiteside Dep. (SJ Ex. 43) 64:10-65:23 |
| 155. | From late 2011 to the present, Morgan Drexen has not had a policy requiring the Legal Intake Specialists to read quality control disclosures to consumers before they sign the debt | Wiegman Dep. (SJ Ex. 25) 92:18-93:8; 93:25 – 94:3; 105:8-12 |

| | | |
|---|---|---|
| | settlement or bankruptcy contracts. | |
| 156. | Legal Intake Specialists frequently coach consumers as to how they are supposed to respond to the quality control prompts before and during the recordings to ensure consumers answer in a manner that ensures their enrollment. | Adekoya Decl. (SJ Ex. 146) ¶ 5, 11; Banks Decl. (SJ Ex. 147) ¶ 5; Bowman Decl. (SJ Ex. 148) ¶ 5. Montijo Decl. (SJ Ex. 130) ¶ 21-22. Whiteside Dep. (SJ Ex. 43) 64:10-65:23 |
| 157. | Approximately 90% of the time, the recorded quality control disclosures are made after the consumers sign the debt settlement or bankruptcy contracts. | Wiegman Dep. (SJ Ex. 25) 91:13-92:7; 106:4-11 |
| 158. | These recorded quality control disclosures are sometimes made two and a half hours into a conversation with consumers. | Wiegman Dep. (SJ Ex. 25) 98:14-18 |
| 159. | The recorded quality control disclosures take one-and-a-half to two-and-a-half minutes to read to consumers and record. | Wiegman Dep. (SJ Ex. 25) 96:21-97:8. |
| 160. | Since at least October 2010, Morgan Drexen has paid Legal Intake Specialists by commission. | Tesoro Dep. (SJ Ex. 41) 56:15 – 57:8; Walker Dep. (SJ Ex. 24) 186: 7-9; Yescas Dep. (SJ Ex. 45), Ex. 69 (“Legal Intake Specialist |

| | | |
|---|---|---|
| | | Agreement": MDWI002296) Montijo Decl. (SJ Ex. 130) ¶ 11, 29. |
| 161. | The commission for Legal Intake Specialists is based on the number of consumers the Legal Intake Specialist enrolls in a Morgan Drexen program in a given week. | Tesoro Dep. (SJ Ex. 41) 72; Walker Dep. (SJ Ex. 24) 187: 5; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement": MDWI002296); Montijo Decl. (SJ Ex. 130) ¶ 11, 29. |
| 162. | Morgan Drexen expects Legal Intake Specialists to enroll between 4 and 6 consumers per week. | Tesoro Dep. (SJ Ex. 41) 58:21-24 Montijo Decl. (SJ Ex. 130) ¶ 24 |
| 163. | Under the commission plan, a Legal Intake Specialist earns points for enrolling consumers in a Morgan Drexen program. | Tesoro Dep. (SJ Ex. 41) 56:15 – 57:8; 58:9-12; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement") Montijo Decl. (SJ Ex. 130) ¶ 11 |
| 164. | If a Legal Intake Specialist enrolls a consumer in the dual program, he or she earns 1 point. | Tesoro Dep. (SJ Ex. 41) 56:15 – 57:8; 58:9-12; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement"); Montijo Decl. (SJ Ex. 130) ¶ 11 |
| 165. | If the Legal Intake Specialist enrolls a consumer in a debt settlement only or bankruptcy only program, he or she only earns half a point. | Tesoro Dep. (SJ Ex. 41) 56:15 – 57:8; 58:9-12; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement": MDWI002296) Montijo Decl. (SJ Ex. 130) ¶ 11 |

| | | |
|---|---|---|
| 166. | If a Legal Intake Specialist earns 8 points in a week, he or she earns roughly $1,250 for the week. | Tesoro Dep. (SJ Ex. 41) 59:2-4; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement": MDWI002294) |
| 167. | If a Legal Intake Specialist earns more than 8 points in a week, he or she can earn more than $1,250 per week. | Tesoro Dep. (SJ Ex. 41) 59:15-18; Yescas Dep. (SJ Ex. 45), Ex. 69 ("Legal Intake Specialist Agreement": MDWI002294) |
| 168. | Generally, most Legal Intake Specialists make roughly $1,250 a week. | Tesoro Dep. (SJ Ex. 41) 62:2-12 |
| 169. | Morgan Drexen employs Production Managers to supervise the Legal Intake Specialists. | Tesoro Dep. (SJ Ex. 41) 19:17-19 Montijo Decl. (SJ Ex. 130) ¶ 24. |
| 170. | According to one former Production Manager, the role of a Production Manager was to "build a team, train them, and get them to produce," i.e. "to submit debt deals." | Tesoro Dep. (SJ Ex. 41) 8:13-18 Montijo Decl. (SJ Ex. 130) ¶ 24 ("my primary duty as Production Manager was to make sure my team members met their quotas for the week") |
| 171. | On average, each Production Manager supervises more than 15 Legal Intake Specialists. | Tesoro Dep. (SJ Ex. 41) 19: 17-19 Montijo Decl. (SJ Ex. 130) ¶ 24. |
| 172. | Production Managers are paid by commission: between $4 - $38 for each consumer a Legal Intake Specialist on their team enrolls | Tesoro Dep. (SJ Ex. 41) 50:19-24; 52:19-24 Montijo Decl. (SJ Ex. 130) ¶ 24. |

| | | |
|---|---|---|
| | in a Morgan Drexen program. | |
| 173. | Production Managers have steered consumer calls to Legal Intake Specialists who enroll the most consumers. | Tesoro Dep. (SJ Ex. 41) 60:21-24 Montijo Decl. (SJ Ex. 130) ¶ 27. |
| 174. | Morgan Drexen Legal Intake Specialists are under intense pressure to enroll consumers in the dual program. | Tesoro Dep. (SJ Ex. 41) 72 Montijo Decl. (SJ Ex. 130) ¶ 27-28. |
| 175. | At least one attorney believes that Morgan Drexen was not making the debt settlement process clear for consumers: "Many [consumers] do not understand that we will NOT be paying any of their creditors and that they will go into default." | Saulski Dep. II (SJ Ex. 36), Ex.72 at 2 (Saulski letter) |
| 176. | According to former Morgan Drexen employees, Morgan Drexen's work place is a fear-based, boiler-room environment, where Legal Intake Specialists and Production Managers need to close deals in order to save their jobs, let alone get paid. | Tesoro Dep. (SJ Ex. 41) 72 – 84 Montijo Decl. (SJ Ex. 130) ¶ 25-28. |
| 177. | Morgan Drexen expects Legal Intake Specialists to hit certain sales numbers. | Tesoro Dep. (SJ Ex. 41) 72 – 82 |

| | | |
|---|---|---|
| 178. | Morgan Drexen threatens to fire Legal Intake Specialists if they do not hit their sales numbers. | Tesoro Dep. (SJ Ex. 41) 72 – 82<br>Montijo Decl. (SJ Ex. 130) ¶ 28. |
| 179. | Morgan Drexen expects Production Managers to hit certain sales numbers through their teams. | Tesoro Dep. (SJ Ex. 41) 72 – 82;<br>Montijo Decl. (SJ Ex. 130) ¶ 24-26 |
| 180. | Morgan Drexen threatens to fire Production Managers if they do not hit their sales numbers. | Tesoro Dep. (SJ Ex. 41) 72 – 82<br>Montijo Decl. (SJ Ex. 130) ¶ 25 |
| 181. | For example, Production Managers have routinely been called into meetings and told they will be fired if their Legal Intake Specialist team does not meet Morgan Drexen's sales goals. | Tesoro Dep. (SJ Ex. 41) 72 – 82;<br>Montijo Decl. (SJ Ex. 130) ¶ 25 |
| 182. | Morgan Drexen fires Production Managers and Legal Intake Specialists who do not meet Morgan Drexen's sales goals. | Tesoro Dep. (SJ Ex. 41) 72 – 82;<br>Montijo Decl. (SJ Ex. 130) ¶ 25, 28. |
| 183. | Legal Intake Specialists complained to at least one Production Manager about the pressure they were under. | Tesoro Dep. (SJ Ex. 41) 79:5 |
| 184. | Some Legal Intake Specialists quit because they could not handle the pressure. | Tesoro Dep. (SJ Ex. 41) 79:7-8 |

| | | |
|---|---|---|
| 185. | After the TSR amendments became effective, the dual program was the main program Legal Intake Specialists tried to sell to consumers. | Tesoro Dep. (SJ Ex. 41) 14:20-22; Montijo Decl. (SJ Ex. 130) ¶ 9-12, 29 |
| 186. | At least one Production Manager instructed Legal Intake Specialists to tell clients that engaging in the bankruptcy program was "just a way of moving forward with the debt resolution program." | Tesoro Dep. (SJ Ex. 41) 45:21-46:5 |
| 187. | According to one former Production Manager, who, from at least 2010 to 2013, monitored five to six hours of phone calls between Legal Intake Specialists and consumers each week, Legal Intake Specialists said what they needed to say to get consumers to sign up. | Tesoro Dep. (SJ Ex. 41) 7:1-8; 8:24; 22:13 – 24:18: 78:16-19 |
| 188. | Legal Intake Specialists tell consumers that if they want to enroll in debt settlement services, they will need to sign up for the dual program and fill out the bankruptcy-related paperwork. | Banks Decl. (SJ Ex. 147) ¶ 7-8; Newkirk Decl. (SJ Ex. 153) ¶ 10; Rixie Decl. (SJ Ex. 155) ¶ 10; Montijo Decl. (SJ Ex. 130) ¶ 16, 32. |

| | | |
|---|---|---|
| 189. | Legal Intake Specialists tell consumers that if they sign up for the dual program, then no bankruptcy work will occur unless and until the consumer explicitly states that he or she wants to file for bankruptcy. | Banks Decl. (SJ Ex. 147) ¶ 9; Bowman Decl. (SJ Ex. 148), Ex. C; Brown Decl. (SJ Ex. 149) ¶ 9; Newkirk Decl. (SJ Ex. 153) ¶ 10, Ex. A; Rixie Decl. (SJ Ex. 155) ¶ 7-8 Montijo Decl. (SJ Ex. 130) ¶ 17, 33. |
| 190. | Legal Intake Specialists tell consumers that if they sign up for the dual program, they will not be charged fees for any bankruptcy-related services unless and until the consumer explicitly states that he or she wants to file for bankruptcy. | Montijo Decl. (SJ Ex. 130) ¶ 18, 34; Banks Decl. (SJ Ex. 147) ¶ 9; Brown Decl. (SJ Ex. 149) ¶ 9; Newkirk Decl. (SJ Ex. 153) ¶ 10 |
| 191. | Legal Intake Specialists tell consumers who enroll in the dual program that Morgan Drexen will use the consumers' monthly payments to pay off the consumers' debts, when in fact, Morgan Drexen uses the consumers' monthly payments first to pay off bankruptcy-related fees, and thereafter uses the consumers' funds to settle the consumers' debts. | Montijo Decl. (SJ Ex. 130) ¶ 35. Adekoya Decl. (SJ Ex. 146) ¶ 7; Banks Decl. (SJ Ex. 147) ¶ 6; Brown Decl. (SJ Ex. 149) ¶ 8; Hazard Decl. (SJ Ex. 152) ¶ 4, Ex. A; Moore Decl. (SJ Ex. 151) ¶ 10-11; Newkirk Decl. ¶ 8 (SJ Ex. 153); Rixie Decl. (SJ Ex. 155) ¶ 6; Whiteside Dep. (SJ Ex. 43) 16:1-12; 22:18-25 |
| 192. | Legal Intake Specialists | Montijo Decl. (SJ Ex. 130) ¶ 15, 31; |

| | | |
|---|---|---|
| | routinely separate the nine signature pages that consumers must sign to enroll in the dual program from the rest of the contract and send only those nine pages to consumers for their signatures. | Bowman Decl. (SJ Ex. 148) ¶ 6, Ex. A |
| **<u>Consumers Believe They are Signing Up for Debt Settlement Only</u>** | | |
| 193. | Consumers who enroll in the dual program believe that they are enrolling in debt settlement services, not bankruptcy services. | Adekoya Decl. (SJ Ex. 146) ¶ 10, 12; Banks Decl. (SJ Ex. 147) ¶ 9; Bowman Decl. (SJ Ex. 148) ¶ 12-13, Ex. C; Brown Decl. (SJ Ex. 149) ¶ 7; Felder Decl. (SJ Ex. 150) ¶ 3-4; Hazard Decl. (SJ Ex. 152) ¶ 6-7; Moore Decl. (SJ Ex. 151) ¶ 5; Newkirk Decl. (SJ Ex. 153) ¶ 4, 10; Richardson Decl. (SJ Ex. 154) ¶ 6-8; Rixie Decl. (SJ Ex. 155) ¶ 7-8; Stockinger Dep. (SJ Ex. 47) 154:9-17; (“A lot of people - I mean even when I talk to other people that – my own – you know, my bankruptcy clients, a lot of them claim that they are in a debt settlement program and they are misinformed about what they are in.”); Montijo Decl. (SJ Ex. 130) ¶ 14, 31; |

| | | |
|---|---|---|
| | | Whiteside Dep. (SJ Ex. 43) 12:6-21, 17:3-15 |
| 194. | In a form letter to consumers welcoming them to the "Bankruptcy Services Program," consumers are told that efforts will be made to settle their debts and avoid having to file for bankruptcy. | Bankruptcy Letter 2 (SJ Ex. 107), MD-CA0444090 ("We support your efforts to resolve your debts in a non-formal manner with your creditors without having to actually file a formal petition for bankruptcy.") Banks Decl. (SJ Ex. 147), Ex. B; Bowman Decl. (SJ Ex. 148), Ex. C; Newkirk Decl. (SJ Ex. 153) ¶ 9, Ex. A and Ex. C |
| **<u>Morgan Drexen Continues to Provide Same Debt Settlement Services to Consumers Enrolled in Dual Program</u>** | | |
| 195. | Morgan Drexen provides the same debt settlement services to consumers enrolled in the debt settlement only program and the dual program. | Compare Debt Settlement Contract (SJ Ex. 114) MD001009-1016 (debt settlement contract under dual program) with Debt Settlement Contract (SJ Ex. 114) MD001017-1024 (debt settlement only contract). Howard Dep. I (SJ Ex. 32) 111:5-112:12 (same debt settlement contract with consumer used under debt settlement only and dual programs) Wiegman Hearing (SJ Ex. 21) 38:10-20;<br>Katz Dep. (SJ Ex. 27) 81:20-82:4 |

