GERALD A. KLEIN - Bar No. 107727
MARK B. WILSON - Bar No. 137400
KLEIN & WILSON
A Partnership of Professional Corporations
326 Old Newport Boulevard
Newport Beach, California 92663
(949) 631-3300; Facsimile (949) 631-3703
klein@kleinandwilson.com; wilson@kleinandwilson.com

RANDALL K. MILLER (admitted *pro hac vice*)
NICHOLAS M. DEPALMA (admitted *pro hac vice*)
RANDAL M. SHAHEEN (admitted *pro hac vice*)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449; Facsimile (703) 821-8949
rkmiller@venable.com; nmdepalma@venable.com

CELESTE M. BRECHT (SBN 238604)
VENABLE LLP
2049 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 229-9900; Facsimile (310) 229-9901
cmbrecht@venable.com

Attorneys for Defendants MORGAN DREXEN, INC., and WALTER LEDDA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>vs.<br><br>MORGAN DREXEN, INC., AND WALTER LEDDA, etc.,<br><br>Defendants. | **Case No. SACV13-cv-01267-JLS (JEMx)**<br><br>**DEFENDANTS MORGAN DREXEN, INC. AND WALTER LEDDA'S OPPOSITION TO PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF GENUINE ISSUES IN DISPUTE [Filed Separately]; DECLARATION OF GERALD A. KLEIN [Filed Separately]; OBJECTIONS TO EVIDENCE [Filed Separately]; AND [PROPOSED] ORDER RE OBJECTIONS TO EVIDENCE**<br><br>**HON. JOSEPHINE L. STATON**<br><br>**Date: November 21, 2014**<br>**Time: 2:30 p.m.**<br>**Courtroom: 10A**<br>**Action Filed: August 20, 2013**<br>**Fact Discovery Cutoff: September 16, 2014**<br>**Pretrial Conf. Date: January 23, 2015**<br>**Trial Date: February 10, 2015** |

# TABLE OF CONTENTS

**Page No.**


1. Introduction. . . . . . . . . . 1
2. The American Legal System Prevents a Large Portion of Society from Having Access to Counsel. . . . . . . . . . 4
3. The MD Paradigm Enables Attorneys to Represent Working Class People by Using Low Priced Clerical Staff and Automation. . . . . . . . . . 5
   A. MD Provides Marketing Support to Small Firms. . . . . . . . . . 5
   B. MD Performs Telephone Screening Services for Attorneys. . . . . . . . . . 6
   C. The Engagement Agreement Between the Consumer and Counsel. . . . . . . . . . 7
   D. The Bankruptcy and Debt Settlement Services MD Provides the Attorneys. . . . . . . . . . 7
   E. The Accounting Services MD Provides Attorneys. . . . . . . . . . 9
   F. Contrary to the Bureau's Contention, The Attorneys Have an Excellent Record of Client Success for Those Who Stay on Their Programs For At Least 12 Months. . . . . . . . . . 9
   G. The Bureau's Depiction of MD as a Fear Based "Boiler Room" Is Groundless. . . . . . . . . . 11
4. Background of the TSR. . . . . . . . . . 11
5. MD Made Every Effort to Comply with the Law. . . . . . . . . . 12
6. The Bureau's Contention MD Developed the "Dual Model" of Attorney Representation in Response to the TSR Amendments Is False. . . . . . . . . . 14
7. Contrary to the Bureau's Contentions, the Dual Model Has Been Successful in Reducing Bankruptcy Filings. . . . . . . . . . 15
8. While Wisconsin and West Virginia Do Not Accept the MD Model, the Overwhelming Majority of States Do. . . . . . . . . . 16
9. MD Has Not Violated the TSR. . . . . . . . . . 16
   A. MD Does Not Charge Any Fees for Debt Settlement. . . . . . . . . . 16
   B. MD Does Not Decide Whether to Give Consumers Refunds. . . . . . . . . . 17
10. The Bureau Sued MD, Rather than the Attorneys, to Circumvent Prohibitions Against the Bureau from Regulating the Practice of Law. . . . . . . . . . 17

11. MD Has Not Engaged in Any Deceptive Advertising. . . . . . . . . . 19

A. Consumers Are Not Charged an up Front Fee for Debt Settlement. . . . . . . . . . 20

B. Consumers Can Become Debt Free in Months. . . . . . . . . . 20

C. Survey Results Confirm Nothing Is Misleading In the Advertisements. . . . . . . . . . 20

12. The Bureau's Evidence Is Based Entirely upon a Handful of Disgruntled Attorneys, a Few Unhappy Customers and Discharged Employees. . . . . . . . . . 21

13. Approximately Half of the Exhibits the Bureau Relies upon Were Not Authenticated.. . . . . . . . . . 22

14. The Case Law the Bureau Cites Is Distinguishable. . . . . . . . . . 22

15. While Ledda Acknowledges He Is a Control Person as to MD, He Does Not Control the Attorneys. . . . . . . . . . 23

16. There Is a Factual Dispute as to Benefits Provided to Consumers. . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Page No.**

**Federal Cases**

*FTC v. Commerce Planet, Inc.* 878 F.Supp.2d 1048 (C.D. Cal 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FTC v. Cyberspace.com, LLC* 453 F3d 1996 (9th Circuit 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*FTC v. John Beck Amazing Profits, LLC* 888 F.Supp.2d 1006 (C.E. Cal. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FTC v. Pantron, I Corporation* 33 F.3d 1088 (9th Circuit 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*FTC v. Stefanchik*, 559 F.3d 924 (9th Circuit 2009).. . . . . . . . . . . . . . . . . . . . . . . . 22-24

*S.E.C. v. JT Wallenbrock & Associates* 430 F.3d 1109 (9th Circuit 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Federal Statutes**

12 U.S.C. § 5517(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Other Authority**

Dodd-Frank Act, section 1027(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Defendants Morgan Drexen, Inc. ("MD") and Walter Ledda ("Ledda") submit the following opposition to the motion for summary judgment filed by plaintiff Consumer Financial Protection Bureau (the "Bureau").

## 1. INTRODUCTION

Recognizing consumers are better protected against predatory lenders by having an attorney represent them, MD developed an automated platform attorneys can use to level the playing field so low income consumers can afford to be represented by counsel. As plaintiff, the Bureau, itself, admits lending institutions look for litigation efficiencies to collect on debts of just a few thousand dollars. They are using "litigation factories" with automated processes and mass production techniques to collect comparatively small debts from consumers, at low litigation expense to the creditors. The Bureau, itself, filed lawsuits against debt collection firms pursue that pursue debts it believes are invalid, barred by the statute of limitation, or otherwise should not be collected. MD's sophisticated automated platform and trained paralegals give customer attorneys the same type of low cost "fire power" their creditor counterparts have.

