1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | CASE NO. SACV 13-1267-JLS (JEMx) |
|        Plaintiff, | **ORDER (1) GRANTING PLAINTIFF'S MOTION FOR SANCTION OF DEFAULT JUDGMENT AGAINST MORGAN DREXEN, INC. (Docs. 255-2, 274) AND (2) REQUIRING SUPPLEMENTAL BRIEFING AS TO DEFENDANT WALTER LEDDA** |
|     vs. | |
| MORGAN DREXEN, INC., ET AL., | |
|       Defendants. | |

## I.    **INTRODUCTION**

Before the Court is a Motion for Sanctions filed by Plaintiff Consumer Financial Protection Bureau (the "Bureau").  (Mot., Docs. 255-2, 274.)  Defendants Morgan Drexen Inc. and Walter Ledda filed an Opposition, and Plaintiff replied.  (Opp'n, Doc. 261; Reply, Doc. 262.)  After considering the briefing and supporting documentation submitted by the parties, holding an evidentiary hearing, and taking the matter under submission, the Court GRANTS Plaintiff's Motion for Sanctions against Defendant Morgan Drexen Inc. and ORDERS supplemental briefing regarding the potential personal liability of Defendant Walter Ledda and whether default judgment should be entered against him as well.

## II.    **BACKGROUND**

Morgan Drexen, Inc. has been in business since 2007.[1]  Defendant Walter Ledda is the Chief Executive Officer of Morgan Drexen and has been a member of the company's Board of Directors since May 21, 2007.  Morgan Drexen provides debt settlement and bankruptcy services to attorneys and consumers.  Specifically, Morgan Drexen works with attorneys to service clients who are subject to actions and lawsuits by organizations within the debt collection industry.

Prior to October 27, 2010, the effective date for recent amendments to the Telemarketing Sales Rule ("TSR"), consumers paid the attorneys that contract with Morgan Drexen an up-front engagement fee and a monthly fee for debt settlement services. However, in 2009, Morgan Drexen became aware of proposed amendments to the TSR that would ban advance fees for debt settlement services.  Morgan Drexen considered the proposed amendments to be a threat to its business.  As the October 27, 2010 effective date approached, Morgan Drexen began contracting with attorneys to not only offer debt settlement services to customers, but also offer bankruptcy services.  Customers are

---

[1]  Unless otherwise noted, all facts in this section were undisputed by Defendants in their Statement of Genuine Issues of Fact.  (Doc. 188-1.)

required to sign separate contracts for the debt settlement services and bankruptcy services. Under the debt settlement contract, the consumer pays no up-front fees.  Under the bankruptcy services contract, the consumer must pay an up-front engagement fee and a monthly maintenance fee.

On August 20, 2013, the Bureau filed suit against Defendants.  The Complaint asserts six claims, four for violations of both the TSR, 16 C.F.R. § 310, and the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a)(1), and two solely for violations of the CFPA.  The Bureau alleges, among other things, that Defendants violated the TSR and the CFPA by (1) requesting or receiving up-front fees for debt relief services, and (2) representing to consumers that they will not be charged advance fees for debt relief services, but in fact charging such fees.  In short, the Bureau claims that Defendants bundled unnecessary bankruptcy services into the package to disguise the fact that they continued to charge an upfront fee for what were essentially debt relief services.

### A.    The Parties' Motions for Summary Judgment

On October 7, 2014, Defendants filed a motion for partial summary judgment, and on October 8, 2014, the Bureau filed a motion for summary judgment.  On November 25, 2014, the Court issued an Order regarding the parties' motions for summary judgment, relying on the following evidence concerning Defendants' debt settlement and bankruptcy services:

> Between October 27, 2010 and August 31, 2014, 95% of Morgan Drexen's customers signed up for both debt settlement and bankruptcy services.  ([Defs' SGI] ¶ 124.)  Approximately 93% of those enrolled in both services were charged an up-front fee.  (Id. ¶ 128.)  However, of those enrolled in both services during that time period, somewhere between 0.897% and 5.1% filed a

Chapter 7 bankruptcy petition.  (Hanson Decl., Pltf's SJ Ex. 138 ¶ 35, Doc. 176; Walker Decl., Defs' Opp'n Ex. 11 ¶ 125, Doc. 188-8; Defs' SGI ¶ 294.)[2]  Only 0.7% of those customers enrolling in any program offered by Morgan Drexen between October 27, 2010 and August 31, 2014, signed up for debt settlement services only (Defs' SGI ¶ 133), while 4.3% of those customers enrolling in any program offered by Morgan Drexen between October 27, 2010 and August 31, 2014, signed up for bankruptcy services only.  (Defs' SGI ¶ 138.)

For those customers signing up for both debt settlement and bankruptcy services, a Chapter 7 bankruptcy petition is prepared using information received from the customer, whether or not the customer decides to file for bankruptcy. (Id. ¶¶ 203, 209, 212.)  Morgan Drexen and the contracting attorneys believe that preparing Chapter 7 bankruptcy petitions for all clients serves a strategic advantage when conducting debt settlement negotiations with creditors and can result in better agreements due to the threat of bankruptcy.  (Id. ¶¶ 299, 302.) The [Bureau], on the other hand, alleges that there is only anecdotal evidence that the threat of bankruptcy results in greater debt reduction and better settlements, and contends that Morgan Drexen is providing bankruptcy services and preparing petitions simply to charge up-front fees from customers for debt settlement services.  (Id. ¶¶ 300-314, 317, 327.)

(Order at 4-5, Doc. 198) (footnote in original).  In its motion for summary judgment, the Bureau asserted that Defendants have unlawfully charged nearly 60,000 customers improper "up-front" fees totaling $90.7 million, because little if any bankruptcy services are actually performed for the customers.  In response, Defendants asserted that a Chapter

---

[2] The parties dispute the actual percentage of customers who filed for bankruptcy during this time.

1   7 bankruptcy petition is prepared using information received from the customer, whether

2   or not the customer decides to file for bankruptcy, because the preparation of the petition

3   serves as leverage in debt settlement negotiations, prevents litigation, and helps customers

4   obtain better settlement offers from creditors.  Defendants further argued that the reason so

5   few customers ultimately file for bankruptcy is that "many consumers are unwilling to pull

6   the bankruptcy trigger," "some consumers drop out of the bankruptcy process when they

7   feel they can resolve their own debts," and it is "the failure to pay fees in full that prevents

8   many bankruptcy petitions from being filed."  (Defs' Opp'n at 15-16.)