| | | |
|---|---|---|
| | | (debt settlement negotiation tools used for both debt settlement only and dual programs) |
| 196. | Morgan Drexen continues to initiate debt settlement negotiations when consumers have accumulated 20% of the balance in their trust account. | Katz Dep. (SJ Ex. 27) 69:20-25. Wiegman Hearing (SJ Ex. 21) 44:7-16. |
| 197. | Morgan Drexen employees continue to conduct debt settlement negotiations. | Katz Dep. (SJ Ex. 27) 69:15-82:4. |
| 198. | Morgan Drexen continues to use the same eight debt negotiation strategies referenced in SUF ___. | Katz Dep. (SJ Ex. 27) 69:20-70:6. |
| 199. | Morgan Drexen continues to play the same role in providing debt settlement services. | *See supra* UF 19 to 54 |
| 200. | Engagement Counsel continue to play the same, limited role in providing debt settlement services. | *See supra* UF 55 to 62. |
| 201. | Local Counsel continue to play the same, limited role in providing debt settlement services. | *See supra* UF 63-74<br>Cottone Dep. (SJ Ex. 37) 44:19-45:1 (80% of DS time reviewing offers and 20% statutory analysis)<br>Benzer Dep. (SJ Ex. 38) 63:2-5 (only role in DS was approval ). |
| **<u>Consumers Who Are Enrolled In The Dual Program Receive Little, If Any,</u>** | | |

| **“Bankruptcy” Services** | | |
|---|---|---|
| 202. | The “Scope of Services” in the bankruptcy contract with consumers sets forth the limited “bankruptcy services” to be provided. | Bankruptcy Contract (SJ Ex. 115); Katz Dep. Ex.150 part 1 (SJ Ex. 28); |
| 203. | If the consumer does not decide to file for bankruptcy, the only services he or she will receive under the bankruptcy contract are: (1) the intake interview; (2) the receipt of certain mandatory notices; and (3) Morgan Drexen’s preparation of a Chapter 7 bankruptcy petition. | Bankruptcy Contract (SJ Ex. 115); Katz Dep. Ex.150 part 1 (SJ Ex. 28); Katz Dep. (SJ Ex. 27) Ex. 153 (email and bankruptcy flow chart) |
| 204. | If the consumer decides to file for bankruptcy, then the consumer will consult with an attorney about filing for bankruptcy. | Katz Dep. Ex.150 part 1 (SJ Ex. 28) at MD-CA045173-176; Katz Dep. (SJ Ex. 27), Ex. 153 (email and bankruptcy flow chart indicating that attorney appointment is made when client decides to file for bankruptcy). |
| 205. | If the consumer actually files for bankruptcy, then the attorney will attend the meeting with creditors and the consumer will receive assistance in preparing | Bankruptcy Contract (SJ Ex. 115); Katz Dep. Ex. 150 part 1 (SJ Ex. 28); Pisinski Dep. (SJ Ex. 34) 152:14-153:8, 155:15-21 |

| | | |
|---|---|---|
| | any amendments to documents requested by the trustee. | |
| 206. | Under the bankruptcy contract, no additional services are provided to consumers. | Bankruptcy Contract (SJ Ex. 115); Katz Dep. Ex. 150 part 1 (SJ Ex. 28) |
| **<u>Morgan Drexen, Not Attorneys, Performs Most Of The "Bankruptcy" Work</u>** | | |
| 207. | Generally, Morgan Drexen, not attorneys, conducts the initial intake interview, as set forth in the bankruptcy fee agreement, with consumers to discuss their financial situation based on information the consumers provide. | Wiegman Dep. (SJ Ex. 23) 9:3-10; Katz Dep. (SJ Ex. 27) 130:21-133:12 (only 3-5 of 60 attorneys involved in intake interview);<br>Pisinski Dep. (SJ Ex. 34) 147:7-14, Ex. 42 (Howard Law contract with Kimberly Pisinski describing Morgan Drexen's role).<br>Howard Dep. I (SJ Ex. 32) 194:17-195:18. |
| 208. | During the intake interview, Morgan Drexen gathers financial information from consumers that it uses to complete a draft bankruptcy petition. | Pisinski Dep. (SJ Ex. 34) 151:15-152:13 (Pisinski says it's MD's job to gather all docs from consumers and fill in Ch 7 petition);<br>Ledda Dep. (SJ Ex. 26) 89:9-91:13;<br>Pisinski Dep. (SJ Ex. 34), Ex. 42 (Howard Law contract with Kimberly Pisinski stating that Morgan Drexen "prepare[s] draft of bankruptcy petition for attorney's review prior to the attorney's consultation with |

| | | |
|---|---|---|
| | | his/her law firm clients”). |
| 209. | Morgan Drexen sends the consumers certain notices required under bankruptcy law. | Katz Dep. (SJ Ex. 27) 135:19-136:22; 140:19-141:6.<br>Pisinski Dep. (SJ Ex. 34) 154:2-155:14. |
| 210. | The notices are form notices that do not vary by consumer. | Bankruptcy Contract (SJ Ex. 115) MD0017854-17867 (exemplar bankruptcy contract with form notices)<br>Katz Dep. Ex. 150 part 1 (SJ Ex. 28) at MD-CA045173-176) |
| 211. | Morgan Drexen is able to send these form notices to consumers with the click of a button. | Katz Dep. (SJ Ex. 27) 141:7-18. |
| 212. | Morgan Drexen inputs the information received from consumers into a draft bankruptcy petition. | Morgan Drexen Interrog. VI (SJ Ex. 23)(Morgan Drexen Response to Interrogatory 1 (at p. 6), Interrogatory 6 (at p. 9-10)) |
| 213. | Morgan Drexen generally prepares the Chapter 7 bankruptcy petition at the outset of the engagement with the consumer. | Morgan Drexen Interrog. VI (SJ Ex. 23)(Morgan Drexen Response to Interrogatory 6 (at p. 9-10)). |
| 214. | One Local Counsel, Barbara Franklin, advised against preparing a bankruptcy petition more than 30 days before filing: “[D]on’t prepare and sign | Franklin Decl. (SJ Ex. 134) ¶ 25<br>Howard Dep. I (SJ Ex. 32), Ex. 265 |

| | | |
|---|---|---|
| | bankruptcy petitions until you are at least less than 30 days from filing.” | |
| **Attorneys Have Little To No Role In “Bankruptcy Services” Provided To Consumers** | | |
| 215. | Generally, attorneys do not meet with consumers to provide consultation on filing for a Chapter 7 bankruptcy until after the consumer decides to file for bankruptcy. | Katz Dep. (SJ Ex. 27), Ex. 153 (email and bankruptcy flow chart indicating that attorney appointment is made when client decides to file for bankruptcy).<br>Pisinski Dep. (SJ Ex. 34), Ex. 42 (Howard Law contract with Kimberly Pisinski stating that Morgan drexen “prepare[s] draft of bankruptcy petition for attorney’s review prior to the attorney’s consultation with his/her law firm clients”).<br>Howard Dep. I (SJ Ex. 32) 128:15-25; 194:17-195:18; 196:14-17. |
| 216. | Generally, attorneys do not provide any bankruptcy services unless the consumer has decided to file for bankruptcy. | Saulski Dep. I (SJ Ex. 35) 123:12-16 (filed bankruptcy for 10-25 people); Cottone Dep. (SJ Ex. 37) 37:17-38:4; 87:13-88:7 (believes that his debt settlement clients signed bankruptcy contracts, but he did not file bankruptcy for all of them and has no idea who provided any bankruptcy |

| | | |
|---|---|---|
| | | services under the bankruptcy contract to these other consumers); Benzer Dep. (SJ Ex. 38) 33:3-34:10; 39:10-16; Elias Decl. (SJ Ex. 133) ¶ 11. |
| 217. | Generally, a formal means test is not conducted until after the consumer and attorney have decided to file for bankruptcy | Wiegman IH 106:1-10 |
| 218. | If consumers would like to speak to an attorney, rather than Morgan Drexen, about their options for bankruptcy, they must pay an additional $55 fee for an "early consultation" with an attorney that is arranged through Morgan Drexen. | Katz Dep. (SJ Ex. 27), Ex. 152 at MD017791. |
| 219. | Engagement Counsel Eric Rosen advised Morgan Drexen and other Engagement Counsel that an attorney should be conducting the initial interview with the consumer:<br><br>"[A] lawyer should be conducting an interview with the client – the client may not qualify for chapter 7 for a | Katz Dep. (SJ Ex. 27). Ex. 157 at CFPB0036277. |

| | | |
|---|---|---|
| | number of reasons, in which case we should not **enter into an agreement with them and take** their money in the first place (we do not want a 'failure to properly supervise' or UPL complaint with a state bar in this type of situation – screwing up a bankruptcy case is a lot different than a $4,000 credit card suit." | |
| 220. | Barbara Franklin, a Local Counsel who terminated her affilation with Engagement Counsel and Morgan Drexen, advised:<br><br>"[A]ll debt settlement clients need a personal interview with a bankruptcy attorney who understands the various chapters in bankruptcy, [and the] exemptions available . . . ." | Howard Dep. I (SJ Ex. 32), Ex. 265 at p. 1. |
| 221. | Prior to the TSR, from 2007 to 2008, Morgan Drexen supported bankruptcy services offered by Engagement Counsel Vincent Howard. | Howard Dep. I (SJ Ex. 32), Ex. 252 (bankruptcy agreement attached to email);<br>Howard Dep. I (SJ Ex. 32) 204:2-7; 209:2-213:6; 214:17-216:11 |
| 222. | Under the pre-TSR bankruptcy | Howard Dep. I (SJ Ex. 32) 204:2-7; |

| | | |
|---|---|---|
| | model, the attorney charged a $450 fee to meet with and review the client's general financial condition. The attorney only began preparing – and charging a fee for – a Chapter 7 bankruptcy petition *after*: (a) the client decided to file bankruptcy; and (b) Engagement Counsel, in their professional opinion, also agreed that bankruptcy was in the best interest of the consumer. | 209:2-213:6; 214:17-216:11, Ex. 252 (bankruptcy agreement attached to email) |
| 223. | As of August 31, 2014, only 584 out of the 61,576 consumers (0.95%) who enrolled in the dual program have filed for Chapter 7 bankruptcy. | Hanson Decl. (SJ Ex. 138) ¶ 36. |
| 224. | For those consumers who did file for bankruptcy (*i.e.*, less than one percent), attorneys have only provided those services. | Katz Dep. (SJ Ex. 27) 140:6-18; 141:19-142:1. |
| 225. | Attorneys cannot distinguish between debt settlement and "bankruptcy" work that Morgan Drexen performs based on the invoices provided by Morgan Drexen to the attorneys. | Saulski Dep. II (SJ Ex. 36) 183:18-184:23; Pisinski Dep. (SJ Ex. 34) 169:6-185:24 |

| | | |
|---|---|---|
| **<u>Engagement Counsel Do Not Conduct Bankruptcy Work</u>** | | |
| 226. | When utilizing Local Counsel, Engagement Counsel generally play no role in providing any services under the bankruptcy agreement. | Katz Dep. (SJ Ex. 27) 168:25-172:9. Howard Dep. I (SJ Ex. 32)113:21-119:8 (stating that Local Counsel or Morgan Drexen performs the services set forth in the bankruptcy agreement). |
| **Attorney Vincent Howard** | | |
| 227. | Vincent Howard was one of the first Engagement Counsel, and he began working with Morgan Drexen in May 2007 to provide debt settlement services. | Howard Dep. I (SJ Ex. 32)41:12-42:3 |
| 228. | Mr. Howard developed a network of Local Counsel beginning in 2007. | Howard Dep. I (SJ Ex. 32) 46:22:47:5. |
| 229. | By the end of 2008, Mr. Howard had a network of approximately 50 to 60 Local Counsel in all 50 states. | Howard Dep. I (SJ Ex. 32) 51:2-14. |
| 230. | By 2013, Mr. Howard signed up hundreds of Local Counsel to be a part of his network of attorneys. | Howard Dep. I (SJ Ex. 32) 276:15-23. |
| 231. | Other Engagement Counsel use Local Counsel provided by Mr. Howard. | Howard Dep. I (SJ Ex. 32) 49:10-19 |

| | | |
|---|---|---|
| 232. | When reviewing the "Scope of Services" in the bankruptcy agreement his firm entered into with a consumer, Mr. Howard stated that he does not know:<br>• Who (*i.e.*, Morgan Drexen or Local Counsel) sends the Section 342(b)(1) notice for filing bankruptcy or when it was sent to consumers;<br>• When the notice required by Section 527 of the Bankruptcy Act is sent to consumers;<br>• When the notice required by Section 521 of the Bankruptcy Act is sent to consumers; and<br>• When a consumer's case is assessed for Chapter 7 bankruptcy. | Howard Dep. I (SJ Ex. 32) 113:21-119:8 |
| 233. | When reviewing the "Scope of Services" in the bankruptcy agreement his firm entered into with a consumer, Mr. Howard explained:<br><br>"I'm going to tell you right now | Howard Dep. (SJ Ex. 32) 112:14-115:15 |

| | | |
|---|---|---|
| | the answer is going to be no to most of this stuff. I know enough about it to put the system together and do this, but my bankruptcy attorney, the ones that do this, they handle this part of this.” | |
| 234. | Mr. Howard testified about his knowledge of bankruptcy:<br><br>“I know enough about bankruptcy to spot issues, maybe how to market for it, based on books that I’ve read and seeing the forms, which a lot of this is from, getting – working with MD to get that stuff into the system.<br>But as it gets down to the – like even knowing that you can’t charge the same fee across the board in every jurisdiction, that’s stuff that I found out from my bankruptcy counsel in doing this and putting this together. They implement stuff like that, and they’re aware of those things like that. | Howard Dep. (SJ Ex. 32) 124:23-125:12 |