Using MD's technology, attorneys representing consumers have saved their clients approximately one half ***billion*** dollars of debt. Thirty-four percent of consumers who engage in the program seriously and stay in the program for 3 months or more become debt free. Fifty-three percent of disciplined consumers who stay with the program 12 months or more become debt free. (Ex. 1, par. 158)[1/]

But new shoes always hurt. In a stodgy field like the practice of law, change comes slowly and painfully. Two states – Wisconsin and West Virginia – rejected the new paradigm of attorneys using companies like MD to reduce legal costs. Those states want to keep the *status quo* of having attorneys meet each client face to face and handle most aspects of their representation (no matter how much it would cost), even if the consequence is a tremendous number of consumers go unrepresented because they cannot

---

[1/] All referenced Exhibits ("Ex.") are authenticated in the accompanying declaration of Gerald A. Klein ("Klein Decl.").

afford a lawyer. ***But those two states stand alone***. Regulatory agencies and bar associations from ***more than 20 states*** have embraced the new technology and the way MD does business with attorneys.

In short, the statistics MD will present at trial do not lie. The legal world is a better place – ***and consumers are better protected*** – because of companies like MD and the attorneys who use MD to cut legal costs their clients cannot afford. While MD is open to change and has repeatedly asked the Bureau to provide guidance to make its practices acceptable to the Bureau, ***the Bureau refuses to do so***. But if the legal profession does not change, representation by counsel will only be available for personal injury plaintiffs, impoverished criminal defendants, and well-heeled litigants who have the resources to pay attorneys $250 per hour or more. The harsh reality is that consumers already in financial trouble do not have the resources to pay even modest hourly rates using traditional paradigms. The Bureau's actions may be well intentioned, but they are misguided. If the Bureau wins this case, consumers will have less protection – not more.

Summary judgment must be denied for a more fundamental reason: MD is not liable on any of the Bureau's claims. The Bureau concedes MD does not contract with consumers and collects no fees from debtor consumers. There is not a scrap of paper suggesting MD has any contract with consumers or a consumer paid MF any money. It is undisputed that the attorneys who use MD's services are the parties to the engagement agreements with debtors and are paid for their services, ***NOT MD***. MD does not receive a penny from consumers. MD's only customers are attorneys who use MD's technology and outsource services to MD. ***Accordingly, to the extent there are any violations of the Telemarketing Sales Rule ("TSR"), it is the attorneys who have violated the TSR – not MD***. Then why did the Bureau sue MD? The Bureau is precluded from regulating the practice of law, so the Bureau has refrained from suing a single attorney and, in an odd twist, decided to sue the paralegals and the back office support those attorneys use (*i.e.*, MD). ***As MD does not have fee agreements with any consumer and collects no money from them, MD cannot be deemed to have violated the TSR***.

This case is about personal choice and the right of attorneys do decide what strategies to employ in a client's case. This case is about the rights of attorneys and clients to define their relationship instead of a federal agency deciding what the attorney-client relationship should be. Even the Bureau concedes ***this case is not about the unauthorized practice of law, legal malpractice, or breach of fiduciary duty***. In fact, not a single attorney has been named as a defendant in this case because the Bureau recognizes it cannot prove a case against ***any*** of the attorneys who use MD for support. The Bureau has attacked MD because it believes MD is an easier target and will not draw the wrath of the American Bar Association. Moreover, the Bureau acknowledges it has ***no jurisdiction*** to regulate attorneys.

Similarly, the advertisements at the center of the Bureau's complaint were approved and aired by the attorneys who purchased them – not MD. While MD creates the advertisements for the attorneys to run, it is the attorneys who air those advertisements – not MD. MD is not liable for any inaccuracies in the advertisements, as they are authorized by the attorneys who solicit business from those advertisements.

Moreover, MD will prove in this opposition that the advertisements are ***not misleading*** in any way and MD has the statistics to prove it. ***Almost 20,000 consumers have completed the programs set by their attorneys.*** Likewise, no "up front" fee is required for debt settlement. The decision to pay for bankruptcy services is entirely optional. ***The Bureau reluctantly admitted at its deposition that the debt settlement contract the attorneys use complies with the TSR***.

MD respectfully requests summary judgment be denied for the following reasons: (1) the Bureau acknowledged in discovery it does not contend attorneys are prohibited from charging a flat fee for bankruptcy; (2) MD provides support to attorneys and does not have any contractual relationship with consumers, nor do consumers pay MD any money; (3) attorneys (not consumers) pay MD to provide services to the attorneys, not the consumers; (4) the advertisements produced by MD on behalf of the attorneys it services are accurate and not misleading, and it is the attorneys who are legally

responsible for these commercials in any event – not MD; (5) the cases relied upon by the Bureau to support its position are distinguishable from this case because MD has a long track record of showing how it has helped attorneys help consumers and MD receives no money from consumers; and (6) it would be improper to award damages in the amount the Bureau requests without taking into account the benefits MD has provided consumers.

## 2. THE AMERICAN LEGAL SYSTEM PREVENTS A LARGE PORTION OF SOCIETY FROM HAVING ACCESS TO COUNSEL.

Professor Benjamin Barton ("Professor Barton") is an expert on the difficulties the middle class, working class, and lower class have to getting an attorney.[2] (*See,* Ex. 108, generally) Professor Barton opines it is difficult to find an attorney in business matters charging less than $200 per hour, and this court knows from its own experience that the costs of counsel in places like California and New York are much higher. (Ex. 108, par. 22) As a result of these high hourly rates, most Americans cannot afford a lawyer, especially in commercial litigation. (Ex. 108, par. 25) As a result, there has been an explosion of people who are forced to represent themselves (Ex. 108, par. 28) – with the usual poor results.