9        Relying on the evidence submitted and assertions made by Defendants, the Court

10  denied both motions for summary judgment.  The Court found that the existence and use of

11  bankruptcy petitions were highly relevant to the central issue of whether Defendants'

12  business model charges up-front fees for debt settlement or bankruptcy services.  The

13  Court accepted at face value Defendants' representation that bankruptcy petitions were

14  prepared for all customers at the outset of their engagement with Defendants, whether or

15  not the customer ultimately decided to file for bankruptcy.  The Court stated that

16  "Defendants have offered some evidence suggesting that the threat of bankruptcy and

17  preparation of certain documents in connection with bankruptcy can serve a strategic

18  purpose in debt settlement negotiations.  While debt settlement and bankruptcy services

19  seem to be closely related under Morgan Drexen's business model, this does not

20  necessarily mean that the upfront fees are not specific to the bankruptcy petitions Morgan

21  Drexen and the attorneys help prepare for consumers."  (Summary Judgment Order at 12-

22  13, Doc. 198.)  As a result, the Court found that Defendants had created a genuine dispute

23  as to the legality of Morgan Drexen's business model.

24

25        **B.**     <u>**The Bureau's Motion for Sanctions**</u>

26        On February 25, 2014, the Bureau served Morgan Drexen with a request for

27  production of documents, including a request for all documents related to a random

28  sampling of 450 consumers who were enrolled in a Morgan Drexen program between 2010

1   and 2014.  (O'Malley Decl. ¶ 4, Doc. 274-3.)   For months, Morgan Drexen failed to

2   produce the requested documents and failed to comply with Court orders regarding

3   discovery.  (O'Malley Decl. ¶¶ 3-29.)  According to Linh Tran, associate general counsel

4   for Morgan Drexen, Defendants were ready to start producing consumer files to the Bureau

5   in May or early June 2014.  (Transcript of February 10, 2015 hearing at 95, Docs. 278,

6   280.)  However, Jeffrey Katz, Morgan Drexen's general counsel, asked Tran to delay the

7   production because supposedly there was additional information that Katz believed should

8   be included in the files.  (Id. at 95-97.)

9        On June 13, 2014, the Magistrate Judge issued an order that required Defendants to

10  produce all consumer files by June 20, 2014.  (Doc. 84.)  On June 18, 2014, Defendants

11  requested an extension of time, providing four specific reasons for why they could not

12  meet the deadline.  (Ex Parte App., Doc. 85.)  On August 4, 2014, the Magistrate Judge

13  ordered Morgan Drexen to complete production of the requested documents (Order at 1-2,

14  Doc. 115), and the Court stated that it "intends to impose monetary sanctions (which

15  Defendants conceded are appropriate) but will withhold doing so until document

16  production is complete."  (Id. at 3.)  Defendants eventually produced the requested

17  documents for the random sample of consumers.  The documents that Morgan Drexen

18  produced included bankruptcy petitions for the consumers in the sample.

19       On January 23, 2015, the Bureau filed the present Motion for Sanctions.  The

20  Bureau asserts "[i]n the weeks leading up to their document production to the Bureau,

21  Defendants manufactured bankruptcy petitions that did not previously exist."  (Reply at 1.)

22  Specifically, the Bureau claims that Defendants manipulated, altered, and destroyed

23  evidence by:

24

25       (1) creating bankruptcy petitions that did not exist at the time of the Bureau's

26       document request and adding them to consumer files before producing files to

27       the Bureau; (2) altering bankruptcy petitions in consumer files that did exist at

28       the time of the Bureau's document request by inputting information into the

petitions to make it look like Morgan Drexen had performed more work on the petitions than it actually had prior to the Bureau's document request; and (3) altering log notes in consumer files to hide the fact that it had created and altered petitions prior to producing the files to the Bureau.

(Mem. at 1, Doc. 274-1.)  The Bureau contends that Defendants' alleged actions constitute fraud on the Court and "were premeditated and performed with a bad faith intent to pervert justice."  (Mem. at 2.)

### 1. <u>The Bureau's Contentions and Evidence</u>

In support of its Motion, the Bureau submitted declarations and provided testimony regarding Defendants' alleged manipulation, alteration, and destruction of evidence during the discovery process.

First, the Bureau submitted a declaration from Joseph Calvarese, an e-law litigation support specialist at the Bureau who reviewed the metadata[3] of the bankruptcy petitions Morgan Drexen produced as part of their production of consumer files to the Bureau. (Calvarese Decl. ¶¶ 1-12, Doc. 274-5.)   According to Calvarese, "[t]he metadata indicates that Morgan Drexen created huge numbers of bankruptcy petitions *after* the Bureau commenced its lawsuit and *after* Morgan Drexen received the Bureau's document request."  (Id. ¶ 13 (emphasis in original).)  Calvarese asserts that 145 of the 222 bankruptcy petitions that he found in the 150 consumer files he reviewed were created by Morgan Drexen between June 27, 2014, and July 3, 2014.  (Id. ¶¶ 8, 17; see Calvarese Decl.)  126 of these 145 petitions were for consumers who were not enrolled in a Morgan Drexen program during that 2014 time period.  (Calvarese Decl. ¶ 22; see, e.g., Calvarese

---

[3]  Metadata provides information about an electronic document's content.  "A text document's metadata may contain information about how long the document is, who the author is, when the document was created, and a short summary of the document."  (Calvarese Decl. ¶ 4.)

Decl., Exs. 3-6.)  Only 68 of the bankruptcy petitions Morgan Drexen produced have creation dates in 2011, 2012, or 2013.  (Mem. at 9.)

The Bureau cites numerous statements made by Morgan Drexen during this litigation suggesting that all bankruptcy petitions should have been created at the time the consumers were enrolled in Morgan Drexen programs.  (*See* Mem. at 10; O'Malley Decl., Exs. 15-17, Doc. 274-3; *see, e.g.,* O'Malley Decl., Ex. 15 at 10 ("Morgan Drexen employees do all of the work necessary to *prepare the bankruptcy petitions at the outset of the engagement by the clients*, so that the petitions can be sent to creditors giving the attorney a credible threat of filing bankruptcy to prevent further litigation efforts by creditors.") (emphasis added).)  According to the Bureau, "[f]rom the outset of this litigation, Defendants have highlighted the creation of petitions as the key fact they believe removes them from coverage under the" TSR.  (Reply at 3.)