| | | |
|---|---|---|
| | Under the State Bar rules, I can practice in these areas as long as I associated myself with attorneys that are knowledgeable in this area, and that's what I've done." | |
| **Attorney Kimberly Pisinski** | | |
| 235. | Kimberly Pisinski became Engagement Counsel in 2011. | Pisinski Dep. (SJ Ex. 34) 128:7-20, Ex. 40 (Pisinski 2011 contract with Morgan Drexen) |
| 236. | Data produced by Morgan Drexen in this litigation shows that 463 consumers for whom Pisinski was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 45 |
| 237. | Since 2011, Pisinski stated that she has had 300 to 400 bankruptcy clients, but has only filed 4 bankruptcy petitions. | Pisinski (SJ Ex. 34) 90:24-92:23 |
| 238. | Each of Pisinski's bankruptcy clients paid her the bankruptcy retainer fee, and are not refunded the retainer fee if no petition is filed. | Pisinski (SJ Ex. 34) 92:24-93:5, 94:4-7 |
| 239. | Since 2011, 80% of Pisinski's income has been generated from | Pisinski (SJ Ex. 34) 91:6-92:14 |

| | | |
|---|---|---|
| | the Morgan Drexen-supported bankruptcy services. | |
| 240. | Morgan Drexen paid for Pisinski's legal costs in connection with her deposition appearance in this litigation. | Pisinski Dep. (SJ Ex. 34) 19:12-15 |
| | **Attorney Eric Rosen** | |
| 241. | Eric Rosen is an attorney who began working with Morgan Drexen in 2007. | Rosen Dep. (SJ Ex. 138) 40:2-5 |
| 242. | Eric Rosen ended his business relationship with Morgan Drexen in 2011. | Rosen Dep. (SJ Ex. 138) 168:24-169:5 |
| 243. | While working with Morgan Drexen, Eric Rosen acted as an Engagement Counsel. | Rosen Dep. (SJ Ex. 138) 29:12-14 |
| 244. | In his capacity as Engagement Counsel, Eric Rosen provided debt settlement services. | Rosen Dep. (SJ Ex. 138) 29:15-17 |
| 245. | From 2008 to the end of his business relationship with Morgan Drexen in 2011, Eric Rosen had, on average, between 5,000 and 8,000 debt settlement clients. | Rosen Dep. (SJ Ex. 138) 49:20-25 |
| 246. | At some point in 2010, Eric Rosen became aware that | Rosen Dep. (SJ Ex. 138) 105:14-106:2 |

| | | |
|---|---|---|
| | Morgan Drexen wanted to begin providing support services in the area of formal bankruptcy work. | |
| 247. | On October 13, 2010, Eric Rosen wrote an email to Morgan Drexen's General Counsel, Jeffrey Katz, among other people, in which he expressed a number of concerns he had about the concept of providing bankruptcy services to clients for whom legal work was outsourced. | Rosen Dep. (SJ Ex. 138) 129:7-130:1 |
| 248. | Eric Rosen never authorized Morgan Drexen to perform any bankruptcy work for any consumer he represented. | Rosen Dep. (SJ Ex. 138) 83:22-84:6; |
| 249. | After Eric Rosen terminated his business relationship with Morgan Drexen, he became concerned that Morgan Drexen had signed contracts with consumers on his behalf without his authorization. | Rosen Dep. (SJ Ex. 33) 186:14-19 |
| 250. | Data produced by Morgan Drexen in this litigation shows that 182 consumers for whom Eric Rosen was assigned as their | Hanson Decl. (SJ Ex. 138) ¶ 42 |

| | | |
|---|---|---|
| | attorney were signed up for the dual program. | |
| 251. | Eric Rosen is not aware that any consumer to whom he was assigned was enrolled in the dual program. | Rosen Dep. (SJ Ex. 33) 160:11-13 |
| **Attorney Joseph Saulski** | | |
| 252. | Joseph Saulski is an attorney who started off as Local Counsel in 2009 and became Engagement Counsel in February 2010. | Saulski Dep. I (SJ Ex. 35) Exs. 61 and 62 |
| 253. | Morgan Drexen's General Counsel, Jeffrey Katz, raised the idea of having Morgan Drexen provide bankruptcy services to Saulski around the Fall of 2010. | Saulski Dep. I (SJ Ex. 35) 80:10-81:2 |
| 254. | Saulski stated that 99% of the consumers that he dealt with on a day-to-day basis were enrolled in the dual program. He could not recall a client who signed up for just debt settlement or just bankruptcy, and stated, "it just didn't occur." | Saulski Dep. I (SJ Ex. 35) 88:17-25; Saulski Dep. II (SJ Ex. 36) 210:22-211:5 |
| 255. | On February 14, 2012, Saulski wrote a letter to Morgan Drexen's General Counsel | Saulski Dep. II (SJ Ex. 36) Ex. 72 |

| | | |
|---|---|---|
| | detailing several concerns, including:<br><br>• Clients were no longer given the option of signing up for just debt settlement.<br><br>• "No one in the in-take process is qualified to analyze the potential client's finances and render an opinion as to whether an attempt at debt settlement is even worth effort and money. Likewise, it is clear to me that we are not making the debt settlement process clear. Many do not understand that we will NOT be paying any of their creditors and that they will go into default, which may lead to a lawsuit that will be filed against them. And if a client is adamant that they will not file for bankruptcy, we cannot enroll them in a bankruptcy program."<br><br>• "There is wide agreement among engagement and local counsel (of those I have spoken to so far) that the monthly 'service fee' is problematic and difficult to justify . . . . The engagement agreement states that the | |

| | | |
|---|---|---|
| | monthly flat fee is for 'response to legal questions from Attorneys via e-mail[], ongoing paralegal and paraprofessional services, facsimile transmissions, telephone charges, postage, on-going document processing, scanning, indexing, retrieval and other file maintenance.' All of the contacts I have had with my clients are charged through the local counsel contract and not the 'services' contract. Likewise, the vast majority of activity MD is doing with the client is related to debt settlement activities – not bankruptcy or this other 'service' category."<br><br>• "It has also come to my recent attention that engagement counsel's failure to approve the clients on the 'new engagement law firm client(s)' email from you does not prevent the potential client from become a client of the Firm. I have not approved (and have written you previously of my disapproval) any new client for my Firm since the third week of December 2011. Yet, all the people that were on those new client emails | |

| | | |
|---|---|---|
| | are now clients of my Firm. In fact, even prior to you sending those emails to engagement counsels all contract documents are signed and initial payment made by the client. My visit to MD's in-take and QA departments confirmed this fact."<br><br>• "[P]aragraph 2.a. of the Attorney/Client Bankruptcy Fee Agreement […] states that 'an intake interview with you to discuss your financial situation on the information provided by you.' A sales rep or even a paralegal is not qualified to conduct this interview."<br><br>• "As I have just recently discovered, the relationship between MD and its customer firms is not normal by any stretch of one's imagination. In the MD relationship, MD controls everything. Although the firms' names are on the bank accounts, MD controls all deposits and withdrawals. In fact, I have been advised by MD accounting staff to not make withdrawals on my own account . . . . [I]t is unheard of to allow an accounting or payroll | |

| | | |
|---|---|---|
| | company to pay itself without clearance or authorization from the principle. Added to this is the practice of MD not invoicing or providing statements to firms for their services. Further, MD makes withdrawals periodically from the Firm's bank account without notice, authorization, or explanation. Sometimes these withdrawals are made every day of the week."<br><br>• "It will be difficult to argue that the MD/firm relationship is a legitimate business endeavor when at the end of the month the firms own [sic] more to MD than they received in revenue. No one pays someone $2 to make $1. Mr. Walker confirmed this 'business model' to me during my visit." | |
| 256. | Data produced by Morgan Drexen in this litigation shows that 358 consumers for whom Saulski was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 44 |
| 257. | Saulski stated that he was assigned clients by Morgan | Saulski Dep. II (SJ Ex. 36) Ex. 72 (2/14/12 letter to Katz) |

| | | |
|---|---|---|
| | Drexen without his approval of those clients. | |
| 258. | Consumers often started paying the bankruptcy engagement fee before Saulski was even able to have a conversation with them. | Saulski Dep. I (SJ Ex. 35) at 120:4-25 |
| 259. | Saulski never instructed Morgan Drexen to send a draft bankruptcy petition to a creditor. He stated, "If they—if they did it, they did it at – they did that as a negotiating tool at their discretion." | Saulski Dep. I (SJ Ex. 35) 137:8-14; Saulski Dep. II (SJ Ex. 36) 332:3-11 |
| 260. | Saulski testified that he filed bankruptcy for 10 to 15 consumers. | Saulski Dep. I (SJ Ex. 35) 123:12-16 |
| 261. | Saulski stated that Morgan Drexen was "calling all the shots" and using him as "legal cover." Saulski explained:<br><br>"Well, this stems all the way back to the financial relationship, where I had no control over the finances whatsoever and they were not invoicing me, taking payments with no knowledge from me, assigning clients and | Saulski Dep. II (SJ Ex. 36) at 228:5-229:18 |

| | | |
|---|---|---|
| | using clients and -- without my knowledge and/or approval, and deciding which clients to take on and – with, ultimately, my approval, I think, but we were – and the financial disparity was that, you know, again, we were here as a firm that gives us legal rights to do certain things that I thought that Morgan Drexen would not be able to do, absent being a law firm at least licensed in the state of Michigan." | |
| 262. | Morgan Drexen invoiced Saulski each month for more than he was receiving in revenue. | Saulski Dep. II (SJ Ex. 36) Ex. 72 (2/14/12 letter to Katz) |
| 263. | Saulski stated that the bankruptcy engagement fee was too high for consumers and instructed Morgan Drexen to lower it, but it took Morgan Drexen six months to do so. | Saulski Dep. II (SJ Ex. 36) 232:14-233:18 |
| **Attorney Lawrence Williamson** | | |
| 264. | Lawrence Williamson is an attorney who became Engagement Counsel in 2007. | Williamson Dep. (SJ Ex. 46) 28:10-13 |
| 265. | Data produced by Morgan | Hanson Decl. (SJ Ex. 138) ¶ 38 |

| | | |
|---|---|---|
| | Drexen in this litigation shows that 378 consumers for whom Williamson was assigned as their attorney were signed up for the dual program. | |
| 266. | Williamson stated that his role as Engagement Counsel was to supervise the "non-law related aspect of the functions that local counsel would be performing." | Williamson Dep. (SJ Ex. 46) 68:20-69:18 |
| 267. | Williamson stated that he does not make legal decisions about consumers where a consumer resides in a state that requires the use of Local Counsel. | Williamson Dep. (SJ Ex. 46) 68:20-69:18 |
| | **Attorney Rachelle McIntyre-Nicholson** | |
| 268. | McIntyre-Nicholson entered into a business relationship with Morgan Drexen in 2010 and became Engagement Counsel, but was told she would not receive any clients as Engagement Counsel until after October 2010, when Morgan Drexen changed its system and the "Federal Regulations" became effective. | McIntyre-Nicholson Sworn Stmt. (SJ Ex. 50) 55:1-56:12 |

| | | |
|---|---|---|
| 269. | McIntyre-Nicholson did not consider the debt settlement work she provided to be legal services. | McIntyre-Nicholson Sworn Stmt. (SJ Ex. 50) 179:11-180:10 |
| 270. | Data produced by Morgan Drexen in this litigation shows that 49 consumers for whom McIntrye-Nicholson was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 39 |
| **<u>Local Counsel Provide Little, If Any, Bankruptcy Work</u>** | | |
| **Attorney Barbara Franklin** | | |
| 271. | Barbara Franklin is an attorney who served as a Local Counsel from approximately September 2010 to the spring of 2013. | Franklin Decl. (SJ Ex. 134) ¶¶ 4, 26 |
| 272. | Data produced by Morgan Drexen in this litigation shows that 49 consumers for whom Franklin was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 39 |
| 273. | Franklin stated that she only provided bankruptcy services to one consumer. | Franklin Decl. (SJ Ex. 134) ¶ 23 |
| 274. | In the one instance where Franklin provided bankruptcy | Franklin Dec. (SJ Ex. 134) ¶ 23 |

| | | |
|---|---|---|
| | services, she learned that the petition Morgan Drexen had populated was inaccurate and that the consumer had never spoken with an attorney prior to Morgan Drexen populating the bankruptcy petition. | |
| 275. | After working with the consumer and confirming that the consumer wanted to file a bankruptcy petition, Franklin corrected the errors in the petition created by Morgan Drexen. | Franklin Decl. (SJ Ex. 134) ¶ 23 |
| 276. | Throughout her involvement with Morgan Drexen, Franklin raised concerns to Morgan Drexen about its debt settlement and bankruptcy work. | Franklin Decl. (SJ Ex. 134) ¶ 26 |
| 277. | Franklin expressed concern to Morgan Drexen that consumers needed a consultation with an attorney as soon as they signed up for the dual program in order to determine whether they wanted to and were eligible to file for bankruptcy. | Franklin Decl. (SJ Ex. 134) ¶ 24; Howard Dep. I (SJ Ex. 32) Ex. 265 |
| 278. | Franklin advised against | Howard Dep. I (SJ Ex. 32) Ex. 265 |

| | | |
|---|---|---|
| | preparing a bankruptcy petition more than 30 days before filing. | |
| 279. | Ultimately, in the spring of 2013, Franklin severed all ties with Morgan Drexen due to her concerns with Morgan Drexen's bankruptcy services. | Franklin Decl. (SJ Ex. 134) ¶¶ 25, 27 |
| | **Attorney Garrett Elias** | |
| 280. | Garrett Elias is an attorney who served as Local Counsel from approximately 2009 to October 2011. | Elias Decl. (SJ Ex. 133) ¶ ¶ 3, 12 |
| 281. | Data produced by Morgan Drexen in this litigation shows that 14 consumers for whom Elias was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 43. |
| 282. | Garrett Elias neither provided bankruptcy services to any consumer nor instructed Morgan Drexen to do so. | Elias Decl. (SJ Ex. 133) ¶ 11 |
| | **Attorney Carl Cottone** | |
| 283. | Carl Cottone is an attorney who became Local Counsel in September 2012. | Cottone Dep. (SJ Ex. 37) 32:4-15; Exhibit 69 (Cottone contract with Howard Law) |