Professor Barton recognizes the only way to deliver legal services to an underclass which is effectively foreclosed from legal services due to cost, is to increase participation by lay people and rely more heavily on automation to deliver cost effective legal services. (Ex. 108, pars. 56- 85) Professor Barton believes companies like MD are part of the solution, not part of the problem. (Ex. 108, pars. 86-123) Unless companies like MD are

/ / /

---

[2] The Bureau contends none of the facts below are relevant to this case, while simultaneously conducting a character assassination of MD. The Bureau fiercely and falsely argues MD preys upon those people least able to afford it. The Bureau is wrong. Without the services MD provides attorneys, those attorneys could not represent consumers facing powerful creditors. These consumers would be defenseless. MD does not run away from any of these facts and is proud of the role it has played in making legal services available to the poor.

allowed to survive – and thrive – a substantial percentage of the American public will have no access to legal services.

As Professor Barton notes in his declaration, the paradigm for delivering legal services is changing. Even in large corporate law firms, there has been a move toward outsourcing as a way to manage costs. (Ex. 86, par. 74) The Bureau's own expert has no criticism of this practice. (Ex. 110, 75:21-76:14) The American Bar Association now recognizes this need to outsource and has amended its rules to allow for it. (Ex. 86, par. 76) Ultimately, if the legal profession does not change how it delivers legal services to the masses, the access to justice problem will only get worse for those unable to afford justice. (Ex. 86, pars.17-55)

**3. THE MD PARADIGM ENABLES ATTORNEYS TO REPRESENT WORKING CLASS PEOPLE BY USING LOW PRICED CLERICAL STAFF AND AUTOMATION.**

The Bureau grossly mischaracterizes MD and what it does. For example, the Bureau contends MD collects money for consumers and provides services to them. Those statements are false. MD provides comprehensive services to attorneys, as discussed below. ***MD does not provide services to consumers and does not charge consumers a dime***. Only a high volume practice enables attorneys to represent debtors who have relatively small debts in a cost effective way. (Ex. 13-31, pars. 17-25 [collectively, "Attorney Declarations"])[3/] Without MD's services, small firms which represent the underclass would not be able to handle their high volume practice. *Ibid.*

**A. MD Provides Marketing Support to Small Firms.**

Few small law firms, if any, can conduct a nationwide advertising campaign. (Ex. 1, par. 211) However, when attorney resources are pooled, nationwide marketing can be done efficiently and cost effectively. (Ex. 1, pars. 212-13) MD creates advertising

---

[3/] To make the declarations from attorneys who use MD's services easier for the court to review, these declarations were harmonized to keep paragraph citations uniform.

material for attorneys, which the attorneys must approve before MD can place it into media for airing, and then MD uses its experience to place advertising on the air at cost-effective rates, bringing attorneys the best "return for the buck." (Ex. 211, par. 212) Attorneys approve each of the marketing pieces played on television or radio. (Ex. 1, par. 215) MD does not air any advertisements on its own behalf. The attorneys air the advertisements and pay MD for creating and placing those advertisements. (Ex. 1, pars. 211-215) Accordingly, the attorneys are responsible for the contents of the advertisements, not MD.

**B. MD Performs Telephone Screening Services for Attorneys.**

Consumers responding to attorney advertisements call a particular telephone number. (Ex. 1, par. 218) Attorneys hire MD to screen these thousands of telephone calls to identify potential clients and winnow out the majority of callers who are either not potential clients pursuant to each attorney's criteria, or simply not interested in the attorney's services. (Ex. 1, pars. 220-221) For example, some callers call in to see if they can get a loan. *Ibid.* Other callers do not have sufficient unsecured debt to justify legal services. *Ibid.* Other callers want help on secured debts, not unsecured debts. *Ibid.* Many callers, after learning more about what options are available, decide they do not want to hire a lawyer. (Ex. 1, pars. 221-22) In fact, almost 85 percent of callers decide after the first telephone call that they do not want to retain an attorney. (Ex. 1, par. 222)

The attorneys require MD intake specialists to follow a checklist the attorneys already approved. (Ex. 1, par. 36) The scripts MD employees who answer phones are checked for quality control. (Ex. 1, pars. 145-151) MD employees who violate the protocols are disciplined and employees who repeatedly violate protocols are terminated. *Ibid.* Not surprisingly, the Bureau obtained declarations from some disgruntled employees no longer employed at MD, yet a former employee who worked as a manager in the intake department for more than six years confirmed that employees are fired for fraudulent sales representations. (Ex. 32, pars. 11-16).

/ / /

**C. The Engagement Agreement Between the Consumer and Counsel**

After the MD employee concludes the prospective client meets the attorney's specified criteria for engagement, a fee agreement and other information required by the attorney are uploaded to the client for electronic signature. (Ex. 1, pars. 231-236) When the client's attorney next looks at his "computer dashboard," the attorney decides whether to accept the signed engagement or not. *Ibid*. The notice of prospective attorney engagements are sent to the attorney via email. The attorney can look up the information regarding the potential new client in the MD Information System ("MDIS"). MD then communicates the engagement or rejection of the engagement to the client. At any time, clients are free to call their attorneys, although most do not. (Ex. 26, par. 42) Clients of the attorneys work with one of the clerical staff at MD and often develop a close bond with that employee. (Ex. 1, par. 251)

**D. The Bankruptcy and Debt Settlement Services MD Provides the Attorneys.**

Almost all of the attorneys allow prospective clients to sign up for: (1) bankruptcy; (2) debt settlement; or (3) both bankruptcy and debt settlement. (Ex. 13, par. 26) The bulk of the attorneys recommend consumers simultaneously engage them for both debt settlement and bankruptcy engagement agreements. (Ex. 13, pars. 26-33) ***The Bureau concedes the debt settlement agreement complies with the law***. (Ex. 110, 38:13-20). The Bureau does not appear to contend the attorneys are precluded from charging "up front" fees for their bankruptcy services and the Bureau's own expert admitted as much. (Ex. 111, 66:10-25) Many of the consumers who hire the attorneys are threatened by litigation. (Ex. 2, par. 25) The attorneys believe the threat of bankruptcy will often prevent litigation from being filed. (Ex. 2, pars. 24-26) Accordingly, the Bureau is correct in its conclusion that most clients sign up for both bankruptcy services and debt resolution. That should not be surprising. Attached as Ex. 118 to the Klein Decl. is statistical evidence showing the threat of bankruptcy minimizes lawsuits. *See also*,

/ / /

Declaration of MD's Accounting Expert, Kenneth Rugeti, confirming the statistics MD provided the court are accurate. (Ex. 109)

The attorneys hire MD to do the clerical work necessary to prepare early draft bankruptcy petitions which are continually updated. (Ex. 26, par. 38) Accordingly, using procedures established by the attorneys, MD's paralegals perform the clerical work necessary to prepare bankruptcy documents at lower cost than the attorneys could achieve on their own. *Ibid*. Even the Bureau's expert admitted there is nothing wrong with attorneys using this type of clerical support. (Ex. 111, 85:5-18 and 86:3-86:13)