Second, the Bureau submitted the declaration of Rita Augusta, a former member of Morgan Drexen's Board of Directors and the Chief Operating Officer of Morgan Drexen from in or around 2010 to November 2014.  (Augusta Decl. ¶¶ 4, 6, Doc. 274-4; Opp'n at 10 n. 4-5.)  In November 2014, Augusta was placed on administrative leave without pay by Ledda purportedly because she expressed her concerns about Morgan Drexen and certain actions the company had taken in response to the Bureau's lawsuit.[4]  (Augusta Decl. ¶ 9; Augusta Decl., Ex. 1, Doc. 274-4.)

---

[4] Defendants assert that "much of what Augusta told the Bureau is false."  (Opp'n at 11 (emphasis omitted).)  According to Defendants, "since September 25, 2014, Augusta had been angling for a payoff from Morgan Drexen to buy out her equity and even hired a lawyer threatening a lawsuit against Morgan Drexen."  (Id.)  Augusta allegedly "told other employees she intended to bring Morgan Drexen down, and, in December 2014 when Morgan Drexen refused to pay her off as she demanded, she apparently called the Bureau to take revenge against Morgan Drexen and particularly[] Katz."  (Id.)  In essence, Defendants assert that Augusta is lying.  "In order to make determinations about the party's conduct, a court may 'make inferences and credibility determinations from evidence received.'"  *The Sunrider Corp. v. Bountiful Biotech Corp.* No. SACV 08-1339, 2010 WL 4589156, at *5 (C.D. Cal. Nov. 3, 2010) (quoting *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 592 (9th Cir. 1983).)  Though Defendants have attempted to refute the majority of Augusta's declarations and testimony, the Court finds that, in light of the other evidence submitted to the Court, Augusta has provided the Court with credible evidence.

Augusta asserts that Katz asked her to help with document production related to this case in mid-June 2014.  (Augusta Decl. ¶ 13.)  According to Augusta, Katz and another Morgan Drexen employee, Nancy Jin, instructed Augusta to "(1) create bankruptcy petitions for the consumer if there was no petition in the consumer's file; and (2) add whatever information was available about consumers to any bankruptcy petitions that were already in the files to make the petitions appear more complete."  (Id. ¶¶ 13, 15.)  Augusta asserts that Katz told her that "Morgan Drexen needed petitions to appear as complete as possible in order to make it seem like Morgan Drexen was actually performing bankruptcy-related work for consumers enrolled in the dual program."  (Id. ¶ 13.)  Augusta further contends that "Ledda was aware of the project to create and alter bankruptcy petitions."  (Id. ¶ 23; *see also* Transcript of February 10, 2015 hearing at 54-55.)

Under Jin's supervision, Augusta assigned Morgan Drexen employees/processors to complete this requested work.  (Augusta Decl. ¶¶ 16-17.)  According to Augusta, Jin provided the processors with specific instructions on how to create and update the bankruptcy petitions.  (Id. ¶¶ 18, 24.)  The processors allegedly were told to backdate the bankruptcy petitions to make the documents look like they had been created at an earlier time.  (Id. ¶ 24.)  Augusta later clarified that her use of the term "backdate" does not refer to the actual dating of bankruptcy petitions, but rather refers to Defendants' use of old versions of petitions to make it seem that they were created earlier than they actually were created.  (Transcript of February 10, 2015 hearing at 56.)  Further, Augusta asserts that all of the processors were directed to complete their work under a new, unique username, which allowed Morgan Drexen to alter "the document retention system in such a way that the log notes in a consumer's file did not reflect that a processor using his or her unique username had created a petition or altered information in a petition already in the file."  (Augusta Decl. ¶ 26.)  Augusta claims that Katz directed Avi Gupta, the Chief Information Officer of Morgan Drexen, to delete entries in the log notes related to the creation or alteration of these bankruptcy petitions.  (Id. ¶ 27.)

In support of her declaration, Augusta attached spreadsheets that she used to track

the processors' work.  (Suppl. Augusta Decl., Exs. 1-3, Doc. 262-3.)  These spreadsheets show that, as part of the document production, Defendants performed means tests for certain customers and then included that information in the bankruptcy petitions produced to the Bureau.  (Id.)  A means test is used by Morgan Drexen "to determine whether or not the client fit[s] the criteria or guidelines to file for bankruptcy."  (Transcript of February 10, 2015 hearing at 30-31.)

On February 10, 2015, the Court held an evidentiary hearing regarding the Bureau's Motion for Sanctions, and Augusta testified regarding the alleged events that occurred during Defendants' document production to the Bureau.  (*See* Transcript of February 10, 2015 hearing.)  At the hearing, Augusta asserted that Katz directed her "to go through the files and if there was no petition there, . . . create a petition; and if there were petitions, . . . go through the file with the log notes[ and] any documents that were not processed already and add any information that they could extract from that into the petition."  (Id. at 13-14.)  According to Augusta, Katz stated that he needed it "to appear like Morgan Drexen was doing the work that . . . we stated that we were; that there needed to be work product to justify the fees that were charged."  (Id. at 14.)  Augusta testified she was told by Jin that "it was important for us to [begin with] the cancelled ones that had paid the highest fees, because those ones needed to have the most complete bankruptcy petition done."  (Id. at 16.)  Not only were the processors working on the petitions directed to include information from a variety of written sources, but the processors also were directed to contact active clients to see if they could get more information that could be included in the bankruptcy petitions.  (Id. at 20.)

The Bureau also questioned Augusta regarding an e-mail chain between Augusta, Jin, and the two processors that Augusta had assigned to work on the document production project at Morgan Drexen.  (Id. at 26-41; Augusta Decl., Ex. 2, Doc. 274-4.)  The e-mail chain includes a chart that details the work that was performed on various consumer files after the Bureau's document production request.  (Augusta Decl., Ex. 2.)  The chart shows that considerable work, including the running of means tests with income information that

was provided by the customer at the outset of the engagement, was performed on customer

files after the Bureau's document production request.  (Id.)  Further, the e-mail chain

includes a response from Jin that directs the processors to select bankruptcy forms that

were in existence at the time of the "last cleared positive ACH," which reflects the last

time the customer made a payment.  (Id.)  The e-mail chain also includes a response from

Jin where she states, in regards to a specific customer's file, that the "means test has the

incorrect applicable period."  (Id.)  Additionally, on June 18, 2014, one of the processors

assigned to the project e-mailed Jin to inform her that means tests were being run for

certain customer files.  (Augusta Decl., Ex. 6, Doc. 274-4.)   Based on this e-mail chain,

Jin not only was aware of the means tests being run by the processors, but actually "went

through some of those files to determine if everything was the way that she had instructed

. . . [and] stated areas that needed to be reviewed by" the processors.  (Transcript of

February 10, 2015 hearing at 41.)