| | | |
|---|---|---|
| 284. | Data produced by Morgan Drexen in this litigation shows that 347 consumers for whom Cottone was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 40 |
| 285. | Cottone stated that he had roughly 300 consumer assigned to him. | Cottone Dep. (SJ Ex. 37) at 48:4-20 |
| 286. | Cottone only provided bankruptcy services to the 4 Morgan Drexen clients who expressly stated that they wanted to file a bankruptcy petition. | Cottone Dep. (SJ Ex. 37) 37:17-24; 36:15-24 |
| 287. | Cotton is not aware of any draft bankruptcy petitions being prepared for other consumers assigned to him. | Cottone Dep. (SJ Ex. 37) 36:15-24 |
| 288. | Cottone stated that the bankruptcy engagement fee under the bankruptcy fee agreement was too high. | Cottone Dep. (SJ Ex. 37) 108:1-109:11 |
| 289. | Cottone only spoke with consumers when they called Morgan Drexen and said they wanted to speak with an attorney. | Cottone Dep. (SJ Ex. 37) at 48:4-20 |

| | | |
|---|---|---|
| **Attorney Eric Benzer** | | |
| 290. | Eric Benzer is an attorney who was Local Counsel in 2012. | Benzer Dep. (SJ Ex. 38) Exhibit 207 |
| 291. | Data produced by Morgan Drexen in this litigation shows that 216 consumers for whom Benzer was assigned as their attorney were signed up for the dual program. | Hanson Decl. (SJ Ex. 138) ¶ 41 |
| 292. | Benzer testified that he filed bankruptcy for 10 consumers, but otherwise did not oversee or perform any bankruptcy work for any other consumers. | Benzer Dep. (SJ Ex. 38) 33:3-34:10; 39:10-16; 89:20-90:3 |
| 293. | When Benzer asked Morgan Drexen to provide a consumer with a refund, a Morgan Drexen employee noted in a client file that Benzer was a “pain in the ass.” | Benzer Dep. (SJ Ex. 38) 102:13-103:6 |
| **A Tiny Fraction of Consumers Actually File for Bankruptcy** | | |
| 294. | Only 0.897% of consumers who enrolled in the dual program filed a bankruptcy petition | Hanson Decl. (SJ Ex. 138) ¶ 35 |
| 295. | As of August 2012, only 94 bankruptcy petitions had been filed. | Email 33 (SJ Ex. 90) (e-mail with spreadsheet of number of petitions attached); |

| | | |
|---|---|---|
| | | Cases Spreadsheet (SJ Ex. 117) (spreadsheet showing 94 petitions filed as of 8/2012) |
| 296. | Morgan Drexen anticipated that few dual program enrollees would file bankruptcy petitions. | Ledda Dep. (SJ Ex. 26) 177:19-178:4 (Ledda only anticipated that 10-12% of people who signed up for dual contract program would file a bankruptcy petition) |
| 297. | In instances where petitions have been filed, attorneys have to correct numerous errors by Morgan Drexen. | Franklin Decl. (SJ Ex. 134) ¶ 23 (In the one instance where Barbara Franklin provided bankruptcy services, she learned that the petition that Morgan Drexen had populated was inaccurate and that the consumer had never spoken with an attorney prior to Morgan Drexen populating the bankruptcy petition); Saulski Dep. I (SJ Ex. 35) 153:24-155:17 (Saulski did not believe Morgan Drexen was properly preparing petitions. Specifically, there were missing tax refunds on line 18 of Schedule B, and Saulski did not believe Morgan Drexen was actually running a means test when consumers signed up for bankruptcy services.); Cottone Dep. (SJ Ex. 37) 100:11-102:8 (Had to redo Schedule B |

| | | |
|---|---|---|
| | | because assets were classified incorrectly. Also had to do CH. 13 himself because Morgan Drexen didn't know how.) |
| 298. | Draft petitions prepared by Morgan Drexen are riddled with errors. | Franklin Decl. (SJ Ex. 134) ¶ 23 |
| **<u>According to Morgan Drexen, For Consumers Who do Not File for Bankruptcy, the Preparation of a Petition is a Tool For Debt Settlement Negotiations</u>** | | |
| 299. | For consumers who do not file for bankruptcy, Morgan Drexen contends that the draft Chapter 7 bankruptcy petition serves as leverage when conducting debt settlement negotiations with creditors. | Katz Dep. (SJ Ex. 27) 69:15-70:6; 108:16-25;<br>*See supra* SUF __ [SUFs on post-TSR MD changes business model) |
| **<u>Morgan Drexen's Threat of Bankruptcy Has Little to No Value for Consumers</u>** | | |
| 300. | The threat of bankruptcy is a strategy that Morgan Drexen claims to have used in negotiations with creditors since the TSR was amended, in addition to the 8 other debt negotiations strategies Morgan Drexen utilized with creditors | Katz Dep. (SJ Ex. 27) 56:23-62:1; 69:20-70:6; 108:2-25 ("It's not a brilliant strategy, but it's a – it's a ubiquitous strategy that's been going on for centuries. . . . Meaning the using the leveraged threat of a complaint has been used . . . . They took their standard debt settlement |

| | | |
|---|---|---|
| | prior to the effective date of the TSR amendments. | strategy and they augmented it with this . . . ."); Howard Dep. (SJ Ex. 32) 165:166:19; Ex. 254 (at ER03238) (describing use of bankruptcy petition as "leverage towards forcing settlements of the debts"); Ex. 256 (describing use of bankruptcy petition that may [be] used as leverage in its negotiations"). |
| 301. | Of the at least 9 negotiating strategies Morgan Drexen has identified, the threat of bankruptcy is the only strategy that requires the consumer to pay an up-front engagement fee. | *See supra* UF 49 (setting forth up-front fees charged to consumers for "bankruptcy services") |
| 302. | According to Morgan Drexen, the effectiveness of the threat of bankruptcy as a debt settlement negotiation strategy is demonstrated in a chart showing a decline in lawsuits brought by creditors against Morgan Drexen's consumers from January 2010 through December 2012, but this chart does not show how the threat of bankruptcy results in more debt settlements or on better terms. | Katz Dep. (SJ Ex. 27) 94:24-98:10; Tran Ex. 92 (SJ Ex. 31) |

| | | |
|---|---|---|
| 303. | Aside from the chart referenced in UF 302, Morgan Drexen can only identify "anecdotal" evidence to show the effectiveness of threatening bankruptcy as a debt settlement negotiation strategy. | Katz Dep. (SJ Ex. 27) 116:24-117:24 |
| 304. | Morgan Drexen has not always conveyed the threat of bankruptcy to creditors. | Unterberger Decl. (SJ Ex. 136) ¶¶13-15 (creditor only recently began receiving information that the consumer had retained an attorney for purposes of preparing a bankruptcy petition);<br>Bender Decl. (SJ Ex. 135) ¶ 17 (Morgan Drexen has not threatened bankruptcy or sent any portion of a bankruptcy petition to creditor);<br>Howard Dep. (SJ Ex. 32) 178:23-179:6;<br>Cleary Decl. (SJ Ex. 131) ¶ 13;<br>Hsieh Decl. (SJ Ex. 132) ¶ 12 |
| 305. | Morgan Drexen has identified 3 ways it conveyed a threat of bankruptcy to creditors: (1) orally; (2) in writing; and (3) in writing, including the provision of a draft bankruptcy petition for | Katz Dep. (SJ Ex. 27) 76:2-17 |

| | | |
|---|---|---|
| | review by the creditor. | |
| 306. | Morgan Drexen has no policies or procedures that require Morgan Drexen employees to orally threaten bankruptcy or otherwise inform creditors that the consumer had retained an attorney to prepare a bankrutpcy petition. | Katz Dep. (SJ Ex. 27) 72:17-73:9 |
| 307. | Morgan Drexen did not require Settlement Officers, who negotiated directly with creditors, to threaten bankruptcy. | Cleary Decl. (SJ Ex.131) ¶ 9 and 13; Hsieh Decl. (SJ Ex. 132) ¶ 10 |
| 308. | Morgan Drexen first informed Settlement Officers that they could convey the threat of bankruptcy to creditors orally in 2010. | Hsieh Decl. (SJ Ex. 132) ¶ 10 |
| 309. | Settlement Officers rarely threated bankruptcy to creditors orally. | Cleary Decl. (SJ Ex. 131) ¶ 13; Hsieh Decl. (SJ Ex. 132) ¶ 12 |
| 310. | Morgan Drexen sends letters to creditors indicating that the consumer has retained an attorney and that Morgan Drexen is authorized to negotiate for the consumer. | Katz Dep. Ex. 150 part I (SJ Ex. 28) |
| 311. | From October 2010 until either | Katz Dep. (SJ Ex. 27) 70:2-71:17; |

| | | |
|---|---|---|
| | 2012 or 2013, when Morgan Drexen sent creditors a letter indicating it had authority to negotiate on behalf of the consumer, it did not include language threatening bankruptcy or stating that the consumer had retained an attorney to prepare a bankruptcy petition. | Howard Dep. (SJ Ex. 32) 220:8-224:7; 225:7-227:14;<br>Katz Dep. Ex. 150 part I (SJ Ex. 28) (consumer file with letters to creditors during 2011 and 2012 that did not mention bankruptcy) |
| 312. | From October 2010 until approximately March 2013, when Morgan Drexen sent letters to creditors indicating that the consumer had retained an attorney, it did not include language threatening bankruptcy or stating that the consumer had retained an attorney to prepare a bankruptcy petition. | Katz Dep. (SJ Ex. 27) 76:2-77:77:17 |
| 313. | It was not until March 2013 that Morgan Drexen had the option of sending a letter to a creditor indicating that the consumer had retained an attorney to prepare a bankruptcy petition. This letter could also include a draft of the bankruptcy petition. | Katz Dep. (SJ Ex. 27) at 76:2-77:77:17;79:17-80:22 |
| 314. | From October 2010 until | Katz Dep. (SJ Ex. 27) 76:2-77:77:17; |

| | | |
|---|---|---|
| | approximately March 2013, Morgan Drexen did not send bankruptcy petitions to creditors in connection with debt settlement negotiations. | 79:17-80:22 |
| 315. | At least one attorney prohibited Morgan Drexen from sending bankruptcy petitions to creditors. | Pisinski Dep (SJ Ex. 34) 99:4-24. ("I don't like the petition to be attached because I don't like my client's information to be divulged.) |
| 316. | That attorney testified that she had threatened bankruptcy prior to the effective date of the TSR amendments without the use of a petition. | Pisinski Dep. (SJ Ex. 34) 94:17-95:25 |
| 317. | Even when Morgan Drexen conveys a threat of bankruptcy, it makes no difference in debt settlement negotiations. | Cavalry Dep. (SJ Ex. 42) 19:3-18; Cleary Decl. (SJ Ex. 131) ¶ 13; Hsieh Decl. (SJ Ex. 132) ¶ 12 |
| **Debt Settlement Negotiations with "Preferred Creditors": No Threat of Bankrupcy** | | |
| 318. | Walter Ledda conceived of the idea for the Preferred Creditor program. | Morgan Drexen Interrog. IV (SJ Ex. 15) 8-9 |
| 319. | Ledda assigned a Morgan Drexen employee to engage creditors in a dialogue about having an agreed settlement | Nagin Dep. (SJ Ex. 39) 132:12-22 |

| | | |
|---|---|---|
| | percentage or a settlement range with creditors for accounts that Morgan Drexen worked on. | |
| 320. | Morgan Drexen developed a web portal to facilitate debt settlement negotiations with certain creditors, referred to as "preferred creditors." | Katz Hearing I (SJ Ex. 19) 12:14-13:5; 17:21-18:3; 18:7-22 |
| 321. | Through this web portal, Morgan Drexen matches consumer debts with accounts held by the creditor. | Katz Dep. (SJ Ex. 27) 82:16-83:7; 87:23-89:5; Cavalry Dep. (SJ Ex. 42) 11:19-13:6; Katz Hearing I (SJ Ex. 19) 29:8-30:19; Bender Decl. (SJ Ex. 135) ¶¶ 7-8 |
| 322. | For those accounts that match, the Morgan Drexen web portal creates a settlement offer that is visible to the creditor and the assigned attorney. | Katz Dep. (SJ Ex. 27) 83:5-12; 89:6-13; Cavalry Dep. (SJ Ex. 42)13:7-25; 14:1-11; Katz Hearing I (SJ Ex. 19) 36:11-37:17 |
| 323. | The settlement offer only lists the current account balance, the negotiated settlement amount, and any other settlement terms. | Katz Dep. (SJ Ex. 27) 89:22-90:4; Cavalry Dep. (SJ Ex. 42) 13:7-25; 14:1-19;<br>Bender Decl. (SJ Ex. 135) ¶ 9 |
| 324. | In addition to the settlement information, the Morgan Drexen web portal also makes the | Katz Dep. (SJ Ex. 27) at 90:12-22; Cavalry Dep. (SJ Ex. 42) 14:20-23; Bender Decl. (SJ Ex. 135) ¶ 9 |

| | | |
|---|---|---|
| | authorization to negotiate letter viewable to creditors. | |
| 325. | The creditor can accept the proposed settlement offer with the click of a button. | Katz Dep. (SJ Ex. 27) 89:14-16; Bender Decl. (SJ Ex. 135) ¶ 10 |
| 326. | Generally, all debt settlement negotiations with preferred creditors occur through the web portal. | Katz Dep. (SJ Ex. 27) 92:13-23 ("the settlement process itself, if it's in sync, it's all happening on the platform"); Cavalry Dep. (SJ Ex. 42) 18-6-20:7; Bender Decl. (SJ Ex. 135) ¶¶ 6, 16 |
| 327. | Generally, Morgan Drexen does not utilize the threat of bankruptcy as a strategy when conducting debt settlement negotiations with preferred creditors. | Katz Dep. (SJ Ex. 27) 93:7-94:1 |
| 328. | The only communication related to bankruptcy that a preferred creditor may receive is a letter from Morgan Drexen with language indicating that the consumer has retained an attorney to prepare a bankruptcy petition, which was not sent to creditors prior to 2012 or 2013 | Katz Dep. (SJ Ex. 27)93:7-94:1; Unterberger Decl. (SJ Ex. 136) ¶¶ 13-14 (creditor did not receive written authorization letters indicating that the consumer had retained an attorney in connection with a bankruptcy petition until August 2014); Cavalry Dep. (SJ Ex. 42) 19:3-18 |
| 329. | According to one preferred creditor, ARS National Services, | Bender Decl. (SJ Ex. 135) ¶ 17 |