To minimize the time attorneys spend on each file – and, thereby, minimize cost to the consumer clients – MD's paralegals are expected to advise their creditor counter parts that an attorney now represents the client and communications must go through counsel. (Ex. 2, par. 65) Ironically, one of the Bureau's "exemplar" consumer witnesses, Linda Whiteside ("Whiteside"), admitted at her deposition she was getting up to 13 harassing telephone calls from creditors each day until the Howard Firm stepped in and stopped the phone from ringing – to her great relief. (Bureau SJ Ex. 43, 94:16-95:2) The Bureau's own expert concedes that consumers are often plagued by such calls and want them to stop. (Ex. 111, 38:15 and 41:21-42:20) It is the dual model the Bureau apparently opposes which protected Whiteside from these harassing calls.

After MD engages in the clerical task of notifying creditors the client has engaged counsel, MD's paralegals contact their counterparts for creditors to engage in a negotiation process following strict criteria set by the attorneys, which hopefully will resolve debts at monthly payments the client can afford. (Ex. 2, pars. 64-68) But the decision to accept a particular settlement offer is made by the attorneys and their clients – ***not MD***. (Ex. 1, pars. 256-260) However, MD works with the client to understand how much disposable income is available to the client so the attorney and client can better assess whether the client can afford the monthly payments required to resolve a debt based on logarithms MD developed. (Ex. 1, pars. 274-276)

/ / /

While the Bureau mocks the amount of time lawyers spend on each file, the Bureau misses the point. The entire purpose of this paradigm is to have automation and lower cost employees do as much work as possible so impoverished debtors can afford legal representation and have an attorney make the critical decisions only attorneys make. (Ex. 1, pars. 18-32) Whether this paradigm for providing legal services is a good thing or a bad thing for clients ***is something state bars must decide***, not the Bureau. Likewise, the Bureau's contentions that the attorneys do not do "enough" work on bankruptcy petitions, or petitions are poorly prepared, are irrelevant to whether there is a violation of the TSR. The Bureau's own expert conceded bankruptcy lawyers may charge for their services ***whether or not a bankruptcy petition is filed***. (Ex. 111, 118:10-119:16).

**E. The Accounting Services MD Provides Attorneys**

Few, if any, of the attorneys MD supports have the "back office" necessary to perform complicated accounting functions for hundreds and, potentially, thousands of clients. (Ex. 1, pars. 101-104 and 270-282) MD provides the back office accounting services the attorneys need to comply with trust fund accounting in 50 states. (*Ibid.*) Not a single bar organization or governmental entity has accused MD of trust account violations. (*Ibid.*) MD's sophisticated automation systems track client payments of fees and payments to creditors, and provides a transparent (but secure) portal both the attorney and the client can view to track the accounting. (*Ibid.*) MD's automation is so sophisticated, it even has a mobile application available to consumers so they can track their trust account status and payment history by telephone. (Ex. 1, par. 96)

**F. Contrary to the Bureau's Contention, The Attorneys Have an Excellent Record of Client Success for Those Who Stay on Their Programs For At Least 12 Months.**

Like almost any program, consumer success depends upon whether the consumer follows the program. For example, the weight loss industry has a poor success record if the only statistic reviewed is how many try to lose weight versus how many people actually succeed in losing pounds and keeping them off. But if overweight people cut

their calories and exercise, losing weight and keeping it off is inevitable. The problem is most people give up too soon – often days after starting a weight loss program.

Similarly, consumers who stick with the program their attorneys set for them, will succeed. (Ex. 119) The proof is in the mathematics. Full payments of debts are set at a certain level the client can afford calculated using MD's algorithms and after debts are negotiated through the client's attorney. (Ex. 1, pars. 274-275) MD's algorithms are mathematically accurate and, as long as the client has accurately reported debt and living expenses, the math for repaying the debt inevitably works. However, if consumers take on additional debt (like eating extra cookies) or lose a job, get hospitalized, etc., they cannot make their payments and fall off the programs their attorneys set for them. This is an institutional problem even the Bureau's sole expert concedes. (Ex. 111, 17:18-18:25)

It should not be surprising that many people already challenged by heavy debt cannot complete their programs for a wide variety of reasons. However, for 34 percent of consumers who make at least three payments, they will complete the program. (Ex. 119) For those consumers who make payments for six months, 42 percent will successfully complete the program. (Ex. 119) And for those consumers who make payments for 12 months, 53 percent will successfully complete the program. (Ex. 119) ***Contrary to the assertions of the Bureau, this is an outstanding record***.[4/] The attorneys have saved their clients over $300 million of debt by way of settlement. (Ex. 120)

The fact that many consumers cannot complete their programs is not surprising. Many of these people have tremendous challenges in their lives. As the Bureau's own expert concedes, they are a layoff or a medical emergency away from disaster. She also concedes that once the harassing creditor phone calls stop, many debtors believe they have already achieved their goals. (Ex. 111, 60:6-61:1) As to the contention that 60 percent of enrollees have not settled a debt, this "fact" is plain wrong. (Ex. 1, par. 305)

---

[4/] The Federal Trade Commission ("FTC") found that less than 10 percent of consumers generally resolve their debts using traditional debt settlement companies.

Using the dates the Bureau used to calculate this 60 percent figure, there is ***a total of 275 people who have not yet had debts settled***, and some are new to the program.[5] (Ex. 1, par. 305)

**G. The Bureau's Depiction of MD as a Fear Based "Boiler Room" Is Groundless.**

MD makes no excuses about being a business and operating in a business-like fashion. Salespeople are expected to make sales for the attorneys who hire MD to market for them. As set forth in the declarations of MD employees, MD provides a professional and happy work environment for almost 200 employees the Bureau seeks to put on the street and into unemployment lines. (Exs. 8-12) As the court can see from the declarations consumers filed, consumers are not victims of "boiler room" tactics – they are happy clients of attorneys working on their behalf. (Exs. 33-107) MD employees who use high pressure tactics or misrepresent services to consumers are disciplined and can be terminated. (Ex. 10, par. 24) Interestingly, MD invited the Bureau to come to MD to see what goes on at MD. (Klein Decl., par. 8) The Bureau turned down the offer. (*Ibid*.)