        Based on this evidence, the Bureau requests that the Court sanction Defendants by

entering a default judgment against them.  (Mem. at 2.)

## 2.   Defendants' Contentions and Evidence

        In response to the Bureau's claim that Defendants falsified evidence, Defendants

describe Morgan Drexen as a "virtual office" and claim that all bankruptcy petitions are

kept in their MDIS computer platform and Automated Bankruptcy Module ("ABM").

(Opp'n at 1; *see* Tran Decl. ¶¶ 12-15, Doc. 261-1; Gupta Decl. ¶¶ 3-5, Doc. 261-1.)

Defendants describe MDIS as a relational database that stores almost all of the information

relating to Morgan Drexen's attorney clients.  (Opp'n at 6.)  Despite the fact that they have

made statements throughout this litigation to the contrary, Defendants now claim that

bankruptcy petitions normally are not created unless an attorney requests that Morgan

Drexen generate one; until that time all of the information "remains housed in the

MDIS/ABM system."  (Opp'n at 21.)  Defendants further contend that, in response to the

Bureau's document production requests and "[t]o expedite production of documents, while

11

at the same time redacting consumer names, [Defendants] generated bankruptcy petitions . . . so the petitions could be redacted and all information related to a particular consumer could [be] assembled in one place in a readable form." (Id. at 7.) According to Defendants, "the only way to extract all the information the Bureau requested from MDIS and ABM is to download the information into a bankruptcy petition." (Id. at 2.) Defendants therefore contend that terminating sanctions are not appropriate because they did not act with the intent to falsify or manufacture evidence. (*See generally* id.)

Defendants submitted declarations and provided testimony from Morgan Drexen employees and other individuals involved with the document production that is currently at issue.

First, Defendants submitted a declaration from Katz. (Katz Decl., Doc. 26-1, Ex. B.) Katz details the directions he purportedly provided Jin and Augusta regarding the Bureau's document production requests. (Id. ¶¶ 58-59.) According to Katz, it was Augusta, not Jin or Katz, who attempted to backdate bankruptcy petitions. (Id. ¶ 59.) Katz asserts that he in fact told Jin not to backdate the petitions. (Id.) Katz maintains that "Morgan Drexen did not alter any information in the customer files and the computer data produced to the Bureau was produced intact and it is still on the database." (Id. ¶ 61 (emphasis omitted).) However, Katz admits that he directed Jin and Augusta to "input additional data from all sources available (i.e., Best Case MDIS, unprocessed documents, oral conversations with clients of the law firm, and etc.)" for the consumer files that were produced to the Bureau. (Id. ¶ 58.)

Katz also testified at the Court's evidentiary hearing in this matter. (*See* Transcript of February 10, 2015 hearing at 157-211.) Katz testified that he and Tran were responsible for keeping the Bureau apprised of the document production process. (Id. at 162.) Katz explained that when the process took longer than expected, the Bureau began to forcefully demand the requested information and immediate production of the consumer files. (Id. at 162-165.) According to Katz, the Bureau's demands concerned him and he recognized that he would need to speed up the production process. (Id. at 165-167.) After the

Magistrate Judge granted the Bureau's motion to compel, Katz became "very alarmed about [Defendants'] ability to" meet the 7-day deadline, and recognized that if they failed to meet that deadline, Defendants could be subject to "potential significant sanctions." (Id. at 166-167.) Katz even considered "the possibility there would be terminating sanctions." (Id. at 170.)

Katz claims that because he has been practicing law for more than 20 years, he "would [not have] manufactured evidence to defraud. [His] concern was [to] get the information in a comprehensive fashion as quickly as possible and not risk sanctions." (Id. at 188.) Yet, despite Katz's vast litigation experience, he never informed the Bureau, Defendants' trial counsel, or the Court that Defendants were generating bankruptcy petitions. (Id. at 177-178.) Even though certain documents and log notes were ready to be produced to the Bureau in June 2014, and Defendants were facing potential sanctions if they failed to comply with the Court's production deadlines, Katz asked Tran not to produce these documents and log notes to the Bureau. (Id. at 195-202.) Katz claims that he did not inform anyone of the creation of bankruptcy petitions because Defendants were "understaffed and overwhelmed by the demands." (Id. at 178.)

Second, Defendants submitted declarations from Tran and Gupta. (Tran Decl., Doc. 261-1; Gupta Decl., Doc. 261-1.) Tran refutes Augusta's assertion that any log entries were "suppressed" and/or "deleted." (Tran Decl. ¶ 40.) Gupta also claims that "[a]t no time during the course of Morgan Drexen's responding to the Bureau's document request did . . . Katz[] ever request that [Gupta] suppress or delete log notes in a law firm client's file." (Gupta Decl. ¶ 6.) Gupta asserts that, after conducting a search of the data on MDIS, he has determined "that there have been no log notes suppressed or deleted." (Gupta Decl. ¶ 7; Transcript of February 10, 2015 hearing at 151-152.) According to Gupta, it was Augusta, without Gupta's knowledge, who "created alias petition processor users termed 'Special Project' for two users" and intended to suppress log notes. (Gupta Decl. ¶¶ 9-10; Transcript of February 10, 2015 hearing at 151; Gupta Decl., Ex. 1, Doc. 261-1; *see also* Bush Decl. ¶¶ 10-14, Doc. 261-1; Knox Decl. ¶¶ 8-9, Doc 261-1.)

13

Third, Defendants submitted declarations from Jin and Armidi Addessi, a certified bankruptcy petition preparer who has been employed by Morgan Drexen since December 2011.  (Jin Decl., Doc. 261-1; Addessi Decl., Doc. 261-1.)  Jin contends that she never acted outside of the scope of the instructions she received from Katz and Augusta regarding the document production requests and redaction project.  (Jin Decl. ¶ 10.)  According to Jin, it was Augusta who instructed her to backdate the bankruptcy petitions by using the "'last cleared positive ACH' . . . as the time frame in transferring the data in the Client's file from all available sources."  (Id. ¶ 13.)  Jin supports Katz's assertion that he told her that "under no circumstances should the [bankruptcy petitions] be dated with the 'last cleared positive ACH' date" and that instead the bankruptcy petitions should not be dated at all."  (Id. ¶ 14.)  Further, Addessi maintains that Jin never directed her to create bankruptcy petitions so that they could "look as good as we can" in relation to this case, that no one ever told him to alter log notes, and that Jin never directed him to pick a bankruptcy petition format that was different than the one originally used for the file.  (Addessi Decl. ¶¶ 8-11.)  However, Jin admits that processors working on the document production for the Bureau were directed "to cull the information from a variety of locations," including "the MDIS platform, documents, log entries evidencing information provided by the consumers via telephone, MDCS which contained notes of Orientation Appointments, and handwritten notes."  (Jin Decl. ¶ 12.)  Addessi also admits that he was permitted to contact consumers to secure additional information to include in the documents that would be produced to the Bureau.  (Addessi Decl. ¶ 6.)