| | | |
|---|---|---|
| | Inc., Morgan Drexen has not made any threats of bankruptcy or sent a bankruptcy petition as part of debt settlement negotiations from the time it started using the web portal to the present. | |
| 330. | As of April 27, 2012, Morgan Drexen identified the following as preferred creditors:<br>Aargon Agency<br>AFNI, Inc.<br>Alliance One<br>American Express<br>Apex Financial<br>Arsi<br>Asset Acceptance<br>Associated Recovery Specialist<br>Brachfeld & Associates<br>Capital Management Systems<br>Capital One Bank<br>Cardworks Servicing<br>Cash Call<br>Cavalry Portfolio Services<br>Chase Bank USA, N.A.<br>Citibank USA, N.A.<br>Client Services, Inc.<br>CollectCorp | Morgan Drexen Interrog. II (SJ Ex. 13) |

| | | |
|---|---|---|
| | Couch, Stillman, Blitt & Conville | |
| | Credit Control | |
| | Creditors Financial Group | |
| | Creditors Interchange | |
| | Delanore, Kemper & Associates, LLC | |
| | Dynamic Recovery Solutions, Inc. | |
| | First Asset Recovery Group, LLC | |
| | First Capital Recovery Group, LLC | |
| | First Financial Asset Management | |
| | Firstsource Advantage, LLC | |
| | Forster & Garbus | |
| | Frontier Financial Group, Inc. | |
| | Full Circle Financial Services | |
| | GE Money Bank | |
| | Global Accceptance Credit Company | |
| | GMC Credit Services, LLC | |
| | GT Services | |
| | HFC Beneficial | |
| | HP Debt Exchange | |
| | HSBC | |
| | Icon Equities, LLC | |

| | | |
|---|---|---|
| | Jefferson Capital Systems | |
| | Judgment Enforcement Law Firm, PLLC | |
| | Kramer & Associates | |
| | Leading Edge Recovery Solutions | |
| | LHR, Inc. | |
| | Matthew Thomas & Associates, LC | |
| | Mattia Debt Management | |
| | MCM | |
| | Merrick Bank | |
| | Michael Andrews & Associates | |
| | MRS Associates | |
| | National Credit Adjusters | |
| | National Credit Solutions | |
| | National Enterprise Systems | |
| | National Recovery Solutions, LLC | |
| | Nationwide Credit, Inc. | |
| | NCO Financial Services, Inc. | |
| | Northland Group, Inc. | |
| | P & B Capital Group, LLC | |
| | Phillips & Cohen Associates, Ltd. | |
| | Portfolio Asset Group | |
| | Portfolio Recovery Associates | |
| | Portfolio Recovery Services | |

| | | |
|---|---|---|
| | Resurgent Capital Services, LP<br>Richard J. Boudreau & Associates, LLC<br>RJM Acquisitions<br>Second Round, LP<br>Settlement Collections, LLC<br>Stoneleigh Recovery Associates, LLC<br>Target National Bank<br>US Bank<br>Valentine & Kebartas, Inc.<br>Washington Mutual<br>Wells Fargo Financial Bank<br>Weltman, Weinberg & Reis Co., L.P.A.<br>Weset Asset Management<br>World Financial Network National Bank<br>Zwicker & Associates, P.C. | |
| | **Cancellations** | |
| 331. | Between 2010 through partial year 2014, at least 66,261 consumers cancelled their enrollment in Morgan Drexen's services. | Walker Dep. (SJ Ex. 24) Ex. 143 at p. 2 |
| 332. | According to the data provided by Morgan Drexen, between | Walker Dep. (SJ Ex. 24) 57:6-7; Ex. 137 |

| | | |
|---|---|---|
| | November 2010 (i.e., post-TSR) and November 2011:<br>• 18,519 consumers signed up for Morgan Drexen's services; and<br>• 16,694 consumers cancelled their services with Morgan Drexen. | |
| 333. | Between 25% and 40% of consumers cancel their enrollment in the dual program within the first three months. | Katz Dep. (SJ Ex. 27) 218:1-20 |
| 334. | It is very difficult and time consuming for consumers to cancel their services with Morgan Drexen. | Email 45 (SJ Ex. 202) (email from Engagement Counsel to Morgan Drexen complaints by consumers, including difficulty cancelling); Adekoya Decl. (SJ Ex. 146) ¶ 20-22; Banks Decl. (SJ Ex. 147) ¶ 10-11; Bowman Decl. (SJ Ex. 148) ¶ 17-18; Brown Decl. (SJ Ex. 149) ¶ 14-16; Hazard Decl. (SJ Ex. 152) ¶ 13-14; Moore Decl. (SJ Ex. 151) ¶ 13; Richardson Decl. (SJ Ex. 154) ¶ 11-12; Albanese Decl. (SJ Ex. 137) ¶¶ 11, 23 |
| 335. | 80% of consumers who drop out of the dual program do so because they cannot afford to | Ledda Dep. (SJ Ex. 26) 193:10-194:6 |

| | | |
|---|---|---|
| | continue to make payments; these consumers do not get their money back even if there was no settlement of any debt. | |
| 336. | Morgan Drexen refuses some refund requests on the grounds that bankruptcy legal work has been performed. | Albanese Decl. (SJ Ex. 137) ¶ 24 |
| | **<u>Consumer Complaints</u>** | |
| 337. | Consumers have complained about Morgan Drexen to various third parties. | Albanese Decl. (SJ Ex. 137) ¶ 5-15 (noting that the FTC's Consumer Sentinel Network recorded 148 consumer complaints from law enforcement agencies between Oct. 1, 2010 and September 26, 2014) |
| 338. | Consumers have complained about Morgan Drexen to the Business Consumer Alliance, formerly the Better Business Bureau. | Albanese Decl. (SJ Ex. 137) ¶ 16-24; Burge Decl. (SJ Ex. 139) ¶ 11 (noting that BCA, formerly BBB, received 224 written complaints from Oct. 1, 2010 to Oct. 1, 2014) |
| 339. | Consumer complaints received by the Business Consumer Alliance, formerly the Better Business Bureau, prompted the BCA to assign Morgan Drexen an "F" rating – its lowest rating – for the years 2010 to 2014. | Burge Decl. (SJ Ex. 139) ¶ 13 |

| | | |
|---|---|---|
| 340. | Consumers have complained directly to Morgan Drexen that they were unaware that they had to pay the engagement fee up front in the dual program. | Tesoro Dep. (SJ Ex. 41) 49: 10-12; Adekoya Decl. (SJ Ex. 146) ¶ 19; Bowman Decl. (SJ Ex. 148) Ex. A; Brown Decl. (SJ Ex. 149) ¶ 13; Moore Decl. (SJ Ex. 151) ¶ 13; Richardson Decl. (SJ Ex. 154) ¶ 11-12; Rixie Decl. (SJ Ex. 155) ¶ 13 |
| **WALTER LEDDA'S ROLE IN DESIGNING, IMPLEMENTING, AND PROFITING FROM THE DUAL PROGRAM** | | |
| 341. | Ledda started Morgan Drexen in 2007. | Ledda Hearing (SJ Ex. 18) 17:5-7 |
| 342. | Ledda's owned at least 80% of Morgan Drexen when the company was founded. | Ledda Dep. (SJ Ex. 26) 21:16-25 |
| 343. | Ledda previously had ownership or management interests in a group of companies engaged in debt settlement work. | FTC Order (SJ Ex. 119) 10 (sets forth debt settlement work that Ledda and defendants are prohibited from pursuing);<br>Ledda Hearing (SJ Ex. 18) 16:1-5 (Ledda had interests in the companies that were defendants in the FTC settlement) |
| 344. | Ledda hired the following people from the group of companies shut down by the FTC (*see infra* SUF __ - __) to work in senior-level positions at Morgan Drexen: Avi Gupta, Rita | Ledda Hearing (SJ Ex. 18) 24:14-25:22; 87:4-9;<br>Katz Hearing I (SJ Ex. 19) 10:21; 10:11-15;<br>Walker Hearing (SJ Ex. 22) 38:2-3 |

| | | |
|---|---|---|
| | Augusta, Maureen Webb, Loretta Acosta, and Mark Kruitbosch. Ledda, along with Avi Gupta, Maureen Webb, and Mark Kruitbosch, were original Morgan Drexen shareholders. Avi Gupta became Morgan Drexen's Chief Information Officer; Rita Augusta became Morgan Drexen's Chief Operating Officer; and Loretta Acosta became Morgan Drexen's Trust Officer. | |
| 345. | Morgan Drexen's Board of Directors consists of Ledda and Augusta. Up until the time Ledda transferred shares to a family trust, he believed he had the power to remove her. | Ledda Dep. (SJ Ex. 39) 39:1-40:1 |
| 346. | Ledda has no recollection of Augusta ever disagreeing with an action taken by the Board. | Ledda Dep. (SJ Ex. 39) 38:13-16 |
| 347. | Ledda "self-imposed" his title as CEO of Morgan Drexen. | Ledda Hearing (SJ Ex. 18) 31:6-8 |
| 348. | Ledda views his role as CEO as "broad and strategic providing direction." | Ledda Dep. (SJ Ex. 39) 50:10-16 |

| | | |
|---|---|---|
| 349. | Ledda is the ultimate decision maker on issues relating to Morgan Drexen. | Ledda Hearing (SJ Ex. 18) 79:18-23 ("the buck stops with me eventually, for Morgan Drexen"); Rosen Dep. (SJ Ex. 33) 39:16 ("I do have experience knowledge based on my experience as to who, at least I believe, was ultimately responsible, was the ultimately [sic] decision maker [at Morgan Drexen] and my understanding is that that was Walter Ledda."); Nagin Dep. (SJ Ex. 39) 25:8; Walker Dep. (SJ Ex. 24) 168:12-13 |
| 350. | Ledda has the power to approve or disapprove new projects. | Ledda Hearing (SJ Ex. 18) 80:11-81-6 |
| 351. | Ledda made the decision that Morgan Drexen would begin offering bankruptcy support services in May or June 2010 (before the TSR amendment). | Ledda Dep. (SJ Ex. 39) 63:9-17 |
| 352. | Ledda created a vision document that laid out his vision of comprehensive bankruptcy around May or June 2010. | Ledda Dep. (SJ Ex. 39) 63:18-64:1; Email 38 (SJ Ex. 98); Description of Services (SJ Ex. 108) |
| 353. | Ledda instructed Morgan Drexen to lay out the new bankruptcy process in phases. | Ledda Dep. (SJ Ex. 39) 99:19-100:1 |

| | | |
|---|---|---|
| 354. | Ledda plays an active role in the marketing and IT departments. | Ledda Dep. (SJ Ex. 39) 58:1-12. |
| 355. | Ledda instructed the marketing department on what he wants to see in commercials and reviews commercials. | Ledda Dep. (SJ Ex. 39) 65:1-8. |
| 356. | Ledda directed the company to create the preferred creditor program and a portal through which creditors could quickly communicate with MD. | Ledda Dep. (SJ Ex. 39) 59:9-60:1; Ledda Hearing (SJ Ex. 18) 269:10-271:8 |
| 357. | Ledda has the power oversee any department he wants. | Nagin Dep. (SJ Ex. 39) 17:11-21; 22:1-6 |
| 358. | For those departments Ledda oversees, he is the final decision maker. | Nagin Dep. (SJ Ex. 39) 25:8; Nagin Dep. (SJ Ex. 39) 25:13-14 ("as the CEO of the company, [Walter Ledda] had the prerogative of overseeing what he wanted.") |
| 359. | Ledda directly oversees the following departments at Morgan Drexen: IT, DSP, Managers (who managed employees who answered calls from consumers), Quality Control, Preferred Creditors, Client Services, Operations, Retention, Settlement, Mail Room, and Front Desk. | Nagin Dep.(SJ Ex. 39) 22-25:1 |

| | | |
|---|---|---|
| 360. | In 2010, Ledda created an executive committee of Morgan Drexen personnel. | Nagin Dep. (SJ Ex. 39) 25:16 – 26:2 |
| 361. | The executive committee discusses operational and strategic issues relating to Morgan Drexen. | Nagin Dep. (SJ Ex. 39) 27:15 |
| 362. | On operational and strategic decisions, Ledda has the final say if the executive committee cannot come to a consensus. | Nagin Dep. (SJ Ex. 39) 30:1; Nagin Dep. (SJ Ex. 39) 29:3-6 (“It was not a majority vote. . . that would carry the day because [Walter Ledda] had the prerogative at that time of determining what direction the company would take.”); Nagin Dep. 209: 20-21 (“[Walter] Ledda was the ultimate decision maker and he was forceful in his opinions.”); Nagin Dep. (SJ Ex. 39) 210: 15-21 (“[Walter Ledda] “[Ledda] was the majority owner of [Morgan Drexen], and was accustomed to running it and was unaccustomed to working with an Executive Committte with any authority and occasionally would come up with new initiatives, and the Committee would be informed about them as opposed to having discussions about them.”) |