**4. BACKGROUND OF THE TSR**

MD acknowledges the debt relief industry was infested with many fly-by-night companies. ***MD is not one of those companies that has preyed upon the public***.

In 2010, the FTC amended the TSR to protect the public from predatory companies providing no benefits to their consumers, but charging them for work which often was not done. MD is not one of those companies and should not have been caught in the TSR net. The Bureau correctly states that, pursuant to the TSR, debt settlement companies may not

/ / /

[5] The Bureau has consistently had trouble reading the voluminous spreadsheets MD produced in response to the Bureau's onerous discovery requests. The Bureau had to take one MD deposition just to understand the reports, but apparently is still confused. The 60 percent figure is just plain wrong. (Ex. 1, par. 305)

charge an "up front" fee. As discussed below, MD does not charge consumers ***any*** fee and does not violate the TSR.

## 5. MD MADE EVERY EFFORT TO COMPLY WITH THE LAW.

Ledda, the Chief Executive Officer of MD, already had a bad experience with the FTC. (Ex. 1, par. 115) He violated the "Do Not Call" provisions of regulations in place at the time. (Ex. 1, par. 119) Rather than fight the FTC's allegations, Ledda entered into a consent decree where ***no guilt was found and no guilt was admitted***. (Ex. 1, par. 120) To avoid further trouble with the FTC (or any other government agency), Ledda took every reasonable step he could to make sure he and MD complied with the law. (Ex. 1, par. 124-25) The first thing Ledda did was hire attorney, Stephen Nagin ("Nagin"), to serve as President and General Counsel to MD. (Ex. 1, par. 131 ) Nagin had an impressive consumer background, which included serving as a: (a) former FTC prosecutor; (b) former assistant AG for Florida; and (c) law school professor for 12 years. (Ex. 1, par.131) But Ledda was not content simply to bring in Nagin. Ledda sought counsel from one of the largest and most experienced law firms in the country, and a former head of the FTC, to help MD comply with the law, not skirt it. (Ex. 1, pars. 162-167) Guided by a capable president and knowledgeable counsel, MD built the protocols the Bureau now criticizes as illegal. Ironically, the Bureau's entire case is premised on MD's attempt to ***comply*** with the law, not evade it.

Having already had a bad experience with the FTC, MD and Ledda (guided by Nagin and major law firms) decided the best way to avoid running afoul of federal laws or the laws in the 50 states was to support attorneys, rather than contract with consumers. (Ex. 1, par. 206) At the time this decision was made in 2007, there was no anticipation the TSR would be amended as the Bureau concedes there were no discussions about amending the TSR until 2009. MD's primary concern was making sure it avoided the unauthorized practice of law. (Ex. 1, par. 205) To make sure each attorney provided MD with adequate supervision, MD's agreements with attorneys specifically required such

/ / /

supervision. (Ex. 1, pars. 205-209) MD agreed to provide automation and provide substantial back office. (*Ibid.*)

While the Bureau portrays MD as a puppet master controlling "empty suits" with Svengali-like mind control, this legal theory is as fictional as Svengali himself. Trying to control over 100 attorneys throughout the United States requires superhuman powers MD does not possess. In fact, even the disgruntled attorneys the Bureau cherry picked rankled at any suggestion by the Bureau that MD was pulling their strings. Meanwhile, MD has presented sixteen declarations from attorneys who use MD's services showing it is the attorneys – not MD – that engage the clients and decide what is in the client's best interest. (Exs. 13-31)

While MD built the technological engine to support an attorney's bankruptcy and debt resolution practice, the force steering the direction of each case is – and always has been – the attorneys. As with any large network of people, some of the attorneys who use MD for support are more capable than others. But it is the attorneys who control the relationship with the client and the client's outcome – not MD. (*See, generally*, Exs. 1-2, 7, and 13-31)

The loose network of attorneys who access the MD system originally consisted of just three attorneys: (1) Vincent Howard ("Howard"), a well-respected mass tort and consumer lending lawyer in Orange County; (2) Lawrence Williamson ("Williamson"), who was licensed to practice law in at least two states; and (3) Eric Rosen ("Rosen"), a very experienced bankruptcy practitioner in Florida. (Ex. 1, par. 59) It was these three attorneys who built the network of attorneys using the MD platform and who put into place the initial policies MD was required to follow. (Ex. 1, pars. 51-70)

Pursuant to their business plan, MD would do three things: (1) coordinate marketing for a network of attorneys nationwide; (2) provide clerical and paralegal support for the attorney network; and (3) provide back office support, including tracking billings, trust account reconciliation and other accounting tasks. (Ex. 1, pars. 51-70) MD performs all of these services brilliantly for the attorneys who hire MD and no one

suggests it did not, other than a handful of attorneys. (Exs. 13-31) Eventually, the network grew to approximately 100 lawyers as attorneys around the country saw the value of the services MD provided. (Ex. 1, pars. 71 and114) ***But under this structure, MD had no contractual relationship with any consumers and its only customers were the attorneys who used MD's services***.

**6. THE BUREAU'S CONTENTION MD DEVELOPED THE "DUAL MODEL" OF ATTORNEY REPRESENTATION IN RESPONSE TO THE TSR AMENDMENTS IS FALSE.**

One of the main premises of the Bureau's case is that MD developed the concept of bundling bankruptcy services with debt settlement to circumvent the TSR. ***That contention is false***. The origin of the "dual model" goes back to 2008 and came from the attorneys, not MD. (Ex. 2, pars. 16-35) Howard, Williamson, and Rosen (the first attorneys who used MD's services) believed they were losing clients when debt settlement failed and bankruptcy was the only available option. (*Ibid*.) At that point, the client would hire a bankruptcy attorney to file a bankruptcy petition. Howard saw no reason to lose clients when debt settlement failed and asked Ledda to expand the MDIS to include a bankruptcy component. (*Ibid*.) This request turned out to be harder to achieve than initially expected. (Ex. 1, pars. 176-188)

The efforts to build a bankruptcy component for the MDIS platform started in 2008, but MD could not get the programming to function properly in the beginning. Meanwhile, immediately after starting bankruptcy program in 2008, Howard recognized building a nationwide bankruptcy practice was more complicated than building a nationwide debt settlement practice. (Ex. 1, pars. 176-188) Howard, therefore, told Ledda to stop working on the project while Howard assembled a bankruptcy network of attorneys and decided what capabilities the new software system needed. (*Ibid*.) By the end of 2009, Howard finally assembled the pieces he thought he needed to re-start the bankruptcy program, but MD could not finish its software development until early 2010. In 2009 and early 2010, MD changed its accounting system to MAS 500, which was a

major technology undertaking. (*Ibid.*) It was not until 2010 that MD developed a bankruptcy software module to work with its MDIS platform. (*Ibid.*)