Fourth, Defendants submitted a declaration from Ledda.  (Ledda Decl., Doc. 261-1.)  Ledda claims that he played a very limited role in Defendants' production of documents to the Bureau.  (Ledda Decl. ¶ 3.)  Yet, at the evidentiary hearing, Ledda confirmed that he knew that Morgan Drexen was creating bankruptcy petitions not in the ordinary course of business in order to produce them to the Bureau.  (February 10, 2015 hearing at 109.)  He does not refute that he had discussions with Augusta regarding the redaction and production process, but he claims that Augusta has distorted their

conversations in a disingenuous way.  (Ledda Decl. ¶ 8.)  Ledda also admits that Defendants generated bankruptcy petitions and produced them to the Bureau with information that had not yet been input into Defendants' systems.  (*See* Id. ¶ 4 ("The data was scattered and housed in different systems and different formats: (1) MDIS, (2) ABM Bankruptcy software, (3) Old versions of Best Case Bankruptcy software, (4) Orientation Appointment logs, (5) Unprocessed Bulk Mail, (4) [sic] Partial Orientation recordings, (5) [sic] other misc. sources.").)  However, Ledda maintains that his only role in the document production process was assisting "with the technology issues related to the desired use of an auto redaction process and the compensation for petition processors that would be performing work for the legal team that would be outside of the normal course of business."  (February 10, 2015 hearing at 111; id. at 112.)  Ledda "expected that [the Bureau] would have been notified of these petitions as they were created outside the normal course of business," but claims that he never discussed with Katz whether the Bureau had been informed of the creation of the bankruptcy petitions.  (Id. at 115-116.)

Based on this evidence, Defendants request that the Court deny Plaintiff's Motion for Sanctions.  (Opp'n.)

## III.   LEGAL STANDARD

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence: [1] the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and [2] the availability of sanctions under [Federal Rule of Civil Procedure] 37 against a party who 'fails to obey an order to provide or permit discovery.'"  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting Fed. R. Civ. P. 37(b)(2)(A)).  "A court may sanction spoliation by: imposing monetary sanctions; instructing the jury to draw an adverse inference against the despoiling party; excluding testimony based on despoiled evidence proffered by the despoiling party; or, if willfulness is found, entering default judgment against the despoiling party."  *Columbia Pictures, Inc. v. Bunnell*, No. 2:06CV01093 FMC-JCX, 2007 WL 4877701, at *4 (C.D. Cal. Dec. 13,

2007).

First, a district court "'can sanction a party who has despoiled evidence' under its 'inherent power . . . to levy sanctions in response to abusive litigation practices.'" *Pringle v. Adams*, No. SACV 10-1656-JST RZX, 2012 WL 1103939, at *7 (C.D. Cal. Mar. 30, 2012) (quoting Leon, 464 F.3d at 958). Entry of a default judgment is permitted when the disobedient party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus.*, Inc., 709 F.2d 585, 589 (9th Cir. 1983). A terminating sanction, however, may only issue if the violation or abuse is willful, in bad faith, or the fault of the party. *Id.* "[W]illfulness, bad faith, or fault does not require wrongful intent; rather, disobedient conduct not shown to be outside the party's control is by itself sufficient to establish willfulness, bad faith, or fault." *Sanchez v. Rodriguez*, 298 F.R.D. 460, 463 (C.D. Cal. Mar. 18, 2014).

Second, Federal Rule of Civil Procedure 37 authorizes district courts to issue a "wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle*, 709 F.2d at 589; Fed. R. Civ. P. 37. A district court may render a default judgment against a party that "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A).

## IV.   DISCUSSION

### A.   Gerald Klein's Lack of Knowledge

As an initial matter, the Court notes that during the Final Pretrial Conference hearing on February 4, 2015, Defendants' lead trial counsel, Gerald Klein, asserted that he had no knowledge of Defendants' creation of bankruptcy petitions prior to the filing of the Bureau's Motion for Sanctions. (Transcript of February 4, 2015 hearing at 9-11, Doc. 271.) Based on the evidence submitted to the Court and Klein's statements under penalty of perjury, the Court is convinced that Klein did not have any knowledge of Defendants' falsification of evidence. (*See also* Transcript of February 4, 2015 hearing at 16, where the Bureau's counsel states that "Klein has represented to the Court that he was unaware of this

situation, and we take him at his word.").)

Accordingly, the Court finds that Klein should not be held accountable for the actions of his clients.

### B.   Morgan Drexen's Willfulness, Bad Faith, and Fault

It is well settled that the entry of default judgment is warranted when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995); *see also Phoeceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982) ("It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders."). It is now clear to the Court that Defendants do not create bankruptcy petitions in the normal course of business. The evidence shows that Defendants not only acted willfully and in bad faith by falsifying evidence, but also decided to continuously deceive their own trial counsel, opposing counsel, and the Court by engaging in practices that have undermined the integrity of judicial proceedings.

In its order denying summary judgment, the Court relied on Defendants' assertions that Chapter 7 bankruptcy petitions were prepared for all clients at the outset of their engagement with Morgan Drexen, whether or not the customer ultimately decides to file for bankruptcy. (Order at 4-5; Defs' SGI ¶¶ 203, 209, 212; Defs' Opp'n at 7-8, 18; Klein Decl., Doc. 188-23; Rugeti Decl., Doc. 188-22.) The Court explicitly relied on the fact that Defendants "offered some evidence suggesting that the threat of bankruptcy and *preparation* of certain documents in connection with bankruptcy can serve a strategic purpose in debt settlement negotiations," and found that a genuine dispute of material fact existed as to whether the upfront fees charged by Defendants were "specific to the bankruptcy petitions Morgan Drexen and the attorneys help *prepare* for consumers." (Order at 12-13 (emphasis added).) However, now, only after Defendants' prior statements have been shown to be false, Defendants claim that bankruptcy petitions

normally are not created unless an attorney requests that Morgan Drexen generate one; until that time all of the information "remains housed in the MDIS/ABM system." (Opp'n at 21.) The fact that Defendants now claim for the first time that bankruptcy petitions are not actually prepared for clients at the outset of their engagement with Defendants strongly suggests that Defendants have deceived the Court in a way that not only undermined the Court's previous order denying summary judgment, but also now threatens the integrity of trial.