| | | |
|---|---|---|
| 363. | After November 2010, Morgan Drexen began having weekly meetings for managers that were led by Ledda. | Walker Dep. (SJ Ex. 24) 159:18 – 160:11; Ledda Dep. (SJ Ex. 26) 50-17-22; Ledda Dep. (SJ Ex. 26) 51-7-8; Montijo Decl. (SJ Ex. 130) ¶ 26. |
| 364. | Ledda sets the agenda for the weekly meetings. | Walker Dep. (SJ Ex. 24) 162:21-22 |
| 365. | Typically, two meeting occur each week. | Walker Dep. (SJ Ex. 24) 165:8; Montijo Decl. (SJ Ex. 130) ¶ 26 |
| 366. | The first meeting typically takes place on Monday morning at approximately 10:00 a.m. | Walker Dep. (SJ Ex. 24) 165:10-12; Montijo Decl. (SJ Ex. 130) ¶ 26 |
| 367. | The purpose of the Monday meeting is for departments to report what they plan to do for the week. | Ledda Dep. (SJ Ex. 26) 51:9-13; Montijo Decl. (SJ Ex. 130) ¶ 26 |
| 368. | A second meeting typically takes place on Friday afternoon at 4:00 p.m. | Walker Dep. (SJ Ex. 24) 165:13-16; Montijo Decl. (SJ Ex. 130) ¶ 26 |
| 369. | The purpose of the Friday meeting is for departments to report what was actually done during the week. | Walker Dep. (SJ Ex. 24) 165:13-16; Montijo Decl. (SJ Ex. 130) ¶ 26 |
| 370. | Present at these meetings are the Chief Legal Officer, the General Counsel, Chief Information Officer, Chief Financial Officer, Marketing Director, Director of Media, and representatives from | Ledda Dep. (SJ Ex. 26) 51:25-54:16 |

| | | |
|---|---|---|
| | the following departments: accounting, client services, corporate legal, creditor relations, human resources, technology, law firm liaison, legal intake, marketing, corporate relations, facilities, mailroom, preferred creditors, data processing, quality control, trust services, document control, special projects, and treasury. | |
| 371. | Ledda exercises control over Morgan Drexen's day-to-day business. | Ledda Dep. (SJ Ex. 26) Exs.162-180 Email 3 (SJ Ex. 60); Email 4 (SJ Ex. 61); Email 5 (SJ Ex. 62); Email 6 (SJ Ex. 63); Email 7 (SJ Ex. 64); Email 8 (SJ Ex. 65); Email 9 (SJ Ex. 66); Email 10 (SJ Ex. 67); Email 11 (SJ Ex. 68); Email 12 (SJ Ex. 69); Email 13 (SJ Ex. 70); Email 17 (SJ Ex. 71); Email 18 (SJ Ex. 72); Email 19 (SJ Ex. 73); Email 20 (SJ Ex. 74); Email 21 (SJ Ex. 75); Email 22 (SJ Ex. 76); Email 23 (SJ Ex. 77); Email 24 (SJ Ex. 78); Email 25 (SJ Ex. 79); Email 26 (SJ Ex. 80); Email 27 (SJ Ex. 81); Email 28 (SJ Ex. 82); Email 29 (SJ Ex. 83); Email 30 (SJ Ex. 84); Email 31 (SJ Ex. 85); Email 32 (SJ Ex. 86); |

| | | |
|---|---|---|
| | | Email 33 (SJ Ex. 87); Email 34 (SJ Ex. 88); Email 35 (SJ Ex. 89); Email 36 (SJ Ex. 90); Email 37 (SJ Ex. 91); Email 38 (SJ Ex. 92) |
| **MORGAN DREXEN'S ADVERTISEMENTS FOR DEBT SETTLEMENT** | | |
| 372. | The advertisement identified by Bates number MD-CA0031189 was presented to consumers who called a telephone number during a television program to participate in a poll. The advertisement contains the statement "You could become completely debt free in months"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | Ad. 11 (SJ Ex. 11) |
| 373. | According to Morgan Drexen's records, 10,229 consumers enrolled in a Morgan Drexen program between December 8, 2010 and October 22, 2013 in response to the advertisement identified by Bates number MD-CA0031189. | Hanson Decl. (SJ Ex. 138) ¶ 56; Order Re Stip. (SJ Ex. 118) |
| 374. | The television advertisement | Ad. 7 (SJ Ex. 7) |

| | | |
|---|---|---|
| | identified by Bates number MD-CA0005488 contains the statement: "Libre de deudas en meses!"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | |
| 375. | According to Morgan Drexen's records, 1,120 consumers enrolled in a Morgan Drexen program between August 23, 2011 and November 21, 2013 in response to the advertisement identified by Bates number MD-CA0005488. | Hanson Decl. (SJ Ex. 138) ¶ 53; Order Re Stip. (SJ Ex. 118) |
| 376. | Morgan Drexen aired advertisements that represented that consumers: (1) could "be debt free in months; and (2) would pay "zero up-front fees" or "no up-front fees." | Ad. 1 (SJ Ex. 1) ("Be debt free in months" and "The best part is there are no up-front fees"); Ad. 2 (SJ Ex. 2) ("You could be debt free in months" and "the best part is that there are no up-front fees"); Ad. 3 (SJ Ex. 3) ("Be debt free in months" and "Best part zero up-front fees"); Ad. 4 (SJ Ex. 4) ("Be debt free in months" and "Best part zero up-front fees"); |

| | | |
|---|---|---|
| | | Ad. 5 (SJ Ex. 5) ("Be debt free in months" and "Best part zero up-front fees"); Ad. 6 (SJ Ex. 6) ("Be debt free in months" and "Best part zero up-front fees"); Ad. 7 (SJ Ex. 7 ("Be debt free in months" and "Best part zero up-front fees"); Ad. 9 (SJ Ex. 9) ("Be debt free in months" and "Best part zero up-front fees"); Ad. 10 (SJ Ex. 10) (informercial with "Be DEBT FREE in months" and "$0 Up-front fees" in background") |
| 377. | The television advertisement identified by Bates number MD-CA0005442 contains the statements "Be debt free in months" and "The best part is there are no up-front fees"; the only mention of bankruptcy is "Start your life over without filing bankruptcy"; and only identifies Morgan Drexen, not any specific attorney. | Ad. 1 (SJ Ex. 1) |
| 378. | According to Morgan Drexen's records, 351 consumers enrolled | Hanson Decl. (SJ Ex. 138) ¶ 47; Order Re Stip. (SJ Ex. 118) |

| | | |
|---|---|---|
| | in a Morgan Drexen program between January 19, 2012 and August 31, 2013 in response to the advertisement identified by Bates number MD-CA0005442. | |
| 379. | The radio advertisement identified by Bates number MD-CA0005473 contains the statements “You could be debt free in months” and “the best part is that there are no up-front fees”; the only mention of bankruptcy is “Start your life over without filing bankruptcy”; and only identifies Morgan Drexen, not any specific attorney. | Ad. 2 (SJ Ex. 2) |
| 380. | According to Morgan Drexen’s records, 311 consumers enrolled in a Morgan Drexen program between March 31, 2012 and March 20, 2014 in response to the advertisement identified by Bates number MD-CA0005473. | Hanson Decl. (SJ Ex. 138) ¶ 48; Order Re Stip. (SJ Ex. 118). |
| 381. | The television advertisement identified by Bates number MD-CA0005474 contains the statements “Be debt free in | Ad. 3 (SJ Ex. 3) |

| | | |
|---|---|---|
| | months" and "Best part zero up-front fees"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | |
| 382. | According to Morgan Drexen's records, 501 consumers enrolled in a Morgan Drexen program between April 26, 2011 and February 20, 2014 in response to the advertisement identified by Bates number MD-CA0005474. | Hanson Decl. (SJ Ex. 138) ¶ 49; Order Re Stip. (SJ Ex. 118) |
| 383. | The television advertisement identified by Bates number MD-CA0005476 contains the statements "Be debt free in months" and "Best part zero up-front fees"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. According to Morgan Drexen's records. | Ad. 4 (SJ Ex. 4) |
| 384. | According to Morgan Drexen's records, 6,518 consumers enrolled in a Morgan Drexen program between July 12, 2011 | Hanson Decl. (SJ Ex. 138) ¶ 50; Order Re Stip. (SJ Ex. 118) |

| | | |
|---|---|---|
| | and April 11, 2014 in response to the advertisement identified by Bates number MD-CA0005476. | |
| 385. | The television advertisement identified by Bates number MD-CA0005477 contains the statements "Be debt free in months" and "Best part zero up-front fees"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | Ad. 5 (SJ Ex. 5) |
| 386. | According to Morgan Drexen's records, 1,219 consumers enrolled in a Morgan Drexen program between January 19, 2012 and April 9, 2014 in response to the advertisement identified by Bates number MD-CA0005477. | Hanson Decl. (SJ Ex. 138) ¶ 51; Order Re Stip. (SJ Ex. 118) |
| 387. | The television advertisement identified by Bates number MD-CA0005482 contains the statements "Be debt free in months" and "Best part zero up-front fees"; does not make any mention of or use the word | Ad. 6 (SJ Ex. 6) |

| | | |
|---|---|---|
| | bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | |
| 388. | According to Morgan Drexen's records, 9,327 consumers enrolled in a Morgan Drexen program between June 7, 2011 and March 31, 2014 in response to the advertisement identified by Bates number MD-CA0005482. | Hanson Decl. (SJ Ex. 138) ¶ 52; Order Re Stip. (SJ Ex. 118) |
| 389. | The television advertisement identified by Bates number MD-CA0005492 contains the statements "Be debt free in months" and "Best part zero up-front fees"; does not make any mention of or use the word bankruptcy; and only identifies Morgan Drexen, not any specific attorney. | Ad. 8 (SJ Ex. 8) |
| 390. | According to Morgan Drexen's records, 4 consumers enrolled in a Morgan Drexen program between March 26, 2012 and February 22, 2013 in response to the advertisement identified by Bates number MD-CA0005492. | Hanson Decl. (SJ Ex. 138) ¶ 54; Order Re Stip. (SJ Ex. 118) |

| | | |
|---|---|---|
| 391. | The television advertisement identified by Bates number MD-CA0017984 contains the statements "Be debt free in months" and "Best part zero up-front fees"; and does not make any mention of or use the word bankruptcy. | Ad. 9 (SJ Ex. 9) |
| 392. | According to Morgan Drexen's records, 484 consumers enrolled in a Morgan Drexen program between October 23, 2012 and October 16, 2013 in response to the advertisement identified by Bates number MD-CA0017984. | Hanson Decl. (SJ Ex. 138) ¶ 55; Order Re Stip. (SJ Ex. 118) |
| 393. | The television infomercial identified by Bates number MD-CA0237408 contains the statements "Be DEBT FREE in months" and "$0 Up-front fees" in background"; and does not make any mention of or use the word bankruptcy. | Ad. 10 (SJ Ex. 10) |
| 394. | According to Morgan Drexen's records, 1,909 consumers enrolled in a Morgan Drexen program between March 31, 2012 and April 10, 2014 in | Hanson Decl. (SJ Ex. 138) ¶ 57; Order Re Stip. (SJ Ex. 118) |

| | | |
|---|---|---|
| | response to the advertisement identified by Bates number MD-CA0237408. | |
| 395. | In total, from April 26, 2011 to April 11, 2014, 48,488 consumers enrolled in a Morgan Drexen program in response to an advertisement that represented that consumers: (1) could "be debt free in months; and (2) would pay "zero up-front fees" or "no up-front fees." | Hanson (SJ Ex. 138) Decl. ¶¶ 58-59; Order Re Stip. (SJ Ex. 118) |
| 396. | From April 26, 2011 to April 11, 2014, 21,082 consumers responded to advertisements that included the Bates numbers MD-CA0005474, MD-CA0005476, MD-CA0005477, MD-CA0005482, MD-CA0005488, MD-CA0005492, MD-CA0017984, and MD-CA0237408. | Hanson Decl. (SJ Ex. 138) ¶ 58 |
| 397. | From July 21, 2011 through April 11, 2014, 27,406 consumers responded to advertisements that included the Bates numbers MD-CA0005442, MD-CA0005473, MD- | Hanson Decl. (SJ Ex. 138) ¶ 59 |

| | | |
|---|---|---|
| | CA0005474, MD-CA0005476, MD-CA0005477, MD-CA0005482, MD-CA0005488, MD-CA0005492, MD-CA0017984, MD-CA0031189, and MD-CA0237408. | |
| 398. | With respect to the claim of "zero up-front fees" in commercials, Ledda testified that "I know that is a claim that I don't feel comfortable with today." | Ledda Hearing (SJ Ex. 18) 208:5-13 |
| | **<u>How Long it Actually Takes Consumers to Become Debt Free</u>** | |
| 399. | According to Morgan Drexen's records, 57,850 consumers enrolled in either the debt settlement or dual program from January 4, 2010 to December 28, 2012. Of the 57,850 consumers who had enrolled during this time period:<br><br>• 34,615 (approximately 60%) had not made any payments to creditors (*i.e.*, had not settled *any* debts); and<br><br>• Only 23,235 consumers | Hanson Decl. (SJ Ex. 138) ¶ 60 |

| | | |
|---|---|---|
| | (approximately 40%) had any payments made to creditors. | |
| 400. | In a Comment to the Federal Trade Commission in response to the proposed amendments to the TSR, Morgan Drexen stated that "36 to 60 months duration of services [is] typically require[d] for most near bankrupt clients to become debt free." | Nagin Dep. Ex. 9 (SJ Ex. 40) at 54 |
| 401. | Morgan Drexen produced a chart showing the number of consumers who "completed" the debt settlement program from 2007 through April 15, 2014. Morgan Drexen defined "completed" as either: (i) settled all of their debts; or (ii) disengaged from the program but settled debts with a savings in excess of what the consumer paid to the attorney. The chart does not include consumers who did not "complete" the program—*i.e.*, consumers who cancelled or who remain in the debt settlement program. | Walker Dep. (SJ Ex. 24) 133:7-136:22, Ex. 143 |

| | | |
|---|---|---|
| | According to the chart, of the consumers who have "completed" the debt settlement program:<br><br>• 5.4% of consumers completed the debt settlement program within 12 months;<br><br>• 18.8% of consumers completed the debt settlement program between 12 and 24 months;<br><br>• 23% of consumers completed the debt settlement program between 24 and 36 months;<br><br>• 26.5% of consumers completed the debt settlement program between 36 and 48 months;<br><br>• 18.2% of consumers completed the debt settlement program between 48 and 60 months; and<br><br>• 8.1% of consumers | |