At the time MD was developing its bankruptcy software and Howard was assembling a bankruptcy network of attorneys, neither MD nor Howard believed the TSR would have any impact on how they did business. (Ex. 1, pars. 152-175) In May 2010, the FTC told Ledda the amendments to the TSR would not apply to MD's attorney customers. (Ex. 1, pars. 169-175) Howard believed the FTC had no authority to regulate attorneys, no matter what the FTC decided. (Ex. 2, par. 27) Accordingly, contrary to the Bureau's assertions, the development of the "dual model" approach ***had nothing to do with any proposed amendments to the TSR***. The attorneys conceived this approach by 2008 and were going to put the approach into operation no matter what the amendments to the TSR were. The TSR simply impacted how the debt settlement portion of the dual approach service could be priced.

**7. CONTRARY TO THE BUREAU'S CONTENTIONS, THE DUAL MODEL HAS BEEN SUCCESSFUL IN REDUCING BANKRUPTCY FILINGS.**

The attorneys believed the biggest triggering event for a bankruptcy was the threat of litigation. (Ex. 2, par. 26) Exhibit 118 demonstrates that litigation went down substantially since implementation of the dual model. As expected, the implementation of the "Dual Model" reduced litigation that usually triggered a bankruptcy filing. (*Ibid.*) One of the goals of the Dual Model was to discourage creditor litigation. (Ex. 2, par. 26) Defense of litigation is costly to consumers and a judgment inevitably triggers bankruptcy. (*Ibid.*) As a by-product of discouraging litigation, the clients had more time to resolve debts. (*Ibid.*)

However, when bankruptcy becomes the only option, the attorneys are ready to file the petition at the consumer's request – ***so long as all fees are paid***. (Ex. 26, par.43) But as the Bureau's own expert concedes, many consumers are unwilling to pull the bankruptcy trigger. (Ex. 111, 60:02-05) Likewise, she concedes some consumers drop out of the bankruptcy process when they feel they can resolve their own debts. (Ex. 111,

60:06-21) Sometimes they fail to pay the bankruptcy fee and a bankruptcy cannot be filed. The Bureau's expert concedes no prudent bankruptcy lawyer would file a bankruptcy petition before a client pays legal fees in full. (Ex. 111, 66:10-66:25) And it is the failure to pay fees in full that prevents many bankruptcy petitions from being filed. (Ex. 11, par. 64)

**8. WHILE WISCONSIN AND WEST VIRGINIA DO NOT ACCEPT THE MD MODEL, THE OVERWHELMING MAJORITY OF STATES DO.**

MD admits its model of providing services to attorneys so they can outsource clerical, administrative, and "leg work" to lower priced employees and take advantage of automation, is an approach that will rankle some lawyers and bar associations married to traditional paradigms. But as Professor Barton notes in his declaration (Ex. 108), the traditional paradigm of legal services might work for lawyers, it does not work for those unable to afford counsel. For the most part, bar associations and regulatory bodies who have examined the MD model have concluded it is an acceptable method of outsourcing for lawyers and have embraced it. (Ex. 7, pars. 8-59 ) MD's General Counsel, Jeffrey Katz, explains in detail in his declaration how MD has sought approval of its business model and how the large majority of state bodies have accepted it, with the exception of Wisconsin and West Virginia. (*Ibid.*) Those two decisions are on appeal. (Ex. 7, par. 7)

**9. MD HAS NOT VIOLATED THE TSR.**

Without restating the statutory language of the TSR, the essence of the Bureau's TSR claim is: (1) MD charges an "up front" fee for debt settlement; and (2) MD does not promptly refund fees. Both of these assertions are false.

**A. MD Does Not Charge Any Fees for Debt Settlement**

The Bureau ignores three critical facts in charging MD with violations of the TSR: (1) MD does not have any contractual relationship with consumers; (2) MD provides no services to consumers; and (3) MD does not charge consumers any money. MD's only customers since it went into business in 2007 have been attorneys – not consumers. To underscore this point, attorneys have cancelled MD's services and



61821v1

decided to bring the paralegal support in-house. (Ex. 15, pars. 6-12) They serviced their own clients without the involvement of MD. (*Ibid*.) As noted above, MD consciously and deliberately decided to adopt a business model of serving attorneys rather than the general public. As noted above, this has been the MD business model from the time it started business. The amendments to the TSR had nothing to do with this business model, as those amendments were not even considered until some time in 2009. As a result, MD does not charge consumers anything and has no contractual relationship with consumers to allow MD to charge them. The only relationship MD has is with the attorneys who pay MD for its services.

**B. MD Does Not Decide Whether to Give Consumers Refunds.**

MD is a bookkeeper for the attorneys it serves. (Ex. 11, par. 39) All bank accounts at issue are attorney bank accounts. (Ex. 11, par. 40) The money in those accounts does not belong to MD. (*Ibid*.) For reasons that preceded and having nothing to do with the TSR amendments, MD and the attorneys recognized client and attorney bank accounts had to be in the name of the attorneys and under the direct control of the attorneys. (*Ibid*.) MD simply acts as a bookkeeper to execute transactions the attorneys request. (Ex. 11, par. 39) MD has no right as a bookkeeper to decide for the attorneys who receives refunds or when refunds will be paid. (Ex. 11, par. 54) The Bureau simply glosses over this fact in its motion and does not explain how the bookkeeper is liable for the attorneys' actions.

For these fundamental reasons, MD cannot be found to have violated the TSR.

**10. THE BUREAU SUED MD, RATHER THAN THE ATTORNEYS, TO CIRCUMVENT PROHIBITIONS AGAINST THE BUREAU FROM REGULATING THE PRACTICE OF LAW.**

This is an odd case. In essence, the Bureau seeks to punish the paralegals and bookkeepers for the purported sins of the attorneys. But this was no accident or oversight on the part of the Bureau. Section 1027(e) of the Dodd-Frank Act expressly ***prohibits the Bureau from regulating lawyers engaged in the practice of law***. It provides under the

"exclusion for the practice of law," provision that "the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1). Yet, that is ***exactly*** what the Bureau is doing.