Though the Court finds Augusta's declarations and testimony credible, even if the Court were to ignore her allegations, the evidence overwhelmingly reflects that Defendants acted willfully and in bad faith by falsifying evidence during the discovery process.

First, Defendants admit that they were ready to start producing consumer files to the Bureau in May or early June 2014. (Transcript of February 10, 2015 hearing at 95, Docs. 278, 280.) However, Katz asked Tran to delay the production because there was additional information that Katz wanted to include in the files. (Id. at 95-97.) Katz testified that, even though certain documents and log notes were ready to be produced to the Bureau in June 2014, and Defendants were facing potential sanctions if they failed to comply with the Court's production deadlines, Katz asked Tran not to produce these documents and log notes to the Bureau. (Id. at 195-202.) Defendants have failed to explain why, even though a large portion of the requested discovery could have been produced to the Bureau, Defendants chose to risk litigation sanctions by delaying production. Absent any explanation by Defendants, the logical explanation is that Morgan Drexen delayed production in order to create hundreds of new bankruptcy petitions to produce to the Bureau because they knew the absence of such petitions would raise serious red flags. (*See generally* Calvarese Decl.)

Second, Defendants' decision to produce the requested discovery in the form of bankruptcy petitions strongly suggests an intent to deceive the Court and opposing counsel. Defendants contend that "not only is the bankruptcy petition the simplest and most efficient method to extract data from ABM, but it is the only method to extract data

from ABM." (Tran Decl. ¶ 25 (emphasis omitted).) However, at the evidentiary hearing, Defendants admitted that the requested customer information could have been produced as raw data, and log notes could have been produced in a form other than bankruptcy petitions (e.g. as a .csv file). (Transcript of February 10, 2015 hearing at 153-154.) Further, Defendants specifically chose to use old versions of bankruptcy petitions that coincided with the last payment that the customer had made to Morgan Drexen, rather than current versions of the bankruptcy petitions. (Id. at 56; Jin Decl. ¶ 13.) Defendants have not provided a convincing reason for why they would decide to use old versions of bankruptcy petitions if the only goal was to produce the requested information to the Bureau in a single and convenient format. Once again, Defendants' actions strongly suggest that they were engaging in behavior intended to mislead the Court and the Bureau by attempting to pass off bankruptcy petitions as if they had been created in the normal course of business.

Third, Defendants admit that the processors assigned to work on the document production project for the Bureau were directed "to cull the information from a variety of locations," including "the MDIS platform, documents, log entries evidencing information provided by the consumers via telephone, MDCS which contained notes of Orientation Appointments, and handwritten notes." (Jin Decl. ¶ 12.) Jin and Augusta were directed to "input additional data from all sources available (i.e., Best Case MDIS, unprocessed documents, oral conversations with clients of the law firm, and etc." for the consumer files that were produced to the Bureau. (Katz Decl. ¶ 58; *see also* Ledda Decl. ¶ 4.) Processors working on the petitions also were directed to contact active clients to see if they could get more information that could be included in the bankruptcy petitions. (Addessi Decl. ¶ 6.) Defendants thus gathered information from a variety of sources and input data into bankruptcy petitions that did not exist prior to the Bureau's document production request. The only logical conclusion is that Defendants were attempting to make it seem that more substantive bankruptcy work had been performed on customer files to support Defendants' charging of upfront fees.

Fourth, Defendants ran means tests for certain customers and included that information in the bankruptcy petitions produced to the Bureau.  (Suppl. Augusta Decl., Exs. 1-3.)  Defendants have failed to provide an explanation for why means tests needed to be run on consumer files after the Bureau's document production request.  Once again, the only logical conclusion is that Defendants were attempting to make it seem that more substantive and complete bankruptcy work had been performed on certain consumer files before producing the files to the Bureau.  And while Defendants claim that Augusta was the person who directed the processors to perform these means tests, the evidence submitted to the Court proves that Defendants not only knew that means tests were being performed, but that Jin actually "went through some of those files to determine if everything was the way that she had instructed . . . [and] stated areas that needed to be reviewed by" the processors.  (Transcript of February 10, 2015 hearing at 41.)  Even if it were true that Jin conducted only one means test on a customer file herself (*see* id. at 121), the e-mails between Augusta, Jin, and the processors reveal that Defendants were aware and actively involved in the running of means tests.

Fifth, and maybe most damning to Defendants' case, Defendants had numerous opportunities to inform the Court, opposing counsel, or its own trial counsel of the creation of new bankruptcy petitions.  However, they continually failed to do so.

On June 13, 2014, the Magistrate Judge issued an order that required Defendants to produce all consumer files by June 20, 2014.  (Doc. 84.)  On June 18, 2014, Defendants requested an extension of the deadline, providing four specific reasons for why they could not meet the deadline (Ex Parte App., Doc. 85.)  Yet, Defendants never informed the Court that at least part of the reason for the delay was the fact that Defendants were creating bankruptcy petitions to produce to the Bureau.

Further, in opposition to the Bureau's subsequent motion for litigation sanctions, Defendants submitted a declaration from Tran which provided several reasons why Defendants were unable to meet their productions deadlines.  (Opp'n, Doc. 100; Tran Decl., Dec. 100-3; *see also* Transcript of February 10, 2015 hearing at 100-102.)  Though

20

1   Tran delineated five specific reasons why Defendants could not comply with the Court's

2   production deadlines, Defendants once again failed to inform the Court that Defendants

3   were creating hundreds of new bankruptcy petitions to produce to the Bureau.  (*See*

4   Calvarese Decl. ¶¶ 8, 17; Calvarese Decl., Ex. 1, Doc. 274-5 (showing that of the 222

5   bankruptcy petitions that Calvarese found in the 150 consumer files he reviewed, 145 were

6   created by Morgan Drexen between June 27, 2014, and July 3, 2014, and 126 of these 145

7   petitions were for consumers who were not enrolled in a Morgan Drexen program during

8   that 2014 time period).)

9       Additionally, Katz testified that, after the Magistrate Judge granted the Bureau's

10  motion to compel, he became "very alarmed about [Defendants'] ability to" meet the 7-day

11  deadline, and recognized that if they failed to meet that deadline Defendants could be

12  subject to "potential significant sanctions."  (Transcript of February 10, 2015 hearing at

13  166-167.)  He even considered "the possibility there would be terminating sanctions."  (Id.