| | | |
|---|---|---|
| | completed the debt settlement program between 60 and 72 months. | |
| 402. | According to one Local Counsel, Barbara Franklin, Morgan Drexen told her it took 12 to 60 months to complete the debt relief program. | Franklin Decl. (SJ Ex. 134) ¶ 11 |
| 403. | According to Engagement Counsel Vincent Howard:<br><br>"It's not - - it's not a short process. I mean, we have had clients that have settled all their accounts, I mean, you know, in less than six months or six or something like that. But that is not average. It takes a few years sometimes for clients to totally resolve their debt issues. It is not uncommon at all. It's quite common in the industry." | Howard Dep. II (SJ Ex. 44) 190:15-191:2 |
| **DEBT SETTLEMENT CONSUMER PROFILE (in Debt Settlement Only or Dual Program)** | | |
| 404. | Between January 1, 2010 and August 31, 2014, the last date for which the Bureau has enrollment data, Morgan Drexen enrolled | Hanson Decl. (SJ Ex. 138) ¶ 6. |

| | | |
|---|---|---|
| | consumers residing in all 50 states, the District of Columbia, and the Virgin Islands in a debt settlement program. | |
| 405. | From January 4, 2010 through August 31, 2014, consumers enrolled an average of 14 debts into the Morgan Drexen debt settlement programs. | Hanson Decl. (SJ Ex. 138) ¶ 26. |
| 406. | In 2011, consumers who enrolled in a Morgan Drexen debt settlement program enrolled an average of $58,300 of debt. | Hanson Decl. (SJ Ex. 138) ¶ 7. |
| 407. | In 2011, the average income of consumers who enrolled in a Morgan Drexen debt settlement program was $23,700. | Hanson Decl. (SJ Ex. 138) ¶ 11. |
| 408. | In 2011, approximately 47% of consumers who enrolled in a Morgan Drexen debt settlement program had an annual income below $20,000. | Hanson Decl. (SJ Ex. 138) ¶ 16. |
| 409. | In 2011, approximately 9.7% of consumers who enrolled in a Morgan Drexen debt settlement program had an annual income below $10,000. | Hanson Decl. (SJ Ex. 138) ¶ 21. |
| 410. | In 2012, consumers who enrolled | Hanson Decl. (SJ Ex. 138) ¶ 8. |

| | | |
|---|---|---|
| | in a Morgan Drexen debt settlement program enrolled an average of $ 45,600 of debt. | |
| 411. | In 2012, the average income of consumers who enrolled in a Morgan Drexen debt settlement program was $21,375. | Hanson Decl. (SJ Ex. 138) ¶ 12. |
| 412. | In 2012, approximately 55.2% of consumers who enrolled in a Morgan Drexen debt settlement program had an annual income below $20,000. | Hanson Decl. (SJ Ex. 138) ¶ 17. |
| 413. | In 2012, approximately 13.6% of consumers who enrolled in a Morgan Drexen debt settlement program had an annual income below $10,000. | Hanson Decl. (SJ Ex. 138) ¶ 22. |
| 414. | In 2013, consumers who enrolled in a Morgan Drexen debt settlement program enrolled an average of $41,500 of debt. | Hanson Decl. (SJ Ex. 138) ¶ 9. |
| 415. | In 2013, the average income of consumers who enrolled in a Morgan Drexen debt settlement program was $20,920. | Hanson Decl. (SJ Ex. 138) ¶ 13. |
| 416. | In 2013, approximately 57.4% of consumers who enrolled in a Morgan Drexen debt settlement | Hanson Decl. (SJ Ex. 138) ¶ 18. |

| | | |
|---|---|---|
| | program had an annual income below $20,000. | |
| 417. | In 2013, approximately 15.5% of consumers who enrolled in a Morgan Drexen debt settlement program had an annual income below $10,000. | Hanson Decl. (SJ Ex. 138) ¶ 23. |
| 418. | Consumers who enrolled in a Morgan Drexen debt settlement program between January 1, 2014 and August 31, 2014, the last date for which Morgan Drexen produced data, enrolled an average of $54,000 of debt. | Hanson Decl. (SJ Ex. 138) ¶ 10. |
| 419. | The average income of consumers who enrolled in a Morgan Drexen debt settlement program between January 1, 2014 and August 31, 2014, the last date for which Morgan Drexen produced data, was $22,760. | Hanson Decl. (SJ Ex. 138) ¶ 14. |
| 420. | Approximately 51.1% of consumers who enrolled in a Morgan Drexen debt settlement program between January 1, 2014 and August 31, 2014, the last date for which Morgan | Hanson Decl. (SJ Ex. 138) ¶ 19. |

| | | |
|---|---|---|
| | Drexen produced data had an annual income below $20,000. | |
| 421. | Approximately 13.4% of consumers who enrolled in a Morgan Drexen debt settlement program between January 1, 2014 and August 31, 2014, the last date for which Morgan Drexen produced data, had an annual income below $10,000. | Hanson Decl. (SJ Ex. 138) ¶ 24. |
| 422. | From 2011 through 2014, the average annual income of consumers who enrolled in Morgan Drexen's debt settlement programs was approximately $22,600. | Hanson Decl. (SJ Ex. 138) ¶ 15. |
| 423. | From January 4, 2010 through August 31, 2014, approximately 53.0% of consumers who enrolled in Morgan Drexen's debt settlement programs had an annual income below $20,000. | Hanson Decl. (SJ Ex. 138) ¶ 20. |
| 424. | From January 4, 2010 through August 31, 2014, approximately 12.9% of consumers who enrolled in Morgan Drexen's debt settlement programs had an annual income below $10,000. | Hanson Decl. (SJ Ex. 138) ¶ 25 |

| | | |
|---|---|---|
| **JUDGMENTS** | | |
| **<u>In Re Morgan Drexen, Inc. (Wisconsin)</u>** | | |
| 425. | On October 5, 2011, the State of Wisconsin, Department of Financial Institutions, Division of Banking issued a Complaint to Morgan Drexen, Inc., alleging that Morgan Drexen was conducting business in Wisconsin as an adjustment service company in violation of Wisconsin State Law. | WI DFI Order (SJ Ex. 122) |
| 426. | On April 25, 2013, the Administrative Court Judge issued a Decision and Order in *In re Morgan Drexen, Inc.* (“April 25, 2013 Decision and Order”). | WI DFI Order (SJ Ex. 122) |
| 427. | The April 25, 2013 Decision and Order included the following findings of fact:<br><br>“1. Morgan Drexen, a Nevada corporation headquartered in California, was founded in 2007 by Walter Ledda. Ledda is the former principal of companies | WI DFI Order (SJ Ex. 122) at p. 4;<br><br>WI DFI Exhibits Part 1 (SJ Ex. 123) Ex. 1; |

| | | |
|---|---|---|
| | who performed debt settlement services until 2004 when the Federal Trade Commission brought an action against those companies and Ledda personally for misrepresentations to consumers, lack of proper disclosures and violations of do-no-call registrations. Ledda personally settled with the Federal Trade Commission for $1,356,000 and ceased operating those debt settlement companies." | WI DFI Exhibits Part 1 (SJ Ex. 123) Ex. 2; |
| | "2. Morgan Drexen is a nationwide debt settlement company that solicits customers in Wisconsin and other states." | WI DFI Exhibits Part 1 (SJ Ex. 123) Ex. 3; |
| | "3. In 2007, Morgan Drexen contracted directly with 37 Wisconsin residents to provide "Debt Negotiation Services," whereby Morgan Drexen would directly negotiate with the debtors' creditors and attempt to settle the unsecured debts of | |

| | | |
|---|---|---|
| | those residents."<br><br>"4. Morgan Drexen's debt settlement program counsels debtors to stop making payments to their creditors and instead requires the debtors to make monthly installment payments into an escrow account where the funds would accrue and later be paid out to creditors if Morgan Drexen successfully negotiated a settlement."<br><br>"5. Under Morgan Drexen's debt settlement program, funds received from debtors would first be used to pay Morgan Drexen's various fees, and moneys would only be paid out to creditors after those fees were paid and enough funds accumulated so that Morgan Drexen, in its discretion, determined that a settlement offer would be made or solicited from creditors. Upon settlement with a creditor, Morgan Drexen | WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 4;<br><br>WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 5; |

| | | |
|---|---|---|
| | would also receive a 'settlement fee' of 25% of the difference between the debt owed and the settlement amount. Morgan Drexen agreed to directly provide this debt settlement service to those Wisconsin debtors." | WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 6; |
| | "6. Morgan Drexen was engaged as a principal when directly contracting with the 37 Wisconsin debtors to provide debt settlement services." | WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 7; |
| | "7. The first Wisconsin debtor with whom Morgan Drexen contracted filed a complaint against Respondents with the Division. The Division contacted Morgan Drexen and informed that it was unlawfully conducting business as an unlicensed adjustment service company and must cease and desist such illegal activity and refund all of the money paid by the debtor. In response, Morgan | |

| | | |
|---|---|---|
| | Drexen refunded the money and informed the Division that they had no other Wisconsin residents enrolled in their program."<br><br>"8. The Division subsequently received eight other complaints from Wisconsin debtors who received debt settlement services from Morgan Drexen."<br><br>"9. In 2007, Morgan Drexen began providing the same debt settlement services under the guise of providing paralegal support for attorneys. Morgan Drexen entered into an agreement with three attorneys: Lawrence Williamson, a Kansas Lawyer, Vincent Howard, a California lawyer, and Eric Rosen, a Florida lawyer. The attorneys had not practiced in the area of debt settlement before entering into this arrangement. The arrangement was that they would offer debt settlement services nationwide, marketing | WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 8;<br><br>WI DFI Exhibits Part 2 (SJ Ex. 124) Ex. 9; WI DFI Exhibits Part 3 (SJ Ex. 126) Ex. 9; |

| | | |
|---|---|---|
| | their business arrangement as legal services where the lawyers would directly contract with debtors 'supported' by Morgan Drexen ostensibly as a paralegal firm. The three lawyers made a 'gentlemen's agreement' to divide up the fifty states into three regions: the debt settlement clients on the East Coast were Rosen's, those on the West Coast were Howard's, and the clients in the middle of the country would be Williamson's. Howard was responsible for recruiting attorneys in each state to act as "local counsel" because Williamson, Howard, and Rosen were not licensed to practice law in those states. Howard, Williamson, and Rosen are 'engagement counsel' and claim to associate with 'local counsel' in every state in order to provide, what they call, 'debt settlement legal services' in those states."<br><br>"10. The contracts previously | WI DFI Exhibits Part 3 (SJ Ex. 125) Ex. 10; |

| | | |
|---|---|---|
| | utilized by Morgan Drexen to contract directly with debtors for debt settlement were modified to cover this purported 'legal service' arrangement. However, the overall model and fee structure previously utilized by Morgan Drexen to settle debts was retained. Under the guise of a 'legal service,' the contracts between the debtors and the lawyers provided for the same debt settlement service that Morgan Drexen had previously offered directly to consumers, and the contracts expressly excluded the provision of any legal services such as litigation or bankruptcy." | |
| | "11. Under the initial arrangement between Morgan Drexen and the three lawyers, debtors were charged the same fees, with the exception that the monthly "maintenance fee' was increased from $45 to $48 and the 'establishment fee' of 25% | WI DFI Exhibits Part 3 (SJ Ex. 125) Ex. 11; |

| | | |
|---|---|---|
| | was re-named the 'engagement fee' with the same percentage."<br><br>"14. Between 2007 and 2009, Wisconsin debtors who signed up for the debt settlement program entered into a debt negotiation and settlement service agreement with Williamson, with Stockinger acting as local counsel. However, the agreement was solely for the provision of debt settlement services and did not provide for legal representation in the event the client was sued. A separate contract with additional fees was required before the legal representation would be provided."<br><br>"17. With respect to clients serviced by Morgan Drexen where Stockinger served as 'engagement counsel' under the June 2009 contract, Morgan Drexen was engaged as principal and was not the agent of | WI DFI Exhibits Part 3 (SJ Ex. 125) Ex. 14;<br><br>WI DFI Exhibits Part 4 (SJ Ex. 126) Ex. 17; |

| | | |
|---|---|---|
| | attorneys. Neither Stockinger nor any other attorney practicing law in Wisconsin had the right to control Morgan Drexen's work."<br><br>"18. In October 2010, the Federal Trade Commission established a new rule prohibiting debt relief companies engaged in telemarketing from charging debtors 'up front' fees. Morgan Drexen modified its contract with debtors to something Morgan Drexen terms a 'hybrid' or 'non-formal bankruptcy' debt negotiation service. However, this contract does not allow for the provision of any bankruptcy or legal services. Instead, the only relation to bankruptcy under this new 'hybrid' contract is that Morgan Drexen prepares a mock bankruptcy petition for the debtor and sends it to creditors in an effort to persuade them that the debtor is judgment proof. For this purported service, the debtor | WI DFI Exhibits Part 4 (SJ Ex. 126) Ex. 18; |

| | | |
|---|---|---|
| | is charged what Morgan Drexen calls an 'engagement fee' as a purported legal retainer. However, if the debtor does want to hire an attorney and file for bankruptcy, the debtor must enter into a separate contract with the attorney and pay an additional fee."<br><br>"20. Morgan Drexen, rather than attorneys, directly negotiates with creditors to settle clients' debts. Morgan Drexen also performs the same functions as it had when contracting directly with debtors, including conducting client intake, analyzing debtors' budget and the potential amounts that could be saved by settling with creditors, preparing the payment schedule for debtors, directly handling all communications with both creditors and the debtor-clients, the accounting, intake and payments out to creditors of client funds, and the | WI DFI Exhibits Part 4 (SJ Ex. 126) Ex. 20; WI DFI Exhibits Part 5 (SJ Ex. 127) Ex. 20; |

| | | |
|---|---|---|
| | distribution of funds to the attorneys. Client funds were placed in trust accounts to which Morgan Drexen had access and which was accounted for and distributed by Morgan Drexen.” | WI DFI Exhibits Part 5 (SJ Ex. 127) Ex. 21; |
| | “21. Morgan Drexen devised a formula projecting the estimated amount of savings a debtor will achieve through the debt settlement program. Morgan Drexen determines how long the debtor will remain in the program to achieve those projected savings and the amount of monthly payment the debtor must make, taking into account that Morgan Drexen’s fees would first be deducted on a monthly basis. Stockinger does not know how Morgan Drexen makes this determination, has no input on how it is done, and has never asked that any fees or charges be modified.” | WI DFI Exhibits Part 5 (SJ Ex. 127) Ex. 25; |
| | “25. Morgan Drexen, not | |