The Bureau does not like how attorneys bundled bankruptcy and debt settlement services, even though these attorneys have ***proven*** bundling the services leads to less litigation and better outcomes for their clients. (Ex. 121) The Bureau believes it knows better than a client's attorney what is best for that client. The Bureau cannot point to any legislation prohibiting what it calls "the dual model" of attorneys simultaneously representing clients for both debt settlement and bankruptcy. Unable to attack the attorneys, the Bureau turned its guns on MD. The Bureau sees nothing strange about this.

In a brief the Bureau filed on October 3, 2014 in an enforcement case against a ***creditor*** law firm, Hanna & Associates (Ex. 113), the Bureau laid out its view of the "practice-of-law-exclusion." ***The Bureau conceded the exclusion applies to "bankruptcy lawyers***." The Bureau's brief states:

> "Defendants [debt collectors] cannot rely on the CFPA's practice-of-law exclusion because it expressly preserves the Bureau's authority over attorneys who collect debts from consumers who are not their clients.
>
> * * *
>
> … by its terms, ***the exclusion applies only to attorneys who provide legal advice or services to consumers***. Defendants, although licensed attorneys, do not provide legal advice or services to consumers; rather, they serve clients with interests adverse to consumers, and therefore remain within the Bureau's reach.
>
> ***
>
> To be sure, Representative Conyers addressed the important role states play in regulating attorneys. ***But his remarks focused on attorneys who provide legal services to consumers, such as the 'consumer clients of bankruptcy lawyers, consumer lawyers, and real estate lawyers.' Only those attorneys, acting 'exclusively within the scope of an attorney-client relationship,' were intended to be placed beyond the Bureau's reach***. Consistent with the exclusion's

> plain language, Representative Conyers noted that to be exempt, 'the product or service must not be offered by . . . the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with it.'" (Emphasis added.) (Ex. 113)

So, just days after this brief was filed, the Bureau filed its motion for summary judgment in this case, flipping its position on bankruptcy lawyers. As set forth in its brief its case against Hanna & Associates, the Bureau recognizes it does not have jurisdiction to regulate the practice of law or regulate what strategies bankruptcy attorneys adopt to protect their clients. Unable to get at the consumer attorneys directly, the Bureau sued MD, to choke off the support these attorneys need to represent their clients effectively.[6]

**11. MD HAS NOT ENGAGED IN ANY DECEPTIVE ADVERTISING.**

For the same reasons the Bureau's TSR arguments fail, so do the Bureau's claims of deceptive advertising. As noted above, MD acts as an advertising consolidator to make attorney advertising affordable to small law firms. MD helps create the advertisements and uses its knowledge to place advertisements on the air at the lowest cost. (Ex. 1, par. 43) However, it is the attorneys who approve the advertisements, pay for the advertisements, and are responsible for the advertisements. (Ex. 1, par. 215) MD is no more legally responsible for the advertisements than the networks that air them. The Bureau did not cite a single case or statute supporting the contention MD is responsible for these advertisements.

But even if MD were responsible for the advertisements, there is nothing misleading about them. The Bureau apparently focuses on two claimed misrepresentations: (1) no "up front" fee will be charged; and (2) consumers can be debt

---

[6] Recent Bureau statements about its so-called "chokepoint" policy suggest the Bureau's true enforcement "target" is not MD but lawyers supported by MD, with the enforcement action against MD simply a tool to "choke" off support to the lawyers. It has been widely reported that the Bureau's policy is to "choke" enforcement targets by going after others who provide support to the target, such as lenders and payment processors. Some members of Congress have said that the Bureau's "chokepoint" practices are inherently problematic, and the practices are under current investigation. (Ex. 114)

free in months. ***Both of these statements are true***. And a ***survey confirms that consumers are not misled***. (Ex. 123) In contrast, the Bureau presented no survey and relies entirely upon anecdotal evidence.

**A. Consumers Are Not Charged an up Front Fee for Debt Settlement.**

When consumers hire their attorneys, they are offered an opportunity to pursue debt settlement alone, bankruptcy alone, or both services. There is no "up front" fee for debt settlement. The Bureau admitted in its deposition that the fee agreement provided to consumers for debt settlement complies with the TSR. (Ex. 110, 38:13-20) There is an up front fee for bankruptcy services, but the Bureau's expert admits such a fee is proper and must be charged up front. (Ex. 111, 66:21-25) Accordingly, the statement there is no up front fee for debt settlement is true. There is an up front fee for bankruptcy services which the Bureau's own expert admits is appropriate.

**B. Consumers Can Become Debt Free in Months.**

Almost a thousand consumers have become debt free in less than a year. (Ex. 122) These statistics are irrefutable. In its moving papers, the Bureau concedes six percent of consumers are debt free in less than 12 months. But the length of time it takes for each consumer to become debt free depends on the amount of consumer's debt and the consumer's budget. Consumers must choose their payment terms based on ability to pay. When considering it takes a decade or more for most consumers to pay off high interest credit card debt (whereas most consumers who follow the programs their attorneys schedule for them can pay off their debts in 36 months or less), consumers do resolve debts "in months," not a decade or more.

**C. Survey Results Confirm Nothing Is Misleading In the Advertisements.**

The Bureau's entire case is based on a smattering of anecdotal evidence from a handful of unhappy consumers. At trial MD will prove those consumers are badly impeached by statements they made in their own recorded telephone calls. However, if the Bureau wanted to prove the advertisements are misleading, it would have commissioned a survey to prove it. The fact no survey was commissioned in a case like

this speaks loudly. In contrast, MD commissioned a survey where ***the finding was there were no misleading statements***. (Ex. 123)

**12. THE BUREAU'S EVIDENCE IS BASED ENTIRELY UPON A HANDFUL OF DISGRUNTLED ATTORNEYS, A FEW UNHAPPY CUSTOMERS AND DISCHARGED EMPLOYEES.**

The attorneys have represented over 100,000 clients whose identities are in MDIS. In representing these people, the attorneys have cut their debts by over $313 million. (Ex. 120) MD presented a representative sample of 75 consumers who are happy to trumpet the successes they had with their attorneys. (Exs. 33-107) In contrast, the Bureau did no survey or statistical study as to whether the overwhelming majority of these people were satisfied with the services their attorneys provided. Instead, they point to a handful of people who are badly impeached by their own telephone recordings. Their star consumer witness, Linda Whiteside ("Whiteside"), when confronted with her telephone recordings at her deposition, had to admit the testimony she provided to the Bureau was inconsistent with her own voice on recorded telephone calls.