14  at 170.)  Nevertheless, once again, Katz chose not to inform the Bureau, Defendants' trial

15  counsel, or the Court that part of the reason for the delay was that Defendants were

16  generating bankruptcy petitions.  (Id. 177-178.)  Defendants chose to risk sanctions, and

17  potentially terminating sanctions, rather than inform the Court that new bankruptcy

18  petitions were being created for production.

19      During the discovery process, Defendants also deposed one of the Bureau's experts,

20  Katherine Porter, who provided testimony related to the bankruptcy petitions produced by

21  Defendants in response to the Bureau's request.  Even though Katz was present at this

22  deposition, and Porter's testimony opined specifically on many of the newly created

23  bankruptcy petitions, Katz never informed the Bureau or Defendants' trial counsel that the

24  petitions were not created in the ordinary course of business.  (Id. at 208-209.)

25      Finally, even after the Court issued its order denying summary judgment, in which

26  the Court clearly relied on Defendants' misleading assertions regarding the preparation and

27  creation of bankruptcy petitions that purportedly occurred in the ordinary course of

28  business, Katz never informed the Court, the Bureau, or Defendant's trial counsel that new

bankruptcy petitions had been created and then produced to the Bureau.  (Id. at 210-211.)

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed."  *Leon*, 464 F.3d at 959 (internal quotation marks and citation omitted).  Further, "[t]he duty to preserve documents attaches when a party should have known that the evidence may be relevant to future litigation."  *Pringle*, 2012 WL 1103939, at *7 (quoting *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006)).  Not only may bad faith destruction of evidence result in the issuance of terminating sanctions, but the manufacturing or alteration of evidence may warrant the issuance of a default judgment as well.  *See PersonalWeb Technologies, LLC v. Google Inc.*, No. C13-01317-EJD (HRL), 2014 WL 580290, at *2 (N.D. Cal. Feb. 13, 2014).  After holding an evidentiary hearing and reviewing the evidence submitted against Defendants, the Court now is convinced that Defendants willfully and in bad faith engaged in a coordinated and extensive effort to deceive the Court and opposing counsel.  Defendants blatantly falsified evidence and then concealed this fact from the Court, opposing counsel, and even their own counsel at every turn.  Accordingly, the Court finds that Defendants' conduct was "utterly inconsistent with the orderly administration of justice."  *Wyle*, 709 F.2d at 589.

### C. <u>Factors Relevant to the Imposition of a Terminating Sanction</u>

Nevertheless, under either Rule 37 or the district court's inherent power, "[b]efore imposing the harsh sanction of dismissal [or default judgment], the district court must weigh several factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Anheuser-Busch*, 69 F.3d at 348 (citation omitted).

1     **1.    The Public's Interest in Expeditious Resolution of Litigation**

2     This factor always favors imposing sanctions. *Sunrider*, 2010 WL 4589156, at *6.

3 The granting of a default judgment is appropriate when a party's conduct causes

4 considerable delays in a case, such as when a court needs to continue trial, a plaintiff is

5 forced to file discovery motions after the discovery cut-off date, or the filing of multiple

6 sanctions motions frustrates a court's and the parties' ability to resolve the litigation. *Id.*

7 Here, because of Defendants' deceitful conduct during the discovery process and

8 throughout this litigation, the Court has had to delay trial and hold an evidentiary hearing.

9 Further, the Bureau has been forced to file numerous discovery motions, motions to

10 compel, and motions for sanctions.  As a result, the Court finds that Defendants' conduct

11 has caused considerable delays in this case and has threatened Plaintiff's and the Court's

12 ability to resolve the litigation.

13     Accordingly, the Court finds that this factor weighs in favor of the entry of default

14 judgment against Defendants.

15

16     **2.    The Court's Need to Manage its Docket**

17     This factor also almost always weighs in favor of granting a default judgment.

18 *Sunrider*, 2010 WL 4589156, at *6.  If a party poses unnecessary hurdles in the resolution

19 of the action, consumes more than his share of judicial time and resources, and affects a

20 court's ability to manage its other cases, entering default judgment may be warranted. *Id.*

21 Defendants' falsification of evidence and deceitful conduct throughout the discovery

22 process have created considerable hurdles to the resolution of this action.  The Magistrate

23 Judge and this Court have had to decide numerous discovery and sanctions motions, delay

24 trial, and hold an evidentiary hearing because of Defendants' wrongdoing.  As a result,

25 Defendants have consumed more than their fair share of judicial time and resources and

26 threatened the Court's ability to manage its docket.

27     Accordingly, this factor weighs in favor of terminating sanctions.

28

### 3.   <u>The Risk of Prejudice to the Party Seeking Sanctions</u>

"The prejudice inquiry looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (alterations in original) (internal quotation marks and citation omitted). "For the Court to impose the sanction of default, it must find that there is a nexus between the Defendants' misconduct and the merits of the case." *Columbia Pictures*, 2007 WL 4877701, at *6. A party suffers prejudice when it is led to rely on incomplete information or spotty evidence or when the opposing party willfully thwarts the discovery process. *Pringle*, 2012 WL 1103939, at *9; *Sunrider*, 2010 WL 4589156, at *8. "Whether or not the documents would have changed the outcome of the trial is not the issue in determining prejudice." *Anheuser-Busch*, 69 F.3d at 354. Moreover, "it is appropriate to presume that where documents relevant to the merits of the litigation have been concealed the deception casts doubt on the concealing party's case." *Id.*

Defendants contend that the Bureau has not suffered any prejudice because "no evidence was destroyed. Nothing was lost. We're going to trial on the same basic issues." (Transcript of February 4, 2015 hearing at 11.) However, not only has the Court relied on Defendants' misrepresentations and falsified evidence, but the Bureau also has suffered prejudice as a result of Defendants' wrongdoing. From the outset of this litigation, Defendants have argued that they are entitled to charge upfront fees because of the considerable bankruptcy work performed for clients. (*See, e.g.,* O'Malley Decl., Ex. 15 at 10.) As discussed above, the Court has determined that the existence and use of bankruptcy petitions is highly relevant to the central issue of whether Defendants' business model charges up-front fees for debt settlement or bankruptcy services. The number of bankruptcy petitions that Defendants prepared and created for clients relates directly to the amount of substantive bankruptcy work Defendants actually performed for its customers. As a result, the creation and number of bankruptcy petitions is at the heart of the defense in this case.