| | | |
|---|---|---|
| | Stockinger, has specialized knowledge of the credit industry, including knowledge of the timing and circumstances in which creditors are willing to accept reductions in the debt owed. This knowledge is 'secret' and 'proprietary' to Morgan Drexen and is not shared with Stockinger. In 'approving' the settlements negotiated by Morgan Drexen, Stockinger usually has no idea why or how the settlement was reached. Settlement approval occurred through an Internet-based portal where the attorney could simply click a button to indicate approval. Stockinger would approve the settlement if it looked 'reasonable' to her. However, if an attorney in the Morgan Drexen program does not respond to the settlement proposal within 24 hours, it is deemed automatically approved." | WI DFI Exhibits Part 5 (SJ Ex. 127) Ex. 26; WI DFI Exhibits Part 6 (SJ |

| | | |
|---|---|---|
| | "26. In January 2011, Stockinger and Morgan Drexen entered into a new contract for Stockinger to continue serving as 'engagement counsel' for Wisconsin clients that modified some of the provisions of the July 2009 contract but did not provide the attorney with the right to control Morgan Drexen's debt settlement activities. With respect to clients serviced by Morgan Drexen where Stockinger served as 'engagement counsel' under the January 2011 contract, Stockinger did not have the right to control Morgan Drexen's debt settlement activities. No other attorneys had the right to control Morgan Drexen's debt settlement activities. Morgan Drexen is engaged as principal and is not the agent of attorneys under this agreement."<br><br>"27. Neither Attorney Williamson nor Attorney | Ex. 128) Ex. 26<br><br>WI DFI Exhibits Part 6 (SJ Ex. 128) Ex. 27; |

| | | |
|---|---|---|
| | Howard provided any legal services to Wisconsin debtor-clients serviced by Morgan Drexen.” | WI DFI Exhibits Part 6 (SJ Ex. 128) Ex. 28; |
| | “28. Morgan Drexen places advertisements in Wisconsin in radio and television media, urging Wisconsin residents overwhelmed with debt to contact Morgan Drexen at a 1-800 number that connects with Morgan Drexen’s offices in Southern California. Some of these advertisements identify Stockinger, others identify a law firm that is not licensed to practice in Wisconsin, and others identify no attorney at all.” | WI DFI Exhibits Part 6 (SJ Ex. 128) Ex. 33 |
| | “33. Debtors enrolled in the Morgan Drexen debt settlement program typically did not speak with the attorney that is purportedly representing them, do not know how to contact the attorney, receive no legal counsel of any kind, and often do | |

| | | |
|---|---|---|
| | not understand that they are supposed to be represented by an attorney." | |
| 428. | The April 25, 2013 Decision and Order included the following conclusions of law:<br><br>• "Morgan Drexen is an 'adjustment service company' as defined by Wis. Stat. § 218.02(1)(a) because it is in the business of prorating the income of a debt to the debtor's creditors."<br><br>• "Morgan Drexen was 'engaged as a principal' in the business of prorating and was not the agent for attorneys."<br><br>• "Morgan Drexen has been conducting business as an adjustment service company in Wisconsin illegally and without licensure by the Division as required by Wis. Stat. § 218.02."<br><br>• "Morgan Drexen has been charging fees for adjustment service company activities in | WI DFI Order (SJ Ex. 122) |

| | | |
|---|---|---|
| | excess of the maximum fixed by the Division, in violation of Wis. State § 218.02 and Wisc. Admin. Code § DFI-Bkg 73." | |
| 429. | On April 25, 2013, the Administrative Court Judge in *In Re Morgan Drexen, Inc.* issued an Order, which included:<br><br>• "Within 30 days of the effective date of [the order], Morgan Drexen shall remit payment to the Division in the amount of $4,253,081.93, as restitution for fees illegally charged Wisconsin debtors."<br><br>• "Within 30 days of the effective date of [the order], Morgan Drexen shall remit payment to the Division in the amount of $1,890,000 as forfeitures for committing at least 1,890 violations of the adjustment service company laws." | WI DFI Order (SJ Ex. 122) |
| **West Virginia v. Morgan Drexen, Inc. et al.** | | |
| 430. | West Virginia filed a lawsuit against Morgan Drexen, Walter Ledda, in his individual capacity | West Virgina v. Morgan Drexen, Inc., Civ. No. 11-C-829 (Cir. Court Kanawha Co. West Virginia). |

| | | |
|---|---|---|
| | and as majority owner and CEO of Morgan Drexen, Inc., and other defendants, alleging violation of West Virginia's Consumer Credit and Protection Act. | WV Order (SJ Ex. 121) |
| 431. | On July 15, 2014, the court entered a Final Order in *West Virginia v. Morgan Drexen, Inc. et. al.*, Case No. 11-C-829. | WV Order (SJ Ex. 121) |
| 432. | The court's July 15, 2014 Final Order included the following findings of fact:<br><br>"At the bench trial, Ms. Nicholson testified that she is an attorney licensed to practice in West Virginia. Ms. Nicholson serves as local counsel in West Virginia for Williamson Law Firm."<br><br>"Ms. Nicholson entered into a *Confidential Contract* with Morgan Drexen . . . ."<br><br>"Via the *Confidential Contract,* Morgan Drexen also dictates the | WV Order (SJ Ex. 121) at ¶¶ 18, 21, 24-25 |

| | | |
|---|---|---|
| | maximum fees that Ms. Nicholson is allowed to charge clients. Attached to the *Confidential Contract* is a sample attorney client agreement identical to the ones that Ms. Linville and Ms. Martin signed, along with letter templates, disclosure statements identical to the ones Ms. Linville and Ms. Martin signed, a script for attorneys to use when contacting consumers . . . ."<br><br>"David Walker (Mr. Walker), Chief Financial Officer of Morgan Drexen, testified during the trial . . . ."<br><br>"Mr. Walker testified that the attorneys pay Morgan Drexen, not consumers. He testified further that Morgan Drexen provides accounting services for the attorneys' clients funds: 'we document the ACH's [Automated Clearing House, an electronic network used for | |

| | | |
|---|---|---|
| | electronic banking, direct deposit, and electronic bill payment], document the banking processes, send out monthly statements to the law firm clients, upload these statements and all the accounting so the attorney can review that at any time through their Web portal, as well as we do trust administration and trust transfers on behalf of attorneys . . . The creditors get paid from the trust funds that the clients have accrued within the trust funds of the attorneys." | |
| 433. | The Court's conclusions of law include the following:<br><br>"The Court finds and concludes that Morgan Drexen violated W. Va. Code § 46-A-6-104 by failing to 'clearly and conspicuously disclose that it provides all debt relief services' and by misrepresenting 'lawyers will provide debt relief services to consumers.'" | WV Order (SJ Ex. 121) at [¶¶ 136, 141 -143, 149, 152] |

| | | |
|---|---|---|
| | "The Court finds and concludes that Morgan Drexen violated West Virginia's debt pooling statute by charging, by way of fees, reimbursement of costs, or otherwise, in excess of an amount equal to two percent of the total amount of money actually deposited pursuant to a debt pooling in violation of W. Va. Code § 61-10-23."<br><br>"The Court finds and concludes that Morgan Drexen violated W. Va. Code § 46-A-6-104 via W. Va. Code §§ 46-A-6-102(7)(I) and (L) by falsely representing that lawyers will provide legal representation and debt relief services for consumers."<br><br>"The Court finds and concludes that Defendant Mr. Williamson creates the likelihood of confusion or of misunderstanding by representing to consumers that | |

| | | |
|---|---|---|
| | his law firm will provide services when it does not, which, in terms of the West Virginia code, amounts to advertising services with intent not to sell them as advertised and misrepresenting a material fact with the intent that others rely upon such misrepresentation in connection with the sale or advertisement of services."<br><br>"The Court finds and concludes that the documents that Morgan Drexen sends to consumers are not written in a clear and coherent manner and are not easily understandable."<br><br>"The Court finds and concludes that Morgan Drexen has engaged in willful and repeated violations of chapter 46A of the West Virginia Code—the West Virginia Consumer Credit and Protection Act." | |
| 434. | The West Virginia court's Order permanently enjoined and | Order at p. 70. |

| | | |
|---|---|---|
| | restrained Morgan Drexen from conducting business activity, telemarketing, or other debt relief activity in West Virginia; ordered Morgan Drexen to pay an $8.75 million penalty for violations of West Virginia state law; ordered Morgan Drexen to refund all monies and fees paid to it directly or indirectly by West Virginia consumers; and awarded a judgment against Morgan Drexen for the State's costs, including its reasonable attorney's fees. | |
| | **<u>Federal Trade Commission v. National Consumer Council, Inc.</u>** | |
| 435. | On March 30, 2004, the Federal Trade Commission ("FTC") filed a Complaint against National Consumer Council, Inc. ("NCC"), Walter Ledda, and other defendants, alleging violations of the FTC Act, the TSR, the Gramm-Leach-Bliley Act, and the FTC's Consumer Financial Privacy Rule. The Complaint sought an injunction | FTC Order (SJ Ex. 119); FTC News Release (SJ Ex. 120) |

| | | |
|---|---|---|
| | and other equitable relief. Concurrently, the FTC filed an *ex parte* application for a Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue And a Permanent Receiver Should Not Be Appointed ("TRO"). | |
| 436. | In a March 30, 2005 news release announcing the FTC's Complaint, NCC solicited customers through aggressive telemarketing and direct mail advertising that falsely promised free debt counseling, when in fact, NCC generated leads for other defendants, who then charged consumers thousands of dollars in fees to enroll in their debt negotiation program. Furthermore, the defendants failed to disclose important information to consumers. | FTC News Release (SJ Ex. 120) |
| 437. | On May 3, 2004, the Court granted the FTC's ex parte | FTC Order (SJ Ex. 119) |

| | | |
|---|---|---|
| | Application. The Court appointed a temporary receiver over Defendants and instituted an asset freeze that applied to both corporate and individual assets. | |
| 438. | On March 29, 2005, the FTC entered into a settlement agreement with Defendant Walter Ledda, which among other things:<br><br>• Prohibits Ledda from making any material misrepresentations in connection with the advertising, promotion, offering for sale, or sale of any good or service;<br><br>• Prohibits Ledda from engaging in abusive telemarking practices;<br><br>• And ordered Ledda to pay $1,356,000 to the FTC. | FTC Order (SJ Ex. 119) |
| 439. | The stipulated order against Walter Ledda includes a suspended judgment of $84.3 million, the amount the defendants received from | FTC Order (SJ Ex. 119) |

| | | |
|---|---|---|
| | consumers. | |

## CONCLUSIONS OF LAW

1. This is an action by the Bureau instituted under the Telemarketing Sales Rule, 16 C.F.R. part 310; and Sections 1031(a), 1036(a), 1054, and 1055 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a), 5564, and 5565. The Complaint seeks permanent injunctive relief and monetary relief for the Defendants' acts or practices in violation of the TSR and the CFPA. The Bureau has the authority under the TSR and the CFPA to seek the relief it has requested.

2. The Complaint states a claim upon which relief can be granted against Defendants.

3. There is no genuine issue as to any material fact concerning the liability of Defendants for the unlawful practices charged in the Complaint, or the amount of consumer losses and ill-gotten gains resulting from Defendants' unlawful practices.

4. Uncontroverted facts show Defendants are "covered persons" and/or "related persons" as those terms are defined by the CFPA, 12 U.S.C. § 5481(6)(A), (19) and (25).

5. Uncontroverted facts show that Defendants are "sellers" or "telemarketers" of a "debt relief service," who engage in "telemarketing," as defined in the TSR, 12 CFR part 310.2.

6. Uncontroverted facts show that in the course of telemarketing debt relief services from October 27, 2010 to the present, Defendants have requested or received fees from consumers before renegotiating, settling, reducing, or otherwise altering the terms of at least one of such consumers' debts. Defendants have requested or received payment of these fees prior to consumers making at least one payment pursuant to any settlement agreement, debt-management plan, or other valid contractual agreement between consumers and their creditors.

7. Uncontroverted facts show that in the course of telemarketing debt relief services from October 27, 2010 to present, Defendants have required consumers to place up-front fee payments in an account and failed to hold these payments such that consumers own the funds or to allow consumers to withdraw from the debt relief program without penalty and receive all funds held in the account.

8. Uncontroverted facts show that in the course of advertising, marketing, promoting, offering for sale, or the sale of debt relief services from April 26, 2011 to April 11, 2014, Defendants, have represented, directly or indirectly, expressly or by implication, that consumers are not charged an advance fee for Defendants' debt relief services when, in fact, consumers are charged advance fees for Defendants' debt relief services.

9. Uncontroverted facts show that in the course of advertising, marketing, promoting, offering for sale, or the sale of debt relief services from December 8, 2010 to April 11, 2014, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who enroll in the debt relief program advertised by Defendants will be debt free in months of enrolling in the program when, in fact, in numerous instances consumers do not become debt free in months, *i.e.*, less than a year of enrolling in Defendants' debt relief program.

10. As no material facts are in dispute, the Bureau is entitled to judgment as a matter of law pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

11. Section 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, empower this Court to order injunctive and other equitable relief against Defendants for violations of the CFPA and the TSR, including restitution and disgorgement of ill-gotten gains resulting from Defendants' unlawful practices, injunctive relief, and civil money penalties for violations of the Federal consumer financial laws.

12. The Bureau is entitled to a judgment for equitable monetary relief in the amount of $90.7 million against Defendants as restitution for the up-front fees paid by Affected Consumers, as well as additional restitution the Court deems appropriate for any

additional fees paid by consumers who enrolled in a debt relief service in response to Defendants' deceptive advertisements. Defendants shall be jointly and severally liable for the amount of equitable monetary relief awarded by the Court.

13. Defendants have recklessly violated the TSR and the CFPA, warranting second tier civil money penalties under the CFPA. 12 U.S.C. § 5565(c)(2)(B). Defendants must pay a civil penalty of _____, for which Defendants are jointly and severally liable.

14. This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

15. Entry of this Order is in the public interest.

Respectfully submitted,
PLAINTIFF

CARA PETERSEN
Acting Deputy Enforcement Director For Litigation

_/s/_R._Gabriel_D._O'Malley______
R. Gabriel D. O'Malley
Shirley Chiu
Jan Singelmann
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Dated: October 7, 2014