Given the number of people in the MDIS database, it would have been a miracle if nobody were unhappy with the services of their attorneys. Clients are often unhappy with their counsel – sometimes for good cause, sometimes not. MD has submitted declarations from 75 consumers (and stopped there) to show that most consumers are thankful for the services these attorneys performed. Even Whiteside conceded she was getting up to 13 harassing telephone calls each day from creditors and those calls only stopped when the law firm stepped in. (Bureau SJ Ex. 43, 91:17-94:15) Even Whiteside conceded the Howard law Firm successfully negotiated one of her major debts. (Bureau SJ Ex. 43, 130:8-24)

While the Bureau puts a spotlight on a handful of lawyers who had issues with MD (mostly over bills MD presented to them), the overwhelming majority of lawyers disagree with them. (Exs. 13-31) MD has filed 16 declarations of attorneys who strongly believe they are providing valuable services to the clients they represent and that they could not

provide this service without the support MD provides. (*Ibid.*) Ironically, even the attorneys the Bureau featured emphatically stated they were the ones who decided what was in the interest of their clients and that MD's job was to carry out their instructions.

The Bureau's reliance on the testimony of disgruntled former employees is also disappointing. In the case of Harvey Montijo ("Montijo"), ***Montijo committed extortion and solicited a bribe from MD to provide favorable testimony***. (Ex. 12, par. 46) The Bureau featured Montijo's testimony anyway. What may be most shocking is the Bureau's reliance on a rogue company claiming to be part of the Better Business Bureau ("BBB") that was ejected from the BBB for misconduct. (Ex. 7, par. 91) ***The Bureau knows the real BBB gave MD an A minus rating***. The reliance of a federal agency on a known charleton is disappointing.

**13. APPROXIMATELY HALF OF THE EXHIBITS THE BUREAU RELIES UPON WERE NOT AUTHENTICATED.**

The Federal Rules of Evidence and the local rules of this court require parties to authenticate the evidence they submit to the court. As set forth in the accompanying Objections to Evidence, the Bureau did not bother to authenticate approximately half of its exhibits and introduced entire transcripts, making objections to testimony impractical.

**14. THE CASE LAW THE BUREAU CITES IS DISTINGUISHABLE.**

The fact that the Bureau's most important case citation is an unpublished, uncitable district court order currently on appeal, speaks loudly to the lack of legal support for the Bureau's legal position. It is telling that the Bureau relegated almost all of its legal authority to footnotes, as if legal authority were not important. The Bureau knows none of these cases are on point.

*FTC v. Stefanchik*, 559 F.3d 924 (9th Circuit 2009) is easily distinguishable. Unlike this case, where attorneys are selling services, Stefanchik and Beringer were selling their own services. *Id*. at 927. Unlike this case where there is demonstrable evidence the dual program reduces litigation and achieves favorable results for consumers, "the Stefanchik method" was demonstrably useless. *Ibid*. Unlike in this case,

the FTC took the time and effort to support its claims using survey results proving that only a small percentage of customers were able to achieve the results promised by the Stefanchik method. *Ibid*. Moreover, unlike this case, Stefanchik and Beringer failed to conduct a survey of their own, failed to offer consumer declarations or present any evidence their methods worked. *Ibid*. In fact, the *Stefanchik* court gave great weight to the FTC's survey, something the Bureau does not have in this case. *Id*. at 929.

Furthermore, the *Stefanchik* case is the reverse of this case. Stefanchik claimed he did not make any of the calls and, therefore, could not be deemed a telemarketer. But, just as the attorneys do in this case, Stefanchik approved all of the telemarketing and authorized the actions of the third parties, reviewed the telemarketing scripts, and sold products as a result of that telemarketing. *FTC v. Stefanchik, supra,*, 559 F.3d 924 at 930. Accordingly, *Stefanchik* is not on point.

The Bureau's reliance on *FTC v. Cyberspace.com, LLC*, 453 F3d 1996 (9th Circuit 2006) is even more puzzling. In that case, defendants sent checks in the mail which looked like a refund check, but in small print on the back of the check indicated that cashing the check would constitute enrollment in a costly Internet program. *Id*. at 1198. *Cyberspace.com* has nothing to do with the facts of this case.

Likewise, *FTC v. Pantron, I Corporation*, 33 F.3d 1088 (9th Circuit 1994) is irrelevant to this case. In *Pantron*, a seller sold a product where the "effective" component simply came from a "placebo effect." It is hard to understand why *Pantron* would have any applicability of the facts of this case.

**15. WHILE LEDDA ACKNOWLEDGES HE IS A CONTROL PERSON AS TO MD, HE DOES NOT CONTROL THE ATTORNEYS**.

Ledda acknowledges he is a control person as to MD. While the Bureau continues its strategy of character assassination by suggesting Ledda transferred his assets to a trust, the Bureau knows Ledda did this as part of estate planning and voluntarily disclosed this fact to the Bureau. But any suggestion Ledda controls the attorneys is nonsense and

/ / /

specifically refuted by the attorneys themselves. Even the Bureau does not seem to suggest Ledda controls the attorneys.

**16. THERE IS A FACTUAL DISPUTE AS TO BENEFITS PROVIDED TO CONSUMERS.**

In making a claim for over $90,000,000 of damages, the Bureau ignores the substantial benefits attorneys provided to their clients. Unlike the cases cited by the Bureau, this is not a case where a deceptive seller charged consumers for failing to cancel a "free" offer. *See, FTC v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048 (C.D. Cal 2012). It is not a case involving selling a fraudulent "get rich quick" scheme, as in *FTC v. Stefanchik, supra,* 559 F.3d 924; *see also, FTC v. John Beck Amazing Profits, LLC*, 888 F.Supp.2d 1006 (C.E. Cal. 2012). This case does not involve a Ponzi scheme. *S.E.C. v. JT Wallenbrock & Associates*, 430 F.3d 1109 (9th Circuit 2006).

Here, consumers have had their debts reduced by a collective total of $330 million. 61 percent of consumers who stayed on their attorneys' program for 18 months completed the programs. In the universe of people who generally do not have access to the legal system and are one personal catastrophe away from destitution, these are impressive statistics. In short, consumers have spent substantially less money than they have saved using the attorneys MD supports.

GERALD A. KLEIN
KLEIN & WILSON

Dated: October 31, 2014

/s/
Gerald A. Klein
Attorneys for Defendants Morgan Drexen, Inc. and Walter Ledda