Therefore, there is no question that Defendants' falsification of evidence threatened to distort the resolution of the case by forcing the Bureau to rely on fabricated and manufactured evidence. Here, Defendants destroyed the snapshot of what the petitions would have actually looked like had they simply been produced in the ordinary course of business. The Bureau has been misled and prejudiced throughout the discovery process, when preparing its experts for depositions, in arguing for and against summary judgment, and during its preparation for trial. The Bureau asserts that it "has wasted considerable time (deposition and trial preparation) and incurred significant expense (retention of expert Katherine Porter) responding to Defendants' canard that they actually perform bankruptcy work on bankruptcy petitions and present those bankruptcy petitions to third parties." (Reply at 8.) The Court agrees, and thus finds that Defendants' falsification and alteration of evidence has prejudiced the Bureau. Even if this prejudice could be "mitigated somewhat by [the Bureau's] success in locating some relevant evidence despite Defendants' misconduct, this factor nonetheless weighs strongly in favor of terminating sanctions." *Columbia Pictures*, 2007 WL 4877701, at *7.

Accordingly, the Court finds that this factor weighs in favor of an entry of default judgment against Defendants.

### 4.     The Public Policy Favoring Disposition on the Merits

This factor almost always weighs against dismissal. *See Sunrider*, 2010 WL 4589156, at *8 ("This factor by its very title falls against the imposition of terminating sanctions"). Defendants already have undermined the integrity of the Court's summary judgment order. And the Court recognizes that the issuance of terminating sanctions prior to trial would prevent the Court from disposing of this case on the merits. However, here, the ability to reach a merits determination has already been compromised by the falsification of evidence.

Accordingly, the Court finds that this factor weighs only slightly against terminating sanctions. Thus, this factor "is insufficient to outweigh the other four factors."

1    *Pringle*, 2012 WL 1103939, at *10.

2

3         **5.**     **The Availability of Less Drastic Sanctions**

4       "The Court may dismiss the case based on spoliation of evidence where (1) less

5 drastic sanctions would be inappropriate, (2) the Court implemented alternative sanctions

6 before ordering dismissal, and (3) the Court warned the party of dismissal before ordering

7 dismissal." *Id.* (citing *Leon*, 464 F.3d at 960).

8       As to the first criterion, imposition of a lesser sanction is not appropriate if it would

9 reward a defendant for its misconduct. *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593

10 F. Supp. 1443, 1456 (C.D. Cal. 1984). Further, lesser sanctions, such as the exclusion of

11 evidence or a jury instruction creating an evidentiary presumption, are insufficient if they

12 would be futile. *Leon*, 464 F.3d at 960. Here, the Court cannot issue a jury instruction as a

13 lesser sanction because Defendants waived their right to a jury trial. (Stipulation, Doc.

14 219.) Additionally, Defendants have called into question the authenticity of any

15 bankruptcy work they claim they have performed for customers. The central issue of this

16 case is whether Defendants provide bankruptcy services that warrant charging up-front

17 fees. As a result, a lesser sanction excluding evidence would require the Court to exclude

18 all evidence of bankruptcy services performed by Defendants, a ruling that would be an

19 effective dismissal. Finally, "[i]t is appropriate to reject lesser sanctions where the court

20 anticipates continued deceptive misconduct." *Anheuser-Busch*, 69 F.3d at 352. Based on

21 the extent of Defendants' misrepresentation and falsification of evidence, the Court

22 anticipates that Defendants would continue to deceive the Court, its own trial counsel, and

23 opposing counsel if the Court allowed this case to proceed to trial. Thus, the first criterion

24 under this factor weighs in favor of entering default judgment.

25       The second and third criteria are inapplicable when "the destruction of the evidence

26 occurred before the court had any opportunity to warn" the disobedient party. *Leon*, 464

27 F.3d at 960; *Pringle*, 2012 WL 1103939, at *10. "[A]n explicit warning is not always

28 necessary." *Anheuser-Busch*, 69 F.3d at 353 (citation and quotation marks omitted).

1    Nevertheless, Defendants admitted that they were aware that terminating sanctions could

2    be issued against Defendants if they continued to violate Court orders.  (Transcript of

3    February 10, 2015 hearing at 170.)  The Magistrate Judge also explicitly stated that he

4    would be issuing monetary sanctions after document production was complete.  (Order at

5    3, Doc. 115.)  Thus, the Court finds that the second and third criteria under this factor also

6    weigh in favor of entering default judgment against Defendants.

7          Although termination of a case is a harsh sanction appropriate only in

8    "extraordinary circumstances," *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.

9    1988), the circumstances in this case warrant the entry of default judgment against

10   Defendants.  "Lesser sanctions would not be adequate to punish the [D]efendants for the

11   wrongful conduct and ameliorate the prejudice and harm to the [Bureau]."  *Columbia*

12   *Pictures*, 2007 WL 4877701, at * 8.

13         Accordingly, the Court GRANTS the Bureau's Motion for Sanctions and enters

14   default judgment against Morgan Drexen.

15

16       **D.**       <u>**Personal Liability of Walter Ledda**</u>

17         At the evidentiary hearing, Ledda confirmed that he knew that Morgan Drexen was

18   creating bankruptcy petitions not in the ordinary course of business in order to produce

19   them to the Bureau.  (February 10, 2015 hearing at 109.)  Yet, Ledda maintained that his

20   only role in the document production process was assisting "with the technology issues

21   related to the desired use of an auto redaction process and the compensation for petition

22   processors that would be performing work for the legal team that would be outside of the

23   normal course of business."  (Id. at 111; id. at 112.)  Ledda contends that he "expected that

24   [the Bureau] would have been notified of these petitions as they were created outside the

25   normal course of business," but claims that he never discussed with Katz whether the

26   Bureau had been informed of the creation of the bankruptcy petitions.  (Id. at 115-116.)

27         The Court finds that the briefing, supporting documentation, and evidence

28   submitted by the parties is insufficient for the Court to determine whether Ledda should be

held personally liable for Morgan Drexen's wrongful conduct at this time.  Accordingly, the Court orders that the parties provide supplemental briefing regarding the personal liability of Ledda and whether default judgment should be entered against him as well.

## V.   **CONCLUSION**

For the foregoing reasons, the Court GRANTS the Bureau's Motion for Sanctions as to Defendant Morgan Drexen Inc.  (Docs. 255-2, 274.)  Pursuant to this Order, all other pending motions are DENIED as moot.  (Docs. 248, 250.)

The Court ORDERS supplemental briefing regarding the personal liability of Defendant Walter Ledda and whether the Court should enter default judgment against him as well.  The Bureau shall file a supplemental brief no later than **May 1, 2015**.  Defendants may respond to the Bureau's supplemental brief no later than **May 15, 2015**.  Any reply is due no later than **May 22, 2015**.

DATED: April 21, 2015

_